**JANOVE PLLC**
Raphael Janove (SBN 361193)
raphael@janove.law
115 Broadway, 5th Floor
New York, NY 10006
(646) 347-3940

**LEVI & KORSINSKY, LLP**
Edward Korsinsky, *pro hac vice forthcoming*
ekorsinky@zlk.com
33 Whitehall Street, 27th Floor
New York, NY 10004
(212) 363-7500

*Attorneys for Plaintiffs and the Proposed Classes*

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SCOTT PFLAUMER, HANS CUMMINGS, and MARK ROSENTHAL, individually and on behalf of all others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> ACE HARDWARE CORPORATION, <br><br> Defendant. | Case No.:  26-cv-2151 <br><br> **CLASS ACTION COMPLAINT** <br><br> **DEMAND FOR JURY TRIAL** |

Case No.  26-cv-2151                          CLASS ACTION COMPLAINT

Scott Pflaumer, Hans Cummings, and Mark Rosenthal ("Plaintiffs"), individually and on behalf of all others similarly situated, by and through their undersigned counsel, bring this Class Action Complaint against Defendant Ace Hardware Corporation ("Defendant" or "Ace Hardware"). Plaintiffs allege the following upon information and belief based on the investigation of counsel, except as to those allegations that specifically pertain to Plaintiffs, which are alleged upon personal knowledge.

<strong>NATURE OF THE ACTION</strong>

1. In recent years, federal courts across the country have warned that opaque digital-tracking practices pose a profound threat to Americans' privacy. The unauthorized collection of a person's browsing activity, website interactions, and device identifiers constitutes an invasion of the most basic expectation of privacy in one's online life. When a company affirmatively represents that users may control whether their data is sold, shared, or tracked, but then secretly sells, shares, and tracks that data anyway, the misconduct is especially egregious.

2. Ace Hardware operates a commercial website, https://www.acehardware.com (the "Website"), through which users browse and purchase hardware products, tools, home improvement supplies, lawn and garden equipment, and related merchandise; locate and interact with local Ace stores; access product information and customer support services; create and manage accounts; and explore promotional offers and special deals. Like many modern websites, the Website displays a cookie banner (the "Cookie Banner") and a "cookie preferences" interface (the "Cookie Settings") purporting to give users meaningful control over what data the Website shares with third parties.

Case No.  26-cv-2151                                    CLASS ACTION COMPLAINT

Ace Hardware and other third parties collect data when you shop, participate in Ace Rewards, through cookies, including session recording, during chat sessions and as described in our Privacy Policy. By selecting any of the options below, by closing this window by clicking "x", or by continuing to browse, you accept and agree to our **TERMS OF USE**, **Notice of Financial Incentive**, **Categories of Personal Information**, and **Privacy Policy**.

**Accept All Cookies**

**Necessary Cookies Only**

**Manage Choices**

 **Privacy Preference Center**

**Your Privacy**

**Strictly Necessary Cookies**

**Share Or Sale of Personal Data**

Share Or Sale of Personal Data

Under the CCPA and other applicable state laws, you have the right to opt-out of the sale or sharing of your personal information to third parties. These cookies collect information for analytics and to personalize your experience with targeted ads. You may exercise your right to opt out of the sale or sharing of personal information by toggling this switch to the left and selecting "Confirm My Choices". This will prevent further cookies from being placed on your device. If you opt out we will not be able to offer you personalized ads, although you may still see online ads related to our products and services. This advertising may be delivered to general audiences and may not involve the sale of your personal information. Below are categories of cookies that may fall into the "Sale or Share of Personal Information".

**Advertising Cookies**

These cookies allow us to deliver personalized and tailored content that may be more relevant to your interests. They may be set by us or by third party providers to deliver more relevant and meaningful advertisements both on our websites and others you may visit. If you

*Figure 1 – Cookie Banner and Cookie Settings of Ace Hardware, representing that users could change tracking behavior through Cookie Settings*

3

3. Defendant's assurances are false. The Website begins placing and transmitting cookies and other third-party tracking technologies (the "Tracking Tools") capable of transmitting users' data the moment users visit the Website, before they can interact with the Cookie Banner.

4. Users were misled by the Cookie Banner, which led users to believe that their data would only be shared when interacting with the Website.

5. The Tracking Tools collect detailed interaction and behavioral data, including users' selections of links, buttons, forms, and other on-page elements, as well as information entered into search fields. This data may include webpages and products viewed or purchased; inferred interests, preferences, age, location, or other characteristics based on user behavior and content engagement; and personal, device, and technical identifiers such as device type, operating system, and browser type. The data also includes persistent identifiers that enable recognition of users across sessions and websites, users' email addresses, and approximate geolocation information derived from IP addresses or similar signals. Collectively, this information is referred to as "Sensitive Information." This Sensitive Information is collected the moment a user arrives on the Website.

6. The Website offers users the ability to disable non-essential cookies and disable the sale or disclosure of personal data by: (1) clicking the "Necessary Cookies Only" button in the Cookie Banner; (2) toggling off "Share or sale of personal data" in the Cookie Settings; and (3) clicking the "Necessary Cookies Only" button in the Cookie Settings. Each of these actions has the same effect: to limit the Website's use of cookies only to those necessary to function and to otherwise disable the sale or sharing of personal data.

7. However, even after users affirmatively disable the sale or sharing of their Sensitive Information and reject all non-essential cookies, regardless of which mechanism to achieve that goal, the Website continues to utilize and deploy Tracking Tools which transmit users' data to the advertising, social media, and analytics companies that designed and operate the Tracking Tools (the "Tracking Entities").

4

Case No.  26-cv-2151                                    CLASS ACTION COMPLAINT

8.    Ace Hardware's Cookie Settings deceive users by (1) placing Tracking Tools on users' browsers, which allow Tracking Entities to intercept users' communications with the Website before users have the ability to interact with the Cookie Banner, and by (2) continuing to use Tracking Tools that intercept and transmit Sensitive Information to Tracking Entities after users toggle off the sale/sharing of personal information and reject all non-essential cookies. Ace Hardware's Website design and procurement of Tracking Entities and Tracking Tools to monitor, intercept, and transmit user data constitute invasion of privacy, intrusion upon seclusion, and fraud. Misrepresenting the effectiveness of a cookie opt-out mechanism and a user's ability to opt out of the sale/sharing of their personal information effectively deprives users of control over their personal information.

9.    In short, the Website's Cookie Settings materially mislead users about the use and sale of their data. Defendant lulls users into a false sense of security, privacy, and control while simultaneously enabling third parties to monitor, intercept, and transmit users' online behavior in real time. Such conduct deprives users of control over their Sensitive Information and violates fundamental privacy protections.

10.    Plaintiffs' experience reflects the conduct described above. Plaintiffs, residents of California, Indiana, and Colorado, visited Defendant's Website in or around 2025 and 2026 for ordinary consumer purposes, including browsing and comparing products, ordering products, and otherwise navigating the Website's content. While accessing the Website from their respective home states, Plaintiffs encountered the Cookie Banner and related Cookie Settings. Certain Plaintiffs affirmatively accepted use only of necessary cookies in reliance on Defendant's representations that marketing and tracking technologies would be disabled upon rejection. Despite these actions and expectations, Defendant deployed Tracking Tools that automatically intercepted, recorded, and transmitted Plaintiffs' Sensitive Information to the Tracking Entities. In each instance, Plaintiffs reasonably relied on Defendant's representations regarding cookie controls and privacy protections, yet their personal information was nonetheless collected and shared without their valid consent.

Case No.  26-cv-2151                    CLASS ACTION COMPLAINT

11. Plaintiffs visited the Website and communicated information to Defendant through their browsers, including browsing activity, product views, and interaction data reflecting their interests. Plaintiffs rejected non-essential cookies through Defendant's cookie controls in an effort to prevent third-party tracking. Defendant nonetheless caused Tracking Tools to intercept and transmit those communications and associated identifiers to third parties. Plaintiffs were thereby subjected to unauthorized disclosure of their communications and deprived of the benefit of the privacy choice that Defendant represented users could make.

12. Defendant invaded Plaintiffs' fundamental right to privacy and fraudulently misrepresented the Website's data-collection practices by facilitating the Tracking Entities' unlawful interception of and intrusion into Plaintiffs' Sensitive Information. In doing so, Defendant violated the federal Wiretap Act, 18 U.S.C. § 2510, *et seq.*; California's Invasion of Privacy Act ("CIPA"), including Penal Code § 631 (illegal wiretapping) and § 638.51 (unlawful use of a pen register or trap and trace device); California Civil Codes § 1750, et seq. ("CLRA"); California Unfair Competition Law, Cal. Bus. & Prof. Code § 17200, et seq. ("UCL"), and common law, including invasion of privacy, intrusion upon seclusion, fraud and deceit, and unjust enrichment. Plaintiffs bring this action on behalf of themselves and a class of similarly situated users harmed by Defendant's deceptive and unlawful surveillance practices.

## JURISDICTION AND VENUE

13. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it arises under the Federal Wiretap Act, 18 U.S.C. § 2511(1)(a)-(e). This Court has supplemental jurisdiction over the non-federal claims in this action. This Court also has jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). The amount in controversy exceeds $5 million, exclusive of interest and costs. The number of class members is more than 100, and at least one member of the Class defined below is a citizen of a different state that is diverse from Defendant's citizenship. Thus, minimal diversity exists under 28 U.S.C. § 1332 (d)(2)(A).

6

14.     This Court has personal jurisdiction over Defendant because Defendant maintains a significant business presence and operation in the state, derives revenue in the State of California, including Defendant's revenue generated from its management over the Website. Venue is proper in this Court because a substantial part of the events, acts, and omissions giving rise to Plaintiffs' claims occurred in this District. Additionally, Defendant conducts substantial business operations in this District. In connection with the Website and the hosting of media accessible to users, all claims originate and arise out of Defendant's business operations in this District. Lastly, the venue is proper in this District because Defendant is subject to this Court's personal jurisdiction with respect to this action.

**PARTIES**

15.     Plaintiff Scott Pflaumer is, and at all relevant times has been, a citizen and resident of San Jose County in the State of California. Plaintiff accessed and used Defendant's Website while physically located in California. Most recently, Plaintiff Pflaumer visited the Website in or about May 2025 for consumer browsing purposes. During that visit, Plaintiff Pflaumer reviewed product information regarding screwdrivers. Plaintiff Pflaumer does not maintain an account with Defendant and has not made a purchase through the Website. Plaintiff consistently declines non-essential cookies on all websites he visits as a matter of personal privacy practice. In connection with his visit to Defendant's Website, Plaintiff Pflaumer engaged with the cookie consent mechanism and declined all non-essential cookies, relying on Defendant's representations that such selection would disable marketing and tracking technologies. Plaintiff Pflaumer reasonably believed that by rejecting non-essential cookies, his browsing activity would not be tracked beyond what was strictly necessary for the Website's basic functionality. Plaintiff Pflaumer more recently visited the Website on February 25, 2026, in connection with the investigation of this case, and attempted to disable the Tracking Tools on the Website by using the Cookie Banner to decline all non-essential cookies. Despite Plaintiff Pflaumer's affirmative rejection of non-essential cookies, Defendant deployed third-party Tracking Tools that intercepted, recorded, and transmitted Plaintiff's browsing activity, device identifiers, and related metadata to Tracking

Case No.  26-cv-2151                              CLASS ACTION COMPLAINT

Entities. The interception disclosed the substance of Plaintiff Pflaumer's communications with the Website, including the pages and product information he chose to review, together with identifiers and related metadata. These Tracking Tools operated notwithstanding Plaintiff Pflaumer's clear refusal of non-essential tracking technologies. As a result, Plaintiff Pflaumer's personal information was intercepted and recorded without his consent. Had Plaintiff Pflaumer been able to rely on Defendant's representations regarding cookie controls, he would have continued to use the Website with confidence in its privacy safeguards.

16. Plaintiff Hans Cummings is, and at all relevant times has been, a citizen and resident of the State of Indiana. Plaintiff accessed and used Defendant's Website while physically located in Indiana. Most recently, Plaintiff Cummings visited the Website in or about February 2026 for consumer browsing purposes. During that visit, Plaintiff Cummings reviewed product information on the Website. Plaintiff Cummings maintains an account with Defendant and has made purchases through the Website, including purchases selected online and picked up at a physical store location. Plaintiff Cummings consistently declines non-essential cookies on all websites he visits as a matter of personal privacy practice. In connection with his visit to Defendant's Website, Plaintiff Cummings engaged with the cookie consent mechanism and declined all non-essential cookies, relying on Defendant's representations that such selection would disable marketing and tracking technologies. Plaintiff Cummings reasonably believed that by rejecting non-essential cookies, his browsing activity would not be tracked beyond what was strictly necessary for the Website's basic functionality. Plaintiff Cummings more recently visited the Website on February 24, 2026, in connection with the investigation of this case, and attempted to disable the Tracking Tools on the Website by using the Cookie Banner to decline all non-essential cookies. Despite Plaintiff Cummings's affirmative rejection of non-essential cookies, Defendant deployed third-party Tracking Tools that intercepted, recorded, and transmitted Plaintiff Cummings's browsing activity, device identifiers, and related metadata to Tracking Entities. These Tracking Tools operated notwithstanding Plaintiff Cummings's clear refusal of non-essential tracking technologies. As a result, Plaintiff Cummings's personal information was

8

intercepted and recorded without his consent. Had Plaintiff Cummings been able to rely on Defendant's representations regarding cookie controls, he would have continued to use the Website with confidence in its privacy safeguards.

17.     Plaintiff Mark Rosenthal is, and at all relevant times has been, a citizen and resident of the State of Colorado. Plaintiff accessed and used Defendant's Website while physically located in Colorado. Most recently, Plaintiff Rosenthal visited the Website in or about January 2026 for consumer browsing purposes. During that visit, Plaintiff reviewed product information regarding barbecue-related products. Plaintiff Rosenthal maintains an account with Defendant and also uses Defendant's mobile application. Plaintiff Rosenthal consistently declines non-essential cookies on all websites he visits as a matter of personal privacy practice. In connection with his visit to Defendant's Website, Plaintiff Rosenthal engaged with the cookie consent mechanism and declined all non-essential cookies, relying on Defendant's representations that such selection would disable marketing and tracking technologies. Plaintiff Rosenthal reasonably believed that by rejecting non-essential cookies, his browsing activity would not be tracked beyond what was strictly necessary for the Website's basic functionality. Despite Plaintiff's affirmative rejection of non-essential cookies, Defendant deployed third-party Tracking Tools that intercepted, recorded, and transmitted Plaintiff Rosenthal's browsing activity, device identifiers, and related metadata to Tracking Entities. These Tracking Tools operated notwithstanding Plaintiff Rosenthal's clear refusal of non-essential tracking technologies. As a result, Plaintiff Rosenthal's personal information was intercepted and recorded without his consent. Had Plaintiff Rosenthal been able to rely on Defendant's representations regarding cookie controls, he would have continued to use the Website with confidence in its privacy safeguards.

18.     Defendant Ace Hardware is a for-profit corporation, incorporated under the laws of the State of Delaware, with its principal place of business in Oak Brook, Illinois. Ace Hardware sells hardware products, tools, home improvement supplies, lawn and garden equipment, and related merchandise through its Website https://www.acehardware.com/.

Case No.  26-cv-2151                                    CLASS ACTION COMPLAINT

**DIVISIONAL ASSIGNMENT**

19.     Assignment to the San Jose Division is proper under Civil Local Rules 3-2(c) and 3-2(d) because a substantial part of the events or omissions giving rise to Plaintiff Pflaumer's claims occurred in San Jose County.

**FACTUAL ALLEGATIONS**

**I.      How Websites Function**

20.     Websites are hosted on servers, in the sense that their files are stored on and accessed from servers. Websites are, in part, "run" on a user's internet browser, as the browser loads and processes the website's code to display the webpage.

21.     Websites are a collection of webpages. A webpage is essentially a document containing text written in HyperText Markup Language (HTML) code.[1]

22.     Each webpage has a unique address, and two webpages cannot be stored at the same address.[2]

23.     When a user navigates to a webpage (by entering a URL address directly or clicking a hyperlink containing the address), that user's browser contacts the DNS (Domain Name System) server, which translates the web address of that website into a unique IP (Internet Protocol) address.[3]

24.     An IP address is "a unique address that identifies a device on the Internet or a local network."[4] Essentially, an IP address is:

---

[1] *What is the difference between webpage, website, web server, and search engine?*, MOZILLA, https://developer.mozilla.org/en-US/docs/Learn/Common_questions/Web_mechanics/Pages_sites_servers_and_search_engines (last visited Feb. 17, 2026).

[2] *Id.*

[3] *How the web works*, MOZILLA, https://developer.mozilla.org/en-US/docs/Learn/Getting_started_with_the_web/How_the_Web_works (last visited Feb. 17, 2026).

[4] *What is an IP Address – Definition and Explanation*, KASPERSKY, https://usa.kaspersky.com/resource-center/definitions/what-is-an-ip-address (last visited Feb. 17, 2026).

Case No.  26-cv-2151                              CLASS ACTION COMPLAINT

The identifier that allows information to be sent between devices on a network: they contain location information and make devices accessible for communication. The internet needs a way to differentiate between different computers, routers, and websites. IP addresses provide a way of doing so and form an essential part of how the internet works. *Id.*

25.     When a user's browser navigates to a webpage, it sends an HTTP request to the server identified by the webpage's IP address (the "Request URL"). This request is for the specific resource located at the URL. If the server fulfils this request, it issues an HTTP response that includes the request status and, typically, the requested content. This content is then transmitted in small chunks, known as data packets, and reassembled into the complete webpage by the user's browser upon arrival.[5]

26.     This Request URL includes a domain name and path, which identify the specific content being accessed on a website and its location within the website's structure.

27.     The Request URL typically contains parameters. Parameters are values added to a URL to transmit data to the recipient, prefaced by a question mark to signal the use of parameters. Parameters direct a web server to provide additional context-sensitive services,[6] as depicted below:



*Figure 2 - Mozilla's diagram of a URL, including parameters[7]*

28.     Website owners or web developers write and manage the URLs for their websites.

29.     URL encoding is an essential process to ensure that data is safely transmitted via URLs. URL encoding converts characters into a format that can be transmitted over the Internet.[8]

---

[5] *Id.*

[6] To see examples of how Defendant used parameters to provide additional information here, *see, infra,* Section C(2).

[7] *What is a URL?*, MOZILLA, https://developer.mozilla.org/en-US/docs/Learn/Common_questions/What_is_a_URL (last visited Feb. 17, 2026).

[8] *Id.*

Case No.  26-cv-2151                              CLASS ACTION COMPLAINT

For example, URLs cannot contain spaces; URL encoding normally replaces a space with a plus (+) sign or with %20.

30.     The American Standard Code for Information Interchange (ASCII) was designed in the early 1960s as a standard character set for computers and electronic devices.[9] Today, UTF-8 is the Internet's most common character encoding.[10]

31.     URL decoding is the process of URL encoding in reverse so that the URL is in a more readable format.[11] To demonstrate:



*Figure 3 – Demonstrating URL encoding and decoding[12]*

32.     Similarly, parameters and metadata can be parsed and separated into easily reviewed, searchable formats.

---

[9] *HTML ASCII Reference*, W3 SCHOOLS, https://www.w3schools.com/charsets/ref_html_ascii.asp (last visited Feb. 17, 2026).

[10] *UFT-8*, MOZILLA, https://developer.mozilla.org/en-US/docs/Glossary/UTF-8 (last visited Feb. 17, 2026).

[11] *What Is URL Decoding and URL Encoding?*, GOCHYU (last modified Oct. 18, 2020), https://gochyu.com/blog/url-encode-decode (last visited Feb. 17, 2026).

[12] Viraj Shetty, *URL Encoding in a few minutes*, YOUTUBE (Sept. 5, 2023), https://www.youtube.com/watch?v=ru0iCHsmsLc (last visited Feb. 17, 2026).

Case No.  26-cv-2151                                    CLASS ACTION COMPLAINT



*Figure 4 – Sample webpage used to demonstrate a webpage URL*



*Figure 5 – Request URL of sample webpage from Figure 4, encoded for transmission (compare with decoded URL in Figure 5)*

Case No.  26-cv-2151                                    CLASS ACTION COMPLAINT



*Figure 6 – Decoded, parsed data from Request URL in Figure 5, showing easy-to-read parameters and metadata*

33.    After sending the Request URL, and after the server responds to the Request URL, the user's browser assembles the packets sent by the server back into the HTML code of the webpage, which is then processed by the user's browser, as it arrives,[13] and rendered into a visual display according to the instructions of the HTML code.[14] This is the visible, and usually interactable, website that most people think of.

---

[13] This processing of webpage data as it arrives is called "parsing," and allows web browsers to convert raw data received over the internet into structured data objects used by the renderer built into the browser to create images on the screen. This means that, unless a software command, like a Tracking Tool, is physically last to arrive at a device, it is loaded and executed before the communication has finished being received. *See Populating the page: how browsers work*, MOZILLA, https://developer.mozilla.org/en-US/docs/Learn/Common_questions/What_is_a_URL (last visited Feb. 20, 2026).

[14] *What Is a URL?*, MOZILLA, (last visited Feb. 17, 2026).

Case No.  26-cv-2151                                    CLASS ACTION COMPLAINT

34. To provide more complex website functionality, website developers will include more complex commands written in other computer programming languages, such as JavaScript snippets, within the HTML documents.[15]

35. Such complex tasks include streaming videos by users or subscribing to Newsletters/ Digital Magazine, or code used to monitor and report user activity.

36. In short, the Internet relies on a constant back-and-forth stream of requests and responses between a user's browser and a website's stored coding and data. Importantly, the requests and responses provide a perfect snapshot of everything a user does (or does not do) on a website and when and how they do it and with what software and hardware.

37. Unbeknownst to users, as they browse the Website, the Tracking Tools, including third- and first-party cookies, capture and record both incoming and outgoing requests and responses that make up their entire experience on the Website.

**II. Defendant Programmed the Website to Include Third-Party Resources that Utilize Cookies and Tracking Tools**

38. Defendant voluntarily integrated Tracking Tools from various Tracking Entities into its Website's programming. Defendant's use of such tools on its Website is performed pursuant to commercial agreements between Defendant and third parties, including Tracking Entities.

39. The Website causes users' devices to store and/or transmit both first-party and third-party tracking cookies. Cookies are small text files sent by a website's server to a user's web browser and stored locally on the user's device. Cookies typically contain unique identifiers that enable a website to recognize and differentiate individual users. These cookie files are automatically transmitted back to web servers through HTTP requests, allowing the Website and third parties to identify the device making the request and to record a session reflecting how the user interacts with the Website, i.e., everything they view, click on, type, or even hover over.

---

[15] *See JavaScript: Adding interactivity*, MOZILLA, https://developer.mozilla.org/en-US/docs/Learn/Getting_started_with_the_web/JavaScript_basics (last visited Feb. 17, 2026).

Case No.  26-cv-2151                                  CLASS ACTION COMPLAINT

40.     First-party cookies are those placed directly on the user's device by the web server with which the user is knowingly communicating, in this case, Defendant's Website. First-party cookies are commonly used to recognize users across repeated visits to the same website and to track their on-site activity.

41.     Third-party cookies are placed by domains other than the Website's domain, such as google.com, facebook.com, and other advertising or analytics domains. When a user's browser loads a webpage containing embedded third-party resources, the third party's scripts determine whether its cookies already exist on the user's device and, if not, cause those cookies to be stored. These third-party cookies contain unique identifiers that allow third parties to recognize and track individual users across different websites, including the Website, and across multiple browsing sessions.

42.     As detailed further below, Tracking Tools, including first and third-party cookies, that are placed on users' devices during interactions with the Website are subsequently used to intercept and record users' communications by the Tracking Entities, enabling them to surreptitiously track and collect Website users' Sensitive Information in real time.

43.     Tracking Tools serve numerous commercial purposes, including: (i) analytics, such as measuring user engagement and Website performance; (ii) personalization, including remembering user preferences; (iii) advertising and targeting, including delivering targeted or behavioral advertisements based on user profiles; and (iv) social media integration. Ultimately, Tracking Tools enable Defendant and Tracking Entities to earn more money and enhance marketing effectiveness through the collection, analysis, and dissemination of users' Sensitive Information, especially as that Sensitive Information is used to build detailed marketing profiles of users to enhance the effectiveness and efficiency of Tracking Entities' and Defendant's marketing efforts.

44.     Defendant owns and operates the Website, which allows users to browse and purchase hardware and home improvement products, check product availability at local stores, access customer service resources, create and manage accounts, and view promotional offers.

Case No.  26-cv-2151                          CLASS ACTION COMPLAINT

When users interact with the Website by navigating pages, clicking links, entering data, or ordering Ace Hardware's products, they communicate directly to Defendant.

45. Defendant chooses to place the Tracking Tools on the Website such that when users visit the Website, both first-party and third-party cookies are placed on users' devices and/or monitored for and transmitted those cookies to Tracking Entities, combined with parameters, metadata, and detailed Request URLs. Because Defendant controls the Website's software code and determines which Tracking Tools are loaded onto users' browsers, Defendant has control over whether these Tracking Tools are placed and whether users' Sensitive Information is transmitted to Tracking Entities.

46. Defendant explains its use of Tracking Tools on the Website's Cookie Settings by stating, in substance:

> Ace Hardware and other third parties collect data when you shop, participate in Ace Rewards, through cookies, including session recording, during chat sessions and as described in our Privacy Policy. By selecting any of the options below, by closing this window by clicking "x", or by continuing to browse, you accept and agree to our TERMS OF USE, Notice of Financial Incentive, Categories of Personal Information, and Privacy Policy.[16]

47. The Cookie Settings states that users can reject non-necessary cookies, including advertising and performance cookies, and can opt out of the sale or sharing of personal information on the Website.

48. The Cookie Settings further represent that "Advertising Cookies" are used across the Website to personalize advertisements and content for users' interests:

> **Advertising Cookies**
>
> These cookies allow us to deliver personalized and tailored content that may be more relevant to your interests. They may be set by us or by third party providers to deliver more relevant and meaningful advertisements both on our websites and others you may visit. If you choose not to allow these cookies, you may not receive advertisements, or the advertisements may be less relevant to you.

---

[16] The Cookie Banner as it appeared on the Website as of Feb. 26, 2026.

Case No.  26-cv-2151                                 CLASS ACTION COMPLAINT

49.     The Cookie Settings further represent that "Performance Cookies" are used to across the Website to collect information about how users use the Website and improve Website performance:

**Performance Cookies**

These cookies collect information about how visitors use our website and help us improve the way our website works. If you choose not to allow these cookies, it will limit our ability to monitor performance and make future improvements to the site. "

50.     Defendant's notices clearly inform users that their detailed browsing activity and interactions with the Website would ***not*** be captured and transmitted to third-party tracking technologies capable of aggregating and monetizing that information across multiple websites, especially after limiting the Website to only necessary cookies and rejecting the sale of their information after accepting only necessary cookies and disabling the sale of their information.

**III.    The Website's Cookie Banner Misled Users**

51.     When users in locations such as California visited the Website, the Website immediately displayed the Cookie Banner. The Cookie Banner informed users of the Website that

Ace Hardware and other third parties collect data when you shop, participate in Ace Rewards, through cookies, including session recording, during chat sessions and as described in our Privacy Policy. By selecting any of the options below, by closing this window by clicking 'x', or by continuing to browse, you accept and agree to our Terms of Use, Notice of Financial Incentive, Categories of Personal Information, and Privacy Policy.

The Cookie Banner further presented users with a button to accept all cookies, a small 'x' in the top right to close the pop-up, a button to accept only necessary cookies, and a button labeled "Manage Choices." After clicking any option on the Cookie Banner, it disappears.



*Figure 7 –Ace Hardware's Cookie Settings, representing that users can manage the use of cookies or the sharing or sale of personal data*

52.    Website users who selected the "Manage Choices" option were presented with the Cookie Settings, which represented that users could control how their Sensitive Information was collected, declining the share or sale of their personal data, or by accepting only necessary cookies.

53.    Upon expanding the section addressing the sale or sharing of personal information and targeted advertising, Defendant represented to users, in substance, that they could exercise

Case No.  26-cv-2151                                    CLASS ACTION COMPLAINT

their right to opt out of the sale or sharing of personal information by using the toggle switch, and that if users opted out, Defendant would not provide personalized advertising and would not expose users' personal information to third parties. Specifically, Defendant informed users: "Under the CCPA and other applicable state laws, you have the right to opt-out of the sale or sharing of your personal information to third parties[...] You may exercise your right to opt out of the sale or sharing of personal information by toggling this switch to the left and selecting 'Confirm My Choices'. This will prevent further cookies from being placed on your device. If you opt out, we will not be able to offer you personalized ads, although you may still see online ads related to our products and services." Defendant's offer was not only to discontinue disclosures through cookies, but a blanket discontinuation of the sale or disclosure of personal information to third parties.



*Figure 8 – Cookie Settings representing users with an option of disabling the selling of user information and targeted advertising*

Case No.  26-cv-2151                                   CLASS ACTION COMPLAINT

*Figure 9 - Screen capture as of Feb. 25, 2026, depicting the automatically enabled tracking system*

54.    After users disabled the sharing of their personal information or declined all non-essential cookies other than those strictly necessary, users were permitted to continue browsing the Website. At that point, the Cookie Settings window disappeared.

55.    Defendant's Cookie Banner and Cookie Settings representations led Plaintiffs, and would reasonably lead all Website users similarly situated, to believe that they had successfully disabled all non-essential cookies and the sale or sharing of their information. The Cookie Banner and preference window further reasonably led Plaintiffs and all reasonable users to believe that Defendant would not allow third parties, through cookies or similar technologies, to access users' personal information on the Website. Plaintiffs acted on those representations by interacting with the Website after making privacy selections intended to prevent the use of non-essential cookies and disable the sale or sharing of personal data.

Case No.  26-cv-2151                                    CLASS ACTION COMPLAINT

56.     These representations were false. In reality, Defendant did not abide by users' expressed preferences, including Plaintiffs'. When users chose to disable the sharing of their personal information and to decline all non-essential cookies other than those strictly necessary, they clearly communicated that they did not consent to the placement or transmission of Tracking Tools, including non-essential cookies. Nevertheless, Defendant continued to cause the Tracking Tools, including cookies, to be placed or otherwise accessed on users' browsers and devices so that Tracking Entities could intercept, transmit, and use users' Sensitive Information in real time.

57.     The Tracking Tools that Defendant caused to be loaded and executed by users' browsers function as an unlawful wiretap, pen register, and trap and trace device when it is executed because it enables Tracking Entities, separate and distinct parties from Defendant, to eavesdrop on, record, extract, analyze, and exploit users' Sensitive Information. The Tracking Entities are not mere passive tools or instruments of Defendant; they collect, analyze, and use the intercepted communications for their own commercial purposes in addition to Defendant's.

**IV.     Defendant's Website Uses Tracking Tools To Spy on Users.**

58.     Defendant operates the Website and has installed Tracking Tools on the Website created by Tracking Entities. These Tracking Tools operate invisibly, tracking Website users' activity surreptitiously by intercepting users' Sensitive Information as it arrives at or is sent from users' devices, copying the contents of those communications, and generating new Request URLs that are transmitted to the Tracking Entities.

59.     Generally, the Tracking Tools collect information about users' site activity when events specified by Defendant, like adding a product to the shopping cart or loading specific webpages, are triggered. Defendant added parameters to events that determine just how much data is collected, and how specific that data is.

60.     Parameters are strings of text that website owners add to a URL to track and organize their webpages.[17] URL parameters include key-value pairs formatted as "key=value."

---

[17] Yongi Barnard, *URL Parameters: What They Are and How to Use Them Properly*, BACKLINKO (last updated Feb. 5, 2026), https://backlinko.com/url-parameters (last visited Feb. 17, 2026).

Case No.  26-cv-2151                              CLASS ACTION COMPLAINT

  a. The "key" is what the website owner wants to adjust or track (e.g., "color" or "ev" for event)

  b. The "value" is the specific setting or data for that parameter (e.g., "yellow" or "AddToCart" for a user taking the action of adding a product to their online shopping cart)



*Figure 10 - Diagram of a URL displaying how parameters function*[18]

**A. Google Analytics**

61. Google's Tracking Tools are not implemented into websites by Google and require several affirmative steps on the part of the website owner to implement and to effectuate their data sharing.

62. Defendant embeds Google Analytics in its Website to enable Google to intercept users' Sensitive Information.

63. Google Analytics ("GA") invisibly collects data about user interactions with a website, including link clicks, button clicks, form submissions, conversions, shopping cart abandonment, adding items to carts, removing items from carts, file downloads, scrolling

---

[18] *Id.*

Case No.  26-cv-2151      CLASS ACTION COMPLAINT

behavior, video views, call to action performance, table of contents clicks, and other customizable events.

64.    The data collected through GA is sent back to Google, which associates the activity with the website it was collected from. Notably, Google notifies web developers that they should provide "users with clear and comprehensive information about the data . . . collect[ed] on [their] websites" and to obtain "consent for that collection where legally required."

65.    In short, the use of GA involves specific data collection practices, pre-configured settings, and known transmission paths for user data. Google acknowledges the legal risks associated with its tracking tools and explicitly shifts the responsibility for informing users and obtaining any required consent onto website operators like Defendant.

66.    Here, Defendant added GA to its Website by (1) creating an Analytics account; (2) designating their Website as a property; (3) adding a data stream to determine what information to collect; and (4) adding the GA tag to their website.

67.    Defendant's decision to implement GA into the Website resulted in the interception and redirection of Plaintiffs' search terms to Google, as depicted from the example taken directly from the Website below:



Case No.  26-cv-2151                                    CLASS ACTION COMPLAINT

*Figure 11 – Test search made on the Website resulted in Google Analytics intercepting search terms "power tools" and redirecting them to Google*

Case No.  26-cv-2151                                   CLASS ACTION COMPLAINT

68.     The GA parameters and payload contain a "cid" value. This value is functionally identical to the "_ga" first-party cookie set by the Website.[19]

69.     The "_ga" cookie identifies specific users to Google, allowing Google to intercept the contents of users' communications on the Website and associate them with a specific profile.[20]

70.     As shown in the figures above for an example Website user, the "_ga" cookie placed by the Website is "GA1.1.2114169123.1773167047". The "cid" value is "2114169123.1773167047", a substantially identical value.

71.     After receiving the Sensitive Information, Google provides analysis and feedback, which helps Defendant monetize the collected information through targeted advertising.

72.     On December 19, 2024, Google announced that organizations using its advertising products can use fingerprinting techniques beginning on February 16, 2025.[21]

73.     "Fingerprinting involves the collection of pieces of information about a device's software or hardware, which, when combined, can uniquely identify a particular device and user," explained Stephen Almond, executive director of regulatory risk at the International Commissioner's Office ("ICO").[22]

74.     Digital fingerprinting essentially creates a unique digital ID for a user and their device based on various pieces of information collected when users browse the internet, including a user's operating system (e.g., Windows, Android, iOS), browser type (e.g., Chrome, Safari,

---

[19] The "cid" value removes the "ga1.1" prefix from the "_ga" cookie, but is otherwise identical.

[20] *How Google Uses Cookies* https://policies.google.com/technologies/cookies (last accessed on February 26, 2026)

[21] Pieter Arntz, *Google now allows digital fingerprinting of its users*, MALWAREBYTES (Feb. 19, 2025), https://www.malwarebytes.com/blog/news/2025/02/google-now-allows-digital-fingerprinting-of-its-users (last visited Feb. 10, 2026).

[22] Stephen Almond, *Our response to Google's policy change on fingerprinting*, INT'L COMMISSIONER'S OFFICE (Dec. 19, 2024), https://ico.org.uk/about-the-ico/media-centre/news-and-blogs/2024/12/our-response-to-google-s-policy-change-on-fingerprinting/ (last visited Feb. 10, 2026).

26

Case No.  26-cv-2151                                CLASS ACTION COMPLAINT

Firefox) and version, IP address, installed browser plugins, time zone, and language settings, among others.[23]

75.     In addition to device identifiers, fingerprinting ingests all of the websites and apps that the user uses, creating a detailed map for Google to follow and analyze, allowing a profile to be built of everything the Subscriber likes and is likely to buy.[24]

76.     Even Google has raised concerns about digital fingerprinting in the past, warning it "subverts user choice and is wrong."[25]

77.     In changing its policy regarding fingerprinting, Google vaguely claims it is investing in privacy-enhancing technologies (PETs) to protect users' privacy, providing few specifics about how PETs do so.[26]

78.     The ICO finds fingerprinting an unfair means of tracking users online, "because it is likely to reduce people's choice and control over how their information is collected."[27]

79.     The ICO explains:

> [W]hen you choose an option on a consent banner or "clear all site data" in your browser, you are generally controlling the use of cookies and other traditional forms of local storage. Fingerprinting, however, relies on signals that you cannot easily wipe. So, even if you "clear all site data" the organization using fingerprinting techniques could immediately identify you again.[28]

---

[23] Pieter Arntz, *Google now allows digital fingerprinting of its users*, MALWAREBYTES (Feb. 19, 2025), (last visited Feb. 10, 2026).

[24] Zak Doffman, *Google's Fingerprinting Returns in 8 Weeks And It Will Track Your Devices*, FORBES (Dec. 21, 2024 2:37 PM), https://www.forbes.com/sites/zakdoffman/2024/12/21/forget-chrome-google-will-start-tracking-you-and-all-your-smart-devices-in-8-weeks/ (last visited Feb. 10, 2026); Zak Doffman, *Google Starts Fingerprinting Your Devices in 10 Days*, FORBES (Feb. 8, 2025), https://www.forbes.com/sites/zakdoffman/2025/02/08/forget-chrome-google-starts-tracking-all-your-devices-in-10-days/ (last visited Feb. 10, 2026).

[25] *Id.*

[26] *Id.*

[27] *Our response to Google's policy change on fingerprinting*, INT'L COMMISSIONER'S OFFICE (Dec. 19, 2024), https://ico.org.uk/about-the-ico/media-centre/news-and-blogs/2024/12/our-response-to-google-s-policy-change-on-fingerprinting/ (last visited Feb. 10, 2026).

[28] *Google's Fingerprinting Returns in 8 Weeks And It Will Track Your Devices*, FORBES (Dec. 21, 2024), (last visited Feb. 10, 2026).

Case No.  26-cv-2151                                CLASS ACTION COMPLAINT

80.     Because fingerprinting does not rely exclusively on cookies or other traditional storage mechanisms, users are unable to entirely control Google's tracking, even when they actively manage their browser privacy settings. Defendant's procurement of Google to intercept and use data to digitally fingerprint users, including Plaintiffs, thus allows for the persistent monitoring of users' identities and online activity across devices, sessions, and websites across the internet, all without users' knowledge or consent.

81.     Parameters can include the contents of the action, the search terms used on the website, the email address of the user taking the action, the value of the product purchased, and the currency in which the purchase was made.[29]

82.     As a result of Defendant's implementation of Google Analytics, Plaintiffs' and Class Members' Sensitive Information were intercepted and used by Google without Plaintiffs' knowledge or meaningful consent from Plaintiffs or Defendant.

**B.     Bazaarvoice Pixel**

83.     Defendant has also installed a pixel created by the ratings and review platform Bazaarvoice.

84.     Bazaarvoice's main business is implementing review platforms on websites, allowing website owners to easily manage and track reviews for their products.[30]

85.     However, Bazaarvoice also offers website owners Bazaarvoice Analytics integration, also known as the BV Pixel. The BV Pixel allows website owners to collect and monitor the behavior of users on their website.[31]

---

[29] *Id.*
[30] BAZAARVOICE, https://www.bazaarvoice.com/ (last visited Feb. 12, 2026).
[31] *Bazaarvoice Analytics integration (BV Pixel)*, BAZAARVOICE (updated Feb. 27, 2025) https://docs.bazaarvoice.com/articles/#!ratings-reviews-legacy-prr/bv_pixel_analytics      (last visited Feb. 17, 2026)

Case No.  26-cv-2151                                    CLASS ACTION COMPLAINT

86.    The BV Pixel can capture a variety of user events, such as when a user purchases a product, interacts with Bazaarvoice user reviews, or views a webpage containing Bazaarvoice content, such as a product page with reviews.[32]

87.    The BV Pixel also intercepts personally identifiable information when the website owners configure it to do so.[33] When a user triggers a transaction or conversion event, the BV Pixel is required to send the user's email address, locale, nickname, and "userId."[34]

88.    Bazaarvoice also uses cookies to consistently track users when they visit a website. These cookies are first-party cookies, as they are placed by the website, and allow Bazaarvoice to track and identify users.[35]

89.    Two cookies that are used by Bazaarvoice to track users are the BVBRANDID cookie, which persists for one year, and the BVBRANDSID cookie, which persists for the user's browsing session.[36]

90.    Bazaarvoice warns website owners that "these cookies can only be set if the site visitor has given consent through a cookie consent panel on your website."[37]

91.    Defendant's use of the BV Pixel on the Website can be seen in the figures below.

---

[32]    *BV Pixel*, BAZAARVOICE (updated Feb. 27, 2025) https://docs.bazaarvoice.com/articles/#!ratings-reviews-legacy-prr/bvpixel/a/steps-to-implement-bv-pixel (last visited Feb. 17, 2026).

[33] *BV Pixel,* BAZAARVOICE (updated Feb. 27, 2025) (last visited Feb. 17, 2026).

[34] *Id.*

[35]    *Bazaarvoice cookies*, BAZAARVOICE (updated Feb. 12, 2026) https://docs.bazaarvoice.com/articles/#!portal-basics/cookies/q/session/qp/1/qid/239076 (last visited Feb. 17, 2026).

[36] *Id.*

[37] *Id.*

Case No.  26-cv-2151                          CLASS ACTION COMPLAINT

*Figure 12 – The BV Pixel on the Website*

Case No.  26-cv-2151                                    CLASS ACTION COMPLAINT

*Figure 13 – The Payload for the BV Pixel on the Website*

92.    *Figures 12* and *13* show that Defendant implemented the BV Pixel on the Website, which intercepted and transmitted the contents of users' communications with the Website, along with identifying cookies, to Bazaarvoice.

93.    Defendant intentionally placed the Bazaarvoice identifying cookies on the Website, as shown in *Figure 14* below.

Case No.  26-cv-2151                                CLASS ACTION COMPLAINT



*Figure 14 – First-party cookies placed by Defendant on the Website, including the BV Pixel cookies*

94.    *Figure 14* shows acehardware.com placing the BVBRANDID and BVBRANDSID first-party cookies on the web browser, allowing Bazaarvoice to track individual users on the Website.

**C.    Other Tracking Tools**

95.    Defendant has also placed Tracking Tools from several other analytics companies.

96.    These Tracking Tools intercept and transmit the content of users' communications with the Website, users' IP addresses, and a unique user ID contained within the payloads sent by these Tracking Tools.

Case No.  26-cv-2151                    CLASS ACTION COMPLAINT

97.    These analytics companies include Verint, which owns the Foresee Tracking Tool, Monetate, and Pingdom.

98.    Defendant's use of these Tracking Tools on the Website can be seen in the figures below.

*Figure 15 – The Foresee Header on the Website*

Case No.  26-cv-2151                                    CLASS ACTION COMPLAINT

*Figure 16 - The Foresee Payload on the Website*

Case No.  26-cv-2151                    CLASS ACTION COMPLAINT

*Figure 17 - The Monetate Header on the Website*

Case No.  26-cv-2151                    CLASS ACTION COMPLAINT

*Figure 18 – The Monetate Payload on the Website*

Case No.  26-cv-2151                                    CLASS ACTION COMPLAINT

*Figure 19 - The Pingdom Header on the Website*

Case No.  26-cv-2151                                        CLASS ACTION COMPLAINT

| × | Headers | Payload | Preview | Response | Initiator | Timing |
|---|---------|---------|---------|----------|-----------|--------|

▼ Query String Parameters    ( View source )    ( View URL-encoded )

| | |
|---|---|
| id | 5b5eea1754acd30016000027 |
| sAW | 1920 |
| sAH | 1032 |
| bIW | 1178 |
| bIH | 911 |
| pD | 32 |
| dPR | 1 |
| or | landscape-primary |
| nT | 0 |
| rC | 0 |
| nS | 0 |
| cS | 7 |
| cE | 7 |
| dLE | 7 |
| dLS | 7 |
| fS | 7 |
| hS | -1 |
| rE | -1 |
| rS | -1 |
| reS | 7 |
| resS | 491 |
| resE | 688 |
| uEE | -1 |
| uES | -1 |
| dL | 569 |
| dI | 739 |
| dCLES | 790 |
| dCLEE | 791 |
| dC | 2120 |

Case No.  26-cv-2151                              CLASS ACTION COMPLAINT

*Figure 20 – The Pingdom Payload on the Website*

99.    These Tracking Tools continue to intercept users' communications with the Website, even when a user chooses to decline all non-necessary cookies and to stop the sale and sharing of their personal information with third parties.

Case No.  26-cv-2151                                    CLASS ACTION COMPLAINT

**V.      Defendant Violated CIPA § 631 and the Federal Wiretap Act**

100.    Courts analyze claims under CIPA § 631 using the same framework applied to claims under the federal Wiretap Act. *See Brodsky v. Apple Inc.*, 445 F. Supp. 3d 110, 127 (N.D. Cal. 2020)

101.    CIPA § 631(a) prohibits several distinct and independent forms of unlawful interception, including: (1) intentionally tapping or making an unauthorized connection with a communication; (2) willfully attempting to read or learn the contents or meaning of a communication while it is in transit; and (3) using or communicating information obtained through such interception. Section 631(a)(iv) separately imposes liability on any party who aids, agrees with, employs, or conspires with another to commit any of those acts.

102.    Similarly, the federal Wiretap Act prohibits the intentional interception[38] of any wire, oral, or electronic communication without the consent of at least one authorized party to the communication. 18 U.S.C. § 2511.

**A.      Defendant Intercepted the Contents of Communications in Transit**

103.    Transmitted URLs that include both the path and query string reflect the substance of a user's communication and therefore constitute content.

104.    Here, the network requests intercepted by the Tracking Entities included detailed Request URLs containing the names and file locations of webpages, the products users browsed on the Website, identifying information in the form of cookies, and user activity information indicating users' commercial activity and purchases.

105.    The Tracking Tools intercepted the contents of Plaintiffs' communications contemporaneously with Plaintiffs' interactions with the Website. The Tracking Tools began transmitting data to the Tracking Entities as soon as the Tools loaded onto Plaintiffs' browsers,

---

[38] "[I]ntercept" means "the aural or other acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device." 18 U.S.C. § 2510(4).

Case No.  26-cv-2151                              CLASS ACTION COMPLAINT

and additionally transmit data at the moment Plaintiffs submitted information through the Website.

106. This interception, duplication, and transmission occurred inside Plaintiffs' browsers, before the communications fully reached users' devices, or otherwise before the communications were transmitted from users' devices, and therefore occurred while the communications were in transit.

107. The Tracking Entities were third parties to Plaintiffs' communications with Defendant, and intercepted, read, duplicated, and retransmitted users' data while it was in transit.

108. Defendant's deployment of the Tracking Tools enabled Tracking Entities to intercept Request URLs that specified the content Plaintiffs accessed on the Website, in violation of CIPA § 631 and the Federal Wiretap Act 18 U.S.C. § 2511(1)(a).

**B.    Defendant Aided and Abetted Third-Party Interceptions**

109. A party violates CIPA § 631 and the Federal Wiretap Act 18 U.S.C. § 2511(1)(a) not only by directly intercepting communications, but also by knowingly permitting or facilitating third-party interception. "[A] conversationalist is betrayed equally by a wiretapper and by the willing conversation participant who surreptitiously allows that third party to wiretap." *Yoon v. Lululemon USA, Inc.,* 549 F. Supp. 3d 1073, 1083 (C.D. Cal. 2021).

110. Defendant knowingly procured the Tracking Entities to embed and configure the Tracking Tools in its Website, in a manner that enabled the Tracking Entities to intercept the contents of Plaintiffs' communications with the Website.

111. CIPA 631(a) requires the prior consent of all parties to the communication.

112. The Federal Wiretap Act 18 U.S.C. § 2511(2)(d) requires the prior consent of at least one party to the communication.

113. Defendant did not obtain Plaintiffs' express or implied consent to allow the Tracking Entities to intercept those communications, before or after the interceptions occurred, nor could Defendant consent to the interception of those communications, as the scope of its consent was bound to the Terms provided by the Tracking Entities, which required obtaining

41

Case No.  26-cv-2151                                   CLASS ACTION COMPLAINT

valid consent from Plaintiffs and/or otherwise prohibited the use of the Tracking Tools for intercepting sensitive or legally protected data.

**C.      The Tracking Tools are Trap and Trace and/or Pen Register Devices.**

114.    California law defines a "trap and trace device" as "a device or process that captures the incoming electronic or other impulses that identify the originating number or other dialing, routing, addressing, or signaling information reasonably likely to identify the source of a wire or electronic communication, but not the contents of a communication." Cal. Penal Code § 638.50(c).

115.    California law defines a "pen register" as "a device or process that records or decodes dialing, routing, addressing, or signaling information transmitted by an instrument or facility from which a wire or electronic communication is transmitted, but not the contents of a communication." Cal. Penal Code § 638.50(b).

116.    The Tracking Tools are processes to identify the source of electronic communication by capturing incoming electronic impulses and identifying dialing, routing, addressing, and signaling information generated by users, who are never informed that the website is collaborating with the Tracking Entities to obtain their phone number and other identifying information. As such, it is a "trap and trace" device.

117.    The Tracking Tools are "reasonably likely" to identify the source of incoming electronic impulses. In fact, they are designed specifically for that purpose. The IP addresses, detailed URLs, cookies, and Pixel IDs disclosed through the use of the Tracking Tools identify: (i) the source and destination of incoming signals to Plaintiffs' devices to the Tracking Entities; and (ii) the source and destination of outgoing signals from Plaintiffs' devices.

118.    Defendant did not obtain Plaintiffs' express or implied consent to be subjected to data sharing with the Tracking Tools for the purposes of fingerprinting and de-anonymization.

119.    CIPA imposes civil liability and statutory penalties for the installation of trap and trace software without a court order. California Penal Code § 637.2. No court order to install a trap and trace device via the Tracking Tools was obtained by Defendant.

Case No.  26-cv-2151                              CLASS ACTION COMPLAINT

120. Defendant did not obtain Plaintiffs' or the Class Members' express or implied consent to be subjected to data sharing with the Tracking Entities for the purposes of fingerprinting and de-anonymization, nor did Defendant obtain a court order.

**D.    Defendant Promised Users That Tracking Could Be Disabled, But Continued Tracking Anyway**

121. When users visit Defendant's Website, they are presented with a cookie banner and a privacy interface that states that users can control whether their information is tracked and shared with third parties.

122. The banner states that users can reject non-essential cookies and prevent the sale or sharing of their personal information. The interface provides toggles and controls that allow users to decline tracking technologies that are not necessary for the Website to function.

123. Users who reject those cookies reasonably believe that non-essential tracking will stop. The interface communicates that users can prevent their browsing activity from being shared with third parties.

124. That representation is false.

125. Even after users rejected non-essential cookies, Defendant continued deploying Tracking Tools that intercepted users' interactions with the Website and transmitted those communications and identifiers to third-party tracking companies.

126. Users were told they could disable tracking, attempted to disable it, and the Defendant continued tracking them anyway.

**E.    Defendant Lacked Consent and Misrepresented the Effectiveness of Cookie Controls**

127. Plaintiffs' investigation revealed that the Website's default settings permitted tracking to begin as soon as users arrived on the Website, before users clicked "Accept Cookies" on the Cookie Banner.

128. As a result, users were tracked from the moment they began using the Website, without prior consent.

Case No.  26-cv-2151                                CLASS ACTION COMPLAINT

129.   Plaintiffs visited the Website while those default tracking settings were active.

130.   Users who visit the Website are shown a Cookie Banner offering the option to accept only "necessary" cookies.



*Figure 21 – The Cookie Banner shown to users who visit the Website*

131.   Despite those representations, even users who declined all unnecessary cookies continued to be tracked by at least GA, the BV Pixel, and various other Tracking Tools from Verint, Monetate, and Pingdom.

Case No.  26-cv-2151                          CLASS ACTION COMPLAINT



*Figure 22- The BV Pixel tracking a user who declined all unnecessary cookies*

132.    Defendant intentionally placed GA, BV Pixel, Foresee, Monetate, and Pingdom tracking cookies on the Website and allowed Google, Bazaarvoice, Verint, Monetate, and Pingdom to track users and intercept their communications with the Website, despite stating in the Cookie Settings that tracking cookies would not be placed and that users' information would not be shared with third parties unless users accepted the use of cookies.

133.    Representations regarding cookie-consent controls are materially misleading where tracking continues despite a website's claim to the contrary and/or users' opt-out selections.

134.    Defendant and the Tracking Entities benefited from the interception of Plaintiffs' communications by reading and subsequently using the intercepted contents to construct detailed profiles reflecting Plaintiffs' browsing habits and interests, and by using those profiles for targeted advertising.[39]

[39] *See About Advanced Matching for Web*, TIKTOK, https://ads.tiktok.com/help/article/advanced-matching-web?lang=en (last visited Feb. 17, 2026). ; *Meta Pixel*, FACEBOOK, https://www.facebook.com/business/tools/meta-pixel (last visited Feb. 17, 2026); *Enable*

Case No.  26-cv-2151                                    CLASS ACTION COMPLAINT

135.    The Tracking Entities independently benefit from the interception of communications, using data collected through the Tracking Tools to improve their advertising products and market those capabilities to other businesses.[40]

**CLASS ALLEGATIONS**

136.    Plaintiffs bring these claims for relief pursuant to the Federal Rules of Civil Procedure 23(a), 23(b)(2), or 23(b)(3) on behalf of the following Classes (collectively "the Class").

137.    Plaintiffs bring this class action individually and on behalf of the following Class:

> All consumers who visited and interacted with the Defendant's Website in the United States during the applicable limitations period and whose electronic communications were intercepted, disclosed, or shared through Defendant's Tracking Tools and Tracking Entities (the "Nationwide Class").

138.    Plaintiffs bring this class action individually and on behalf of the following California Subclass:

> All consumers who visited and interacted with the Defendant's Website while located in the State of California during the applicable limitations period and whose electronic communications were intercepted, disclosed, or shared through Defendant's Tracking Tools and Tracking Entities (the "California Subclass").

139.    Specifically excluded from the Class are Defendant, Defendant's officers, directors, agents, trustees, parents, children, corporations, trusts, representatives, employees, servants, partners, joint venturers, or entities controlled by Defendant, and their heirs, successors, assigns, or other persons or entities related to or affiliated with Defendant and/or its officers and/or directors, the judge assigned to this action, and any member of the judge's immediate family.

---

*automatic enhanced match*, PINTEREST, https://help.pinterest.com/en/business/article/automatic-enhanced-match (last visited Feb. 17, 2026).
[40] *See TikTok Business Products (Data) Terms*, TIKTOK (July 29, 2024), http://ads.tiktok.com/i18n/official/policy/business-products-terms(last visited Feb. 17, 2026).; *Meta Business Tools Terms*, FACEBOOK (Apr. 25, 2023), https://www.facebook.com/legal/terms/businesstools?paipv=0&eav=AfakosFmNyhZJOrkCsGodnMzth_uq6s403DsPEkeiKEyrj7rKyf5_t2I8wFEEUZUJlI&_rdr (last visited Feb. 17, 2026).

Case No.  26-cv-2151                    CLASS ACTION COMPLAINT

140. Plaintiffs reserve the right to amend the Class definitions above if further investigation and/or discovery reveal that the Class should be expanded, narrowed, further divided into subclasses, or otherwise modified in any way.

141. NUMEROSITY: At this time, Plaintiffs do not know the number of Class Members but believe the number to be at least measured in thousands, if not millions, given the popularity of Defendant's Website. The number of persons within the Class is believed to be so numerous that joinder of all members is impractical. The exact identities of Class Members may be ascertained via the records maintained by the Defendant.

142. COMMONALITY: Common questions of fact and law exist as to all Class Members and predominate over any questions affecting only individual members of the Class. Such common legal and factual questions, which do not vary between the Class Members, and which may be determined without reference to the individual circumstances of any Class Members, include but are not limited to the following:

a. Whether Defendant shared the Class Members' personal information with the Tracking Entities or other third parties;

b. Whether Defendant obtained effective and informed consent to do so;

c. Whether Class Members are entitled to statutory penalties; and

d. Whether Class Members are entitled to injunctive relief.

143. TYPICALITY: As persons who visited Defendant's Website and whose personal information was shared by Defendant, Plaintiffs are asserting claims that are typical of the Classes.

144. ADEQUACY: Plaintiffs will fairly and adequately protect the interests of the members of the Classes. Plaintiffs have retained attorneys experienced in class action litigation. All individuals with interests that are actually or potentially adverse to or in conflict with the class or whose inclusion would otherwise be improper are excluded.

145. SUPERIORITY: A class action is superior to other available methods of adjudication because individual litigation of the claims of all Class Members is impracticable and

Case No.  26-cv-2151                                    CLASS ACTION COMPLAINT

inefficient. It would be unduly burdensome on the courts, where individual litigation of numerous cases would proceed. If Class treatment of these claims is not available, Defendant will likely continue their wrongful conduct, will unjustly retain improperly obtained revenues, or will otherwise escape liability for their wrongdoing as asserted herein.

**COUNT I**
**VIOLATION OF THE WIRETAP ACT**
**18 U.S.C. § 2510, *et seq.***
**(On Behalf of Plaintiffs and the Nationwide Class)**

146. Plaintiffs incorporate the allegations in paragraphs 1–12 and 15-134 by reference as if fully set forth herein.

147. Plaintiffs bring this cause of action on behalf of themselves and all Nationwide Class Members.

148. The federal Wiretap Act, codified at 18 U.S.C. § 2510, *et seq.* (the "Wiretap Act"), prohibits the intentional interception of any wire, oral, or electronic communication without the consent of at least one authorized party to the communication. 18 U.S.C. § 2511.

149. The Wiretap Act provides a private right of action to "any person whose wire, oral, or electronic communication is intercepted, disclosed, or intentionally used in violation of this chapter." 18 U.S.C. § 2520(a).

150. The Wiretap Act defines "intercept" as "the aural or other acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device." 18 U.S.C. § 2510(4).

151. The Wiretap Act defines "contents" as "any information concerning the substance, purport, or meaning of that communication." 18 U.S.C. § 2510(8).

152. The Wiretap Act defines "electronic communication" as "any transfer of signs, signals, writing, images, sounds, data, or intelligence of any nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic, or photo optical system that affects interstate or foreign commerce." 18 U.S.C. § 2510(12).

48

Case No.  26-cv-2151                                    CLASS ACTION COMPLAINT

153. The Wiretap Act defines "person" to include any individual, partnership, association, trust, or corporation. 18 U.S.C. § 2510(6).

154. Defendant is a "person" within the meaning of the Wiretap Act.

155. The Tracking Tools embedded on Defendant's Website constitute "device[s]" or "apparatus[es]" capable of intercepting wire, oral, or electronic communications within the meaning of 18 U.S.C. § 2510(5).

156. Plaintiffs had a reasonable expectation of privacy in their electronic communications with Defendant's Website, including the pages they viewed, searches conducted via the Website, browsing activity, shopping-related interactions, and other interactions with Website features, particularly where Defendant represented through their Cookie Banner, Cookie Settings, and Privacy Policy that users could opt out of the sale/sharing of personal information and decline non-essential Tracking Tools.

157. The reasonable expectation of privacy depends on the nature of the contents intercepted. Communications reflecting users' choices, intent, and behavior on commercial websites, such as searches, browsing, and order interactions, are sensitive and convey the substance and meaning of the communication.

158. A reasonable user is entitled to assume that any disclosure of the contents of his communications occurs lawfully and with consent. To hold otherwise would require users to assume their privacy will be violated as a matter of course.

159. Plaintiffs reasonably expected that Tracking Entities were not intercepting, recording, or using the contents of their electronic communications with Defendant's Website without their consent.

160. Within the relevant time period, Plaintiffs' electronic communications with the Website were intercepted contemporaneously at the moment they were sent by the Tracking Tools and transmitted to Tracking Entities without Plaintiffs' consent, for the unlawful purpose of monetizing the Plaintiffs' intercepted information, including for combining that information

Case No.  26-cv-2151                              CLASS ACTION COMPLAINT

with information collected about Plaintiffs from across the internet and used for advertising, analytics, and marketing optimization.

161. Interception occurred whenever Plaintiffs interacted with the Website, including when they navigated webpages, used search or location features, viewed electronics, placed an order, or otherwise communicated information to the Website through their browsers.

162. At all relevant times, Defendant's conduct was knowing, willful, and intentional. Defendant is a sophisticated commercial entity that knowingly embedded and enabled the Tracking Tools on its Website and understood that doing so would result in the interception and transmission of users' communications to Tracking Entities.

163. Plaintiffs were never asked to consent to the interception, recording, disclosure, or use of their electronic communications with the Website by the Tracking Entities. To the contrary, Plaintiffs affirmatively declined non-essential cookies and declined third-party tracking through Defendant's cookie-preference interface

164. The unauthorized interception and use of Plaintiffs' electronic communications by the Tracking Entities was only possible because Defendant knowingly and intentionally placed and enabled the Tracking Tools on the Website. 18 U.S.C. § 2511(1)(a).

165. Defendant knowingly and intentionally placed and enabled the Tracking Tools on the Website and allowed them to intercept the communications of users on the Website, in order to subsequently disclose those communications to the Tracking Entities. Those disclosures were made fraudulently, based on Defendant's false representations in the Cookie Banner, and were an invasion of privacy.

166. As a direct and proximate result of Defendant's violations of the Wiretap Act, Plaintiffs have been damaged and are entitled to relief under 18 U.S.C. § 2520, including:

      a.     damages in an amount to be determined at trial, assessed as the greater of actual damages suffered by Plaintiffs and any profits made by the intercepting parties as a result of the violations, or

Case No. 26-cv-2151                CLASS ACTION COMPLAINT

  b.  statutory damages of the greater of $100 per day per violation or $10,000;

   appropriate equitable and declaratory relief; and

  c.  reasonable attorneys' fees and costs.

**COUNT II**
**Common Law Invasion of Privacy – Intrusion Upon Seclusion**
**(On Behalf of Plaintiffs and the Nationwide Class)**

167. Plaintiffs incorporate the allegations in paragraphs 1–12 and 15-134 by reference as if fully set forth herein.

168. Plaintiffs bring this cause of action on behalf of themselves and all Nationwide Class Members.

169. Defendant has intruded upon the legally protected privacy interests of Plaintiffs and the Nationwide Class by, among other things, permitting third-party tracking technologies to collect, track, and compile users' Sensitive Information while representing to users that they could opt out of such collection.

170. Plaintiffs and the Nationwide Class Members maintained a reasonable expectation that their communications with Defendant via the Website would remain private, specifically with respect to their personal information, including browsing activity, device identifiers, and related metadata, which has been recognized as sensitive information.[41] Plaintiffs expected that their interactions with the Website would not be shared with third-party analytics providers.

171. Plaintiffs and the Nationwide Class Members relied on Defendant's representations and exercised the Website's opt-out controls, reasonably expecting that Defendant would honor its affirmative representation in the Cookie Banner and Cookie Settings

---

[41] For example, California voted to pass the California Consumer Privacy Act of 2018 ("CCPA") and voted to amend the CCPA in 2020 through Proposition 24, the California Privacy Rights Act (CPRA). The CPRA sets out that colling and using "personal information," including real names, online identifiers, internet browsing and search history, location data, audio and visual information, etc., requires businesses to provide adequate notice of such practices. *See generally* Cal. Civ. Code §§1798.100, 1798.105, 1798.106, 1798.110, 1798.115, 1798.120, 1798.140(v).

Case No.  26-cv-2151      CLASS ACTION COMPLAINT

that users could opt out of the sale/sharing of personal information and decline non-essential cookies.

172. Despite Plaintiffs' and the Nationwide Class Members' opt-outs, Defendant permitted third parties to use cookies and related Tracking Tools to collect and compile users' Sensitive Information, including the categories described above. The third parties used and profited from these data to create detailed user profiles, audience segments, and targeted advertising, and to share and monetize those profiles.

173. Defendant lacked any legitimate business justification for permitting the placement and transmission of the third-party cookies and Tracking Tools that allowed third parties to access, intercept, and collect users' Sensitive Information, contrary to users' express opt-outs.

174. As a direct and proximate result of Defendant's conduct, Plaintiffs and the Nationwide Class Members suffered injury, including but not limited to loss of privacy, loss of control over their personal information, diminution in value of their private data, and other compensable harms.

175. Plaintiffs and the Nationwide Class Members seek all available relief for this claim, including compensatory damages, restitution, disgorgement of profits, statutory and punitive damages where available, and injunctive relief to prevent further unlawful tracking.

## COUNT III
**Invasion of Privacy and Violation of the California Constitution, Art. 1, sec. 1**
**(On Behalf of Plaintiff Pflaumer and the California Subclass)**

176. Plaintiff Pflaumer incorporates the allegations in paragraphs 1–12 and 15-134 by reference as if fully set forth herein.

177. Plaintiff Pflaumer brings this cause of action on behalf of himself and all California Subclass Members.

178. Article I, Section 1 of the California Constitution provides: "All people are by nature free and independent and have inalienable rights. Among these are enjoying and defending

52

Case No.  26-cv-2151                                          CLASS ACTION COMPLAINT

life and liberty, acquiring, possessing, and protecting property, and pursuing and obtaining safety, happiness, and privacy." California Constitution, Article I, Section 1.

179.   California voters added the word "and privacy" to the California Constitution when they passed Proposition 11 in 1972. Proposition 11 is also known as the "Privacy Initiative" or "Right to Privacy Initiative."

180.   In support of Proposition 11, voters stated that:

"The right of privacy is the right to be left alone … It prevents government and business interests from collecting and stockpiling unnecessary information about us and from misusing information gathered for one purpose in order to serve other purposes or to embarrass us. Fundamental to our privacy is the ability to control circulation of personal information. This is essential to social relationships and personal freedom."

181.   Plaintiff Pflaumer and the California Subclass Members have a legally protected interest in their Sensitive Information, such as browsing activity, device identifiers, and related metadata, which Defendant violated by providing the Tracking Entities access to that data, enabling the interception of such communications. Plaintiff Pflaumer's and California Subclass Members' protected interests arise from various statutes and common law, including, inter alia, the Wiretap Act, the CIPA, and the California Constitution, which protects privacy rights and includes the "ability to control circulation of our personal information."

182.   The privacy rights of Plaintiff Pflaumer and the California Subclass Members were invaded through the interception and collection of their data, which included their Sensitive Information and other sensitive information, without first obtaining authorization or consent from Plaintiff Pflaumer and the California Subclass Members.

183.   Plaintiff Pflaumer and the California Subclass Members had a reasonable expectation of privacy when communicating with Defendant's Website and thereby providing their Sensitive Information.

184.   By causing third-party cookies and Tracking Entities to be placed on users' browsers and devices and by transmitting users' Sensitive Information to third parties despite users' opt-outs, Defendant violated their reasonable expectation of privacy.

Case No.  26-cv-2151                              CLASS ACTION COMPLAINT

185. Defendant's intrusion, placing third-party Tracking Tools and enabling third-party access to users' Sensitive Information despite users' express rejection of such tracking, is and would be highly offensive to a reasonable person.

186. As a direct and proximate result of Defendant's intentional invasion of their privacy rights, Plaintiff Pflaumer and the California Subclass Members have been harmed and are entitled to compensatory, punitive, and injunctive relief.

**COUNT IV**
**Violation of the California Invasion of Privacy Act, Cal. Penal Code § 631**
**(On Behalf of Plaintiff Pflaumer and the California Subclass)**

187. Plaintiff Pflaumer incorporates the allegations in paragraphs 1–12 and 15-134 by reference as if fully set forth herein.

188. Plaintiff Pflaumer brings this cause of action on behalf of himself and all California Subclass Members.

189. CIPA was enacted to curb "the invasion of privacy resulting from the continual and increasing use of" certain technologies determined to pose "a serious threat to the free exercise of personal liberties." CIPA extends civil liability for various means of surveillance using technology.

190. CIPA provides that a person is liable to another where, "by means of any machine, instrument, contrivance, or in any other manner," committed any of the following: (i) intentionally tapped, or made any unauthorized connection, whether physically, electrically, acoustically, inductively or otherwise, with any telegraph or telephone wire, line, cable, or instrument, including the wire, cable, or instrument of any internal telephonic communication system; or (ii) willfully and without consent of all parties to the communication, or in any unauthorized manner, reads or attempts to read or learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line or cable or being sent from or received at any place within this state; or (iii) uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained; or (iv)

54

aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit or cause to be done any of the acts or things mentioned above in this section. Cal. Penal Code § 631(a).

191. The Ninth Circuit has confirmed that one of the purposes of wiretapping statutes is to "prevent the acquisition of the contents of a message by an unauthorized third-party . . . ." *In re Facebook Internet Tracking Litig.*, 956 F.3d 589, 608 (9th Cir. 2020).

192. In dealing specifically with CIPA, the California Supreme Court has similarly concluded that the objective of CIPA is to protect a person's communications "from a situation where the other person on the other end of the line permits an outsider" to monitor the communication. *Ribas v. Clark*, 38 Cal. 3d 355, 364 (1985); *see also Smith v. LoanMe*, 11 Cal. 5th 183, 200 (2021).

193. The Website, including the Tracking Tools placed upon it, is a "machine, instrument, contrivance, or . . . other manner" used to engage in the prohibited conduct at issue here.

194. Within the relevant time period, Defendant, without the consent of all parties to the communication, or in any unauthorized manner, willfully read or attempted to read or learn the contents or meaning of electronic communications of Plaintiffs and the California Subclass Members, contemporaneous with the communications transit through or passing over any wire, line or cable or with the communications sending from or being received at any place within California. The information collected by the Tracking Tools was not for the sole benefit of Defendant. Within the relevant time period, Defendant aided, agreed with, conspired with, and employed the Tracking Entities to implement the Tracking Tools and to violate CIPA § 631.

195. Within the relevant time period, Defendant aided, agreed with, conspired with, and employed the Tracking Entities to accomplish the wrongful conduct at issue here.

196. Plaintiff Pflaumer and the California Subclass Members did not authorize or consent to the tracking, interception, and collection of any of their electronic communications. The violation of section 631 constitutes an invasion of privacy.

Case No.  26-cv-2151                                        CLASS ACTION COMPLAINT

**COUNT V**
**Violation of the California Invasion of Privacy Act, Cal. Penal Code § 638.51**
**(On Behalf of Plaintiff Pflaumer and the California Subclass)**

197.   Plaintiff Pflaumer incorporates the allegations in paragraphs 1–12 and 15-134 by reference as if fully set forth herein.

198.   Plaintiff Pflaumer brings this cause of action on behalf of himself and all California Subclass Members.

199.   California's Pen Register and Trap and Trace Law is part of the California Invasion of Privacy Act ("CIPA") codified at Cal. Penal Code 630, *et seq.*

200.   A "pen register" is "a device or process that records or decodes dialing, routing, addressing, or signaling information transmitted by an instrument or facility from which a wire or electronic communication is transmitted, but not the contents of a communication." Cal. Penal Code § 638.50(b).

201.   A "trap and trace device" is "a device or process that captures the incoming electronic or other impulses that identify the originating number or other dialing, routing, addressing, or signaling information reasonably likely to identify the source of a wire or electronic communication, but not the contents of a communication." Cal. Penal Code § 638.50(c).

202.   "Process" includes "software that identifies consumers, gathers data, and correlates that data through unique 'fingerprinting.'" *Greenley v. Kochava, Inc.*, 684 F.Supp.3d 1024, 1050 (S.D. Cal. 2023).

203.   California Penal Code § 638.51 provides that "a person may not install or use a pen register or a trap and trace device without first obtaining a court order…" Cal. Penal Code § 638.51(a).

204.   No court order to install pen register or trap and trace devices via the Tracking Tools was obtained by Defendant. Defendant uses pen register and trap and trace processes on its Website by deploying Tracking Tools designed to capture phone numbers, email addresses,

56

Case No.  26-cv-2151                              CLASS ACTION COMPLAINT

routing information, addresses, and other signaling information of website users. The Tracking Tools identify the source of the incoming electronic and wire communications to the Website.

205.    Defendant was not authorized by any court order to use pen register or trap and trace devices to track Plaintiff Pflaumer's and the California Subclass Members' activity on the Website.

206.    Defendant did not obtain consent from Plaintiff Pflaumer or the California Subclass Members before using pen register or trap and trace technology to identify users of its Website, and has violated Section 638.51.

207.    As a direct and proximate result of Defendant's conduct, Plaintiff Pflaumer and the California Subclass Members suffered losses and were damaged in an amount to be determined at trial. CIPA imposes civil liability and statutory penalties for violations of § 638.51.

**COUNT VI**
**Violation of the California Consumer Legal Remedies Act**
**Cal. Civ. Code § 1770, et seq. ("CLRA")**
**(On Behalf of Plaintiff Pflaumer and the California Subclass)**

208.    Plaintiff Pflaumer incorporates the allegations in paragraphs 1–12 and 15-134 by reference as if fully set forth herein.

209.    The CLRA prohibits any person from undertaking any "unfair methods of competition and unfair or deceptive acts or practices" in a transaction "that results in the sale or lease of goods or services to any consumer."

210.    Defendant is a person under the CLRA.

211.    Plaintiff Pflaumer is a consumer of Defendant's services under the CLRA, as Plaintiff used Defendant's Website to browse products.

212.    Defendant undertook deceptive acts or practices in violation of the CLRA by failing to disclose the presence of the Tracking Tools on the Website. Defendant violated section 1770(a) of the CLRA by '[m]isrepresenting the source, sponsorship, approval, or certification of goods or services.'

Case No.  26-cv-2151                                    CLASS ACTION COMPLAINT

213. By this failure to disclose, Defendant violated section 1770(a)(5) of the CLRA by '[r]epresenting that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not have.'

214. By this failure to disclose, Defendant violated section 1770(a)(14) of the CLRA by '[r]epresenting that a transaction confers or involves rights, remedies, or obligations which it does not have or involve, or which are prohibited by law.'

215. Defendant's failure to disclose was material to Website users such as Plaintiff. Users could have chosen a different website that did not use Tracking Tools. Users could have chosen a website that disclosed the presence of Tracking Tools and allowed them to be disabled. Users could have chosen a website that requested consent before implementing Tracking Tools.

216. Defendant undertook deceptive acts or practices in violation of the CLRA by fraudulently misrepresenting the presence of the Tracking Tools on the Website.

217. By this fraud, Defendant violated section 1770(a)(5) of the CLRA by '[r]epresenting that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not have.'

218. By this fraud, Defendant violated section 1770(a)(14) of the CLRA by '[r]epresenting that a transaction confers or involves rights, remedies, or obligations which it does not have or involve, or which are prohibited by law.

219. Plaintiff Pflaumer and California Subclass Members seek all available relief for Defendant's use of unfair acts or practices, including injunctive relief.

**COUNT VII**
**Violation of the California Unfair Competition Law**
**Cal. Bus. & Prof. Code § 17200, et seq. ("UCL")**
**(On Behalf of Plaintiff Pflaumer and the California Subclass)**

220. Plaintiff Pflaumer incorporates the allegations in paragraphs 1–12 and 15-134 by reference as if fully set forth herein.

58

Case No.  26-cv-2151                                    CLASS ACTION COMPLAINT

221. The UCL prohibits acts of "unfair competition," including any "unlawful, unfair or fraudulent business act or practice."

222. By actively and affirmatively misleading consumers by omitting to inform them of the tracking pixels on the Website in violation of the CLRA, Defendant has violated the unlawful prong of the UCL.

223. By actively and purposefully installing a wiretap without a visitor's consent in violation of the Federal Wiretap Act and CIPA, Defendant has violated the unlawful prong of the UCL.

224. By actively and purposefully installing a pen register and trap and trace device without a visitor's consent in violation of CIPA, Defendant has violated the unlawful prong of the UCL.

225. By actively and fraudulently deceiving users about its ability to disable the tracking pixels, Defendant has violated the unlawful prong of the UCL.

226. Defendant failed to disclose the presence of the Tracking Tools on the Website. Defendant disclosed users' personal identifying information without knowledge or consent. Defendant disclosed users' information to Tracking Entities to build personal profiles without knowledge or consent. Defendant failed to disclose that it was wiretapping users' communications with the Website. Defendant fraudulently deceived users about its ability to disable the tracking pixels. Through this conduct, Defendant violated the unfair prong of the UCL.

227. Plaintiff Pflaumer has standing to bring claims against Defendant under the UCL. Plaintiff Pflaumer's information was tracked and recorded without consent. Plaintiff Pflaumer's data was used to build personal profiles for advertising purposes without consent.

228. Plaintiff Pflaumer would have considered it important to the decision to visit Defendant's Website to know that his data was being tracked and recorded without his consent, and regardless of privacy elections made through the Cookie Banner and Cookie Settings.

Case No.  26-cv-2151                                      CLASS ACTION COMPLAINT

229.   Instead, Plaintiff Pflaumer exercised the Website's privacy controls and continued using the Website in reliance on Defendant's representations that non-essential tracking had been disabled and that Plaintiff's information would not be shared with third parties.

230.   Because of Defendant's UCL violations described above, Plaintiff Pflaumer suffered injury by losing control of his personal data and having his personal information tracked and recorded without his consent.

231.   Plaintiff Pflaumer and California Subclass Members seek all available relief for Defendant's use of unfair acts or practices, including injunctive relief.

**COUNT VIII**
**Common Law Fraud, Deceit, and/or Misrepresentation**
**(On Behalf of Plaintiffs and the Nationwide Class)**

232.   Plaintiffs incorporate the allegations in paragraphs 1–12 and 15-134 by reference as if fully set forth herein.

233.   Plaintiffs bring this cause of action on behalf of themselves and all Nationwide Class Members.

234.   Defendant made affirmative representations to users through its Cookie Banner, Cookie Settings, and related disclosures that users could opt out of the sale or sharing of personal information and could decline all non-essential cookies.

235.   Defendant represented that exercising those options would limit or prevent the deployment of non-essential Tracking Tools, including targeting and performance cookies, and would stop the transmission of users' browsing activity, interactions, and related data to the Tracking Entities.

236.   Defendant made these representations at the time users first accessed the Website and again when users were prompted to review and confirm their cookie preferences.

237.   These representations were false and misleading. Before users, including Plaintiffs and the putative class members, were able to exercise the purported opt-in choice provided by Defendant, or otherwise decline all non-essential cookies, Defendant deployed the

Case No.  26-cv-2151                                          CLASS ACTION COMPLAINT

Tracking Tools to intercept and collect Plaintiffs' and the Nationwide Class Members' user data and transmit the same to the Tracking Entities, despite Defendant's representation in the Cookie Settings that it would not track users until they consented to the Tracking Tools.

238. Defendant knew the representations were false or misleading, or acted with reckless disregard for their truth, because Defendant controlled the Website's source code, selected and configured the Tracking Tools, and determined how those tools operated in relation to users' expressed privacy choices.

239. Defendant had the technical ability to prevent post-opt-out data transmissions and to configure the Website so that non-essential tracking ceased when users declined such tracking. Industry-standard tools, configurations, and consent-management frameworks exist that permit websites to block, defer, or condition the loading of non-essential tracking technologies based on user preferences, and Defendant could have implemented such measures.

240. Defendant made misrepresentations with the intent to induce reliance by users, including Plaintiffs, by reassuring them that they could meaningfully control tracking while Defendant continued to collect and transmit data for its own commercial benefit.

241. Plaintiffs and the Nationwide Class Members reasonably and justifiably relied on Defendant's misrepresentations by continuing to use the Website and by exercising the opt-out controls instead of avoiding the Website, withholding information, or taking additional steps to protect their privacy.

242. Plaintiffs' reliance was reasonable because Defendant presented the Cookie Banner and Cookie Settings as mechanisms for exercising legally protected privacy rights and for controlling the collection and sharing of personal information.

243. As a direct and proximate result of Defendant's fraudulent conduct, Plaintiffs and the Nationwide Class Members suffered damages, including loss of privacy, loss of control over their personal information, and diminution in the value of their personal data. Plaintiffs suffered injury, including unauthorized disclosure of their communications, loss of control over their personal information, and loss of the privacy protection Defendant represented it would provide.

Case No.  26-cv-2151                                        CLASS ACTION COMPLAINT

244. Defendant's conduct also resulted in Defendant obtaining an unjust and improper benefit by continuing to collect, use, and monetize users' data despite representing that such practices would cease upon opt-out.

245. Plaintiffs and the Nationwide Class Members seek all available relief for Defendant's fraudulent conduct, including compensatory damages, restitution, disgorgement, punitive damages where available, and injunctive relief to prevent further misrepresentations.

**COUNT IX**
**Unjust Enrichment**
**(On Behalf of Plaintiffs and the Nationwide Class)**

246. Plaintiffs incorporate the allegations in paragraphs 1–12 and 15-134 by reference as if fully set forth herein.

247. Plaintiffs bring this cause of action on behalf of themselves and all Nationwide Class Members.

248. Defendant obtained a benefit by collecting, processing, and enabling third-party monetization of Plaintiffs' and the Nationwide Class Members' Sensitive Information, which Defendant then used to increase the effectiveness of advertising, marketing, and sales and to generate revenue.

249. It is unjust that Defendant retains those benefits under circumstances in which the information was collected and transmitted in breach of the representations made to users and without valid consent.

250. Plaintiffs and the Nationwide Class Members conferred these benefits on Defendant, and Defendant has been unjustly enriched at the expense of Plaintiffs and the Nationwide Class Members. Equity and good conscience require restitution or disgorgement of the benefits unjustly retained by Defendant. Therefore, Plaintiffs and the Nationwide Class Members are entitled to the relief set forth below.

Case No.  26-cv-2151                                          CLASS ACTION COMPLAINT

# PRAYER

WHEREFORE, Plaintiffs individually and on behalf of all others similarly situated, seek judgment against Defendant, as follows:

- a. An order certifying the class and making all appropriate class management orders;
- b. For an order determining that this action is properly brought as a class action and certifying Plaintiffs as the representatives of the respective Classes and Subclasses and their counsel as Class Counsel;
- c. For an order declaring the Defendant's conduct violates the statutes referenced herein;
- d. For an order finding in favor of Plaintiffs and the Nationwide Class and California Subclass on all counts asserted herein;
- e. Entry of an order for injunctive and declaratory relief as described herein, including, but not limited to, requiring Defendant to immediately (i) remove the Tracking Tools from the Website or (ii) add, and obtain, the appropriate consent from Website users;
- f. An award of statutory damages or penalties to the extent available;
- g. For damages in amounts to be determined by the Court and/or jury;
- h. For pre-judgment interest on all amounts awarded;
- i. For an order of restitution and all other forms of monetary relief;
- j. An award of all reasonable attorneys' fees and costs; and
- k. Such other and further relief as the Court deems necessary and appropriate.

# JURY TRIAL DEMANDED

Plaintiff demands a trial by jury for all claims so triable.

Case No.  26-cv-2151                                CLASS ACTION COMPLAINT

Respectfully submitted,

Dated: March 12, 2026

By: */s/ Raphael Janove*
        Raphael Janove

**JANOVE PLLC**
Raphael Janove (SBN 361193)
raphael@janove.law
115 Broadway, 5th Floor
New York, NY 10006
(646) 347-3940

**LEVI & KORSINSKY, LLP**
Edward Korsinsky, *pro hac vice forthcoming*
ekorsinsky@zlk.com
33 Whitehall Street, 27th Floor
New York, NY 10004
(212) 363-7500

*Attorneys for Plaintiffs and the Proposed Classes*

64

Case No.  26-cv-2151                    CLASS ACTION COMPLAINT