DAVID HORNIAK (SBN 268441)
david.horniak@us.dlapiper.com
**DLA PIPER LLP (US)**
500 8th St NW
Washington, DC 20004-2131
Telephone: 202.799.4361
Facsimile: 202.799.5361

MATTHEW C. DANAHER (SBN 351055)
matt.danaher@us.dlapiper.com
**DLA PIPER LLP (US)**
4365 Executive Drive, Suite 1100
San Diego, CA 92121-2133
Telephone: 858.677.1400
Facsimile: 858.677.1401

Attorneys for Defendant
ACE HARDWARE CORPORATION

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

SCOTT PFLAUMER, HANS CUMMINGS, and MARK ROSENTHAL, individually and on behalf of all others similarly situated,

Plaintiffs,

v.

ACE HARDWARE CORPORATION,

Defendant.

Case No. 5:26-CV-02151-EJD

**DEFENDANT ACE HARDWARE CORPORATION'S NOTICE OF MOTION AND MOTION TO COMPEL ARBITRATION AND STAY CASE PENDING ARBITRATION; MEMORANDUM OF POINTS AND AUTHORITIES**

Date: July 30, 2026
Time: 9:00 a.m.
Judge: Hon. Edward J. Davila
Courtroom: Courtroom 4
San Jose Courthouse
280 South First Street, 5th Fl.
San Jose, CA 95113

Complaint Filed: March 12, 2026

**NOTICE OF MOTION AND MOTION TO COMPEL ARBITRATION AND STAY CASE PENDING ARBITRATION**

PLEASE TAKE NOTICE THAT on July 30, 2026 at 9:00 a.m., or as soon thereafter as the matter may be heard, before the Honorable Edward J. Davila, United States District Judge, Northern District of California, located at San Jose Courthouse, 280 South First Street, Courtroom 4, 5th Floor, San Jose, California 95113, Defendant Ace Hardware Corporation ("Ace") will, and hereby does, move for an order compelling the claims of Plaintiffs Scott Pflaumer, Hans Cummings, and Mark Rosenthal (collectively, "Plaintiffs") to individual binding arbitration and staying this action pending arbitration under the Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 2-3.

Ace brings this motion on the grounds that Plaintiffs and Ace entered into a binding and enforceable written arbitration agreement that covers all of Plaintiffs' claims. Under the Federal Arbitration Act ("FAA"), 9 U.S.C. sections 2, 3 and 4, as well as interpretive case law, the Court should order Plaintiffs to arbitrate their claims and stay this action pending completion of the arbitrations.

Ace bases its motion on this Notice of Motion and Motion, the accompanying Memorandum of Points and Authorities, the Declaration of Alice Wilder and the accompanying exhibits, any reply filed in support of this motion, all papers and pleadings filed in this action, and any other evidence and argument as presented in connection with the hearing.

Dated: May 18, 2026

DLA PIPER LLP (US)

By: /s/ *David Horniak*
David Horniak

*Attorneys for Defendant*
Ace Hardware Corporation

# TABLE OF CONTENTS

Page

I. INTRODUCTION ........ 1

II. STATEMENT OF FACTS ........ 1

A. Ace's Website ........ 1

B. Ace's Terms of Use ........ 3

C. Plaintiffs' Relationships with Ace, Website Visits, and Consent to the Terms ........ 4

III. ISSUES TO BE DECIDED ........ 5

IV. LEGAL STANDARD ........ 5

V. ARGUMENT ........ 6

A. There is a Valid Agreement to Arbitrate. ........ 6

1. The Terms are Conspicuous in the Cookie Banner. ........ 7

2. Plaintiffs Manifested Assent to the Terms by Interacting with the Cookie Banner. ........ 9

B. Plaintiffs Cummings and Rosenthal Separately Manifested Assent to the Terms Through Additional Interactions with Ace. ........ 10

C. The Terms Mandate Arbitration of Plaintiffs' Claims ........ 10

D. The Action Should Be Stayed Pending Arbitration. ........ 12

VI. CONCLUSION ........ 12

**TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*AT&T Mobility LLC v. Concepcion*,
563 U.S. 333 (2011)....................5

*AT&T Techs., Inc. v. Commc'ns Workers of Am.*,
475 U.S. 643 (1986)....................11

*Benson v. Casa De Capri Enters., LLC*,
980 F.3d 1328 (9th Cir. 2020)....................5

*Berman v. Freedom Fin. Network, LLC*,
30 F.4th 849 (9th Cir. 2022)....................9

*Brennan v. Opus Bank*,
796 F.3d 1125 (9th Cir. 2015)....................5, 6, 11

*Chabolla v. ClassPass, Inc.*,
129 F.4th 1147 (9th Cir. 2025)....................7, 9

*Chiron Corp. v. Ortho Diagnostic Sys., Inc.*,
207 F.3d 1126 (9th Cir. 2000)....................11

*Dean Witter Reynolds Inc. v. Byrd*,
470 U.S. 213 (1985)....................5, 6

*First Options of Chi., Inc. v. Kaplan*,
514 U.S. 938 (1995)....................6

*Gaines v. Ciox Health, LLC*,
2024 WL 4023817 (Ill. App. Ct. Sept. 3, 2024)....................7

*Godun v. JustAnswer LLC*,
135 F.4th 699 (9th Cir. 2025)....................6, 9

*Henry Schein, Inc. v. Archer & White Sales, Inc.*,
586 U.S. 63 (2019)....................11

*Howsam v. Dean Witter Reynolds, Inc.*,
537 U.S. 79 (2002)....................5

*Keebaugh v. Warner Bros. Ent. Inc.*,
100 F.4th 1005 (9th Cir. 2024)....................7, 9

*L.B. v. LinkedIn Corp.*,
2025 WL 2899514 (N.D. Cal. Oct. 10, 2025)....................8

*Lakes v. Ubisoft, Inc.*, 777 F. Supp. 3d 1047 (N.D. Cal. 2025) .......... 8

*Lamps Plus, Inc. v. Varela*, 587 U.S. 176 (2019) .......... 5

*Morrison v. Yippee Ent., Inc.*, 2025 WL 2389424 (9th Cir. Aug. 18, 2025) .......... 8

*Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1 (1983) .......... 5

*Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171 (9th Cir. 2014) .......... 6

*Oberstein v. Live Nation Entertainment, Inc.*, 60 F.4th 505 (9th Cir. 2023) .......... 7

*Oracle Am., Inc. v. Myriad Grp. A.G.*, 724 F.3d 1069 (9th Cir. 2013) .......... 11

*Peter v. DoorDash, Inc.*, 445 F. Supp. 3d 580 (N.D. Cal. 2020) .......... 7

*Smith v. Spizzirri*, 601 U.S. 472 (2024) .......... 5, 12

*So v. Hyatt Corp.*, 2025 WL 2994995 (C.D. Cal. Aug. 25, 2025) .......... 6

*Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662 (2010) .......... 5

*Tillman v. Tillman*, 825 F.3d 1069 (9th Cir. 2016) .......... 12

*Trimble Inc. v. Unity Software Inc.*, 2026 WL 42557 (N.D. Cal. Jan. 7, 2026) .......... 11

*Wilson v. Redbox Automated Retail, LLC*, 448 F. Supp. 3d 873 (N.D. Ill. 2020) .......... 8

**Statutes**

9 U.S.C. § 2 .......... 5

9 U.S.C. § 3 .......... 3, 5, 6, 12

9 U.S.C. § 4 .......... 6

**MEMORANDUM OF POINTS AND AUTHORITIES**

## I. INTRODUCTION

Plaintiffs Scott Pflaumer, Hans Cummings, and Mark Rosenthal ("Plaintiffs") each visited Ace Hardware Corporation's ("Ace") website, acehardware.com (the "Website"). Each interacted with a prominently displayed cookie banner (the "Cookie Banner"). Each received clear notice that doing so constituted acceptance of Ace's Terms of Use, which include a binding arbitration provision. Plaintiffs now seek to litigate their claims in this Court. But they have chosen the wrong forum.

The Cookie Banner informs every visitor that by selecting any option, closing the banner, or continuing to browse, they accept and agree to Ace's Terms of Use (the "Terms"). The Terms are hyperlinked directly on the banner in capitalized, blue, underlined text. Those Terms contain a mandatory arbitration clause covering all claims related to Ace's website, products, or services. Plaintiffs' own Complaint confirms that each Plaintiff clicked the "Necessary Cookies Only" button in the banner and then continued browsing. They took the very actions the banner told them would constitute acceptance of the Terms. Accordingly, they must now arbitrate their claims.

In addition, Plaintiffs Cummings and Rosenthal admit that they maintain active Ace Rewards accounts, and Plaintiff Cummings has also used the Website to make purchases. These actions constitute separate bases for assent to Ace's Terms and, accordingly, arbitration.

Where a valid agreement to arbitrate exists and covers the claims at issue, the Court must compel arbitration. That standard is met here. Ace respectfully requests that the Court compel Plaintiffs to submit their claims to individual binding arbitration and stay this action pending completion of those proceedings.

## II. STATEMENT OF FACTS

### A. Ace's Website

Ace owns and operates the Website. Complaint ("Compl.") ¶ 2. Through the Website, visitors may browse and purchase products and services, create and manage accounts, and explore offers and deals. *See id.*

"Like many modern websites, the Website displays a cookie banner." Compl. ¶ 2. The Cookie Banner is configured to appear immediately when an individual accesses the Website on either a computer or a mobile device. Declaration of Alice Wilder ("Wilder Decl.") ¶ 5. The Cookie Banner appears prominently in the left-hand corner of the screen and remains there as the user scrolls down the Website page they initially visited. *Id.* ¶ 6. It does not disappear until the user either selects one of the buttons on the Cookie Banner, clicks the 'x' in the banner's corner, or chooses to navigate further into the site by clicking on a link. *Id.* The Cookie Banner has appeared in this form, with this language, and with these hyperlinks, since at least June 4, 2025.

As Plaintiffs' Complaint acknowledges, the Cookie Banner states:




Compl. ¶¶ 2, 46, 51.

As illustrated above, the cookie banner clearly states that "Ace Hardware and other third parties collect data when you shop, participate in Ace Rewards, through cookies, including session recording, during chat sessions and as described in our Privacy Policy. By selecting any of the options below, by closing this window by clicking 'x', or by continuing to browse, you accept and agree to our **TERMS OF USE**, **Notice of Financial Incentive**, **Categories of Personal Information**, and **Privacy Policy**." *See, e.g.*, *id.* ¶ 2. The Cookie Banner contains links to each of Ace's Terms of Use, Notice of Financial Incentive, Categories of Personal Information

(i.e., additional categories of Personal Information about California residents Ace Hardware collects), and Privacy Policy. *See id.* Every link appears in blue, bolded, underlined text. The "TERMS OF USE" link is presented in all capital letters and is the first item in the list, making it particularly conspicuous.

**B. Ace's Terms of Use**

Ace last updated its Terms of Use on March 10, 2026. Wilder Decl., ¶ 16. Before the March 2026 Terms, Ace updated its Terms of Use on October 16, 2025. *Id.* Section 3 of the Terms provides that "[b]y downloading, installing, accessing, or using any of our Online Services after we post a revised version of the Terms of Use, you agree to the Terms of Use as modified." *Id.* ¶ 24; Exs. B, at 3, C, at 3.

The Terms govern each Website visitor's use of the Website, as well as any mobile applications, mobile services, applications, platforms, and tools that link to the Terms, and the content, features, and software available on them. The Terms collectively refer to these as the "Online Services." Wilder Decl., ¶ 15.

Both the October 16, 2025 and March 10, 2026 versions of the Terms contain an arbitration clause. Section 20 states,

> "All claims arising out of or relating to any agreement with Ace and any Ace site, product, service, application, or tool, including these Terms of Use (collectively, 'Ace Offerings'), will be resolved exclusively through binding arbitration according to the Dispute Resolution Terms, available at **https://www.acehardware.com/dispute-resolution-terms**. The Dispute Resolution Terms are hereby incorporated by reference in these Terms of Use. We both agree that all claims must be brought in an individual capacity and not as a plaintiff or class member in any purported class or representative action or proceeding."

*Id.* ¶ 18; Exs. B, at 12, C, at 12.

The Ace Dispute Resolution Terms, linked to by the Terms' arbitration clause (as depicted above), state that the arbitration clause is a "written agreement to arbitrate" pursuant to the Federal Arbitration Act, provide that "you and Ace each agree that this section is intended to satisfy the 'writing' requirement of the Federal Arbitration Act," and call for application of the AAA Consumer Rules. *Id.* Exs D, at 1; E, at 1. At all relevant times, these Dispute Resolution

Terms have provided that arbitrations shall commence with filing a demand with the American Arbitration Association ("AAA"), and that the AAA's Consumer Rules (as applicable) shall govern the arbitration. *Id.* Exs. D, at 1; E, at 1.

### C. Plaintiffs' Relationships with Ace, Website Visits, and Consent to the Terms

Plaintiff Pflaumer alleges that he "visited the Website in or about May 2025 for consumer browsing purposes," during which he "engaged with the cookie consent mechanism and declined all non-essential cookies." Compl. ¶ 15. Plaintiff Pflaumer also alleges that he "more recently visited the Website on February 25, 2026" and once more "us[ed] the Cookie Banner to decline all non-essential cookies." *Id.* During these Website visits, Plaintiff Pflaumer allegedly proceeded to browse the Website after clicking the Cookie Banner's "Necessary Cookies Only" button. *See id.*

Plaintiff Cummings alleges he visited the Website "in or about February 2026" and again "on February 24, 2026," and on both occasions "engaged with the cookie consent mechanism and declined all non-essential cookies" and proceeded to browse the Website. *Id.* ¶ 16. Plaintiff Cummings also alleges that he "maintains an account with [Ace] and has made purchases through the Website." *Id.*

Plaintiff Rosenthal alleges he visited the Website "in or about January 2026" during which he "engaged with the cookie consent mechanism and declined all non-essential cookies" and browsed the Website. *Id.* ¶ 17. He also "uses [Ace's] mobile application." *Id.* Like Plaintiff Cummings, Plaintiff Rosenthal "maintains an account with [Ace]." *Id.*

Since at least June 4, 2025, the Website has displayed the same Cookie Banner that the Complaint depicts. Wilder Decl., ¶¶ 7, 9; *see also* Compl. ¶¶ 2, 51. Accordingly, the Cookie Banner has appeared on the Website during at least one of each Plaintiffs' alleged website visit(s), and each Plaintiff has interacted with that Cookie Banner according to their Complaint. Wilder Decl., ¶ 9.

There are many ways for individuals to consent to the Terms. Any individual that makes a purchase on the Website agrees to Ace's Terms and Privacy Policy as part of the checkout process. *Id.* ¶ 23. Further, individuals (like Plaintiffs Cummings and Rosenthal) must agree to the Terms to maintain an active Ace Rewards Account. *Id.*

## III. ISSUES TO BE DECIDED

A. Have Plaintiffs agreed to the Terms, including their arbitration provision?

B. Should this action be stayed pending arbitration of Plaintiffs' claims?

## IV. LEGAL STANDARD

Under the FAA, written agreements to arbitrate "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. "The overarching purpose of the FAA . . . is to ensure the enforcement of arbitration agreements according to their terms so as to facilitate streamlined proceedings." *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 344 (2011)*; see also Lamps Plus, Inc. v. Varela*, 587 U.S. 176, 185 (2019) ("[B]enefits of private dispute resolution [include] lower costs, greater efficiency and speed, and the ability to choose expert adjudicators to resolve specialized disputes") (quoting *Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662, 685 (2010)). If a court compels arbitration in a dispute filed in federal court, the FAA requires that the Court stay the litigation pending arbitration. 9 U.S.C. § 3; *Smith v. Spizzirri*, 601 U.S. 472, 478–79 (2024).

The FAA is mandatory and does not allow courts to delve into policy considerations regarding arbitration. It "leaves no place for the exercise of discretion by a district court, but instead mandates that district courts shall direct the parties to proceed to arbitration on issues as to which an arbitration agreement has been signed." *Dean Witter Reynolds Inc. v. Byrd*, 470 U.S. 213, 218 (1985); *see also Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24-25 (1983) (holding "questions of arbitrability must be addressed with a healthy regard for the federal policy favoring arbitration"); *Benson v. Casa De Capri Enters., LLC*, 980 F.3d 1328, 1330 (9th Cir. 2020) ("Generally, as a matter of federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." (internal quotation marks omitted)).

In deciding a motion to compel arbitration, the court must limit its review to two issues: "(1) whether there is an agreement to arbitrate between the parties; and (2) whether the agreement covers the dispute." *Brennan v. Opus Bank*, 796 F.3d 1125, 1130 (9th Cir. 2015) (citing *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 84 (2002)). When both elements exist, the FAA "leaves no place for the exercise of discretion by a district court, but instead mandates that district

courts shall direct the parties to proceed to arbitration" on the issues they have agreed to arbitrate. *Byrd*, 470 U.S. at 218 (citing 9 U.S.C. §§ 3, 4). Regarding the second element, where, as here, the parties have delegated threshold arbitrability questions to the arbitrator, the court must honor that agreement and allow the arbitrator to decide arbitrability, including the enforceability and scope of the arbitration agreement. *Brennan*, 796 F.3d at 1130.

## V. ARGUMENT

Arbitration is the correct forum for Plaintiffs' claims. Each Plaintiff agreed to arbitrate their claims by affirmatively interacting with the Cookie Banner, which disclosed the legal significance of clicking "Necessary Cookies Only." In addition, Plaintiffs Cummings and Rosenthal separately agreed to arbitrate their claims through "maintain[ing] an account with [Ace]," and, for Plaintiff Cummings, "mak[ing] purchases," by which they agreed to the Terms. The Court should compel arbitration of their claims.

### A. There is a Valid Agreement to Arbitrate.

Plaintiffs agreed to Ace's Terms, including their arbitration provision, by selecting the "Necessary Cookies Only" button on the Cookie Banner during their Website visits. The Cookie Banner is a "sign-in wrap" agreement, and Plaintiffs' selection of the "Necessary Cookies Only" button in the Cookie Banner evidenced their unmistakable assent to the Terms and their arbitration provision.

Courts apply ordinary contract formation principles under applicable state law to determine whether parties agreed to arbitrate. *First Options of Chi., Inc. v. Kaplan,* 514 U.S. 938, 944 (1995); *Nguyen v. Barnes & Noble Inc.,* 763 F.3d 1171, 1175 (9th Cir. 2014). Here, the Terms contain an Illinois choice-of-law provision. *See* Wilder Decl., Exs. B, at 12; C, at 12 ("These Terms of Use will be governed by and construed in accordance with the laws of the State of Illinois, without giving effect to any principles of conflicts of laws."). The Ninth Circuit "ha[s] consistently stated that no differences exist in the law of the different states as to internet contract formation." *Godun v. JustAnswer LLC*, 135 F.4th 699, 708 (9th Cir. 2025); *see also So v. Hyatt Corp.*, 2025 WL 2994995, at *4 (C.D. Cal. Aug. 25, 2025) (comparing Illinois and California contract formation authorities and noting as to the parties' contract formation that "[t]he Court

agrees the result is the same under either body of law”).

“To form a contract under California law, there ‘must be actual or constructive notice of the agreement and the parties must manifest mutual assent.’” *Keebaugh v. Warner Bros. Ent. Inc.*, 100 F.4th 1005, 1013–14 (9th Cir. 2024) (citation omitted); *Gaines v. Ciox Health, LLC*, 2024 WL 4023817, at *7 (Ill. App. Ct. Sept. 3, 2024) (“Regardless of the type of online agreement, the circumstances of the transaction must provide the offeree with reasonable notice that the terms of an agreement are being offered and that certain acts or conduct by the offeree will constitute acceptance of the offer.”). “In the world of internet contracts . . . there are sign-in wrap agreements . . . [through] which a user signs up to use an internet product or service, and the sign-up screen states that acceptance of a separate agreement is required before the user can access the service.” *Chabolla v. ClassPass, Inc.*, 129 F.4th 1147, 1161 (9th Cir. 2025). “Like all online contracts, a sign-in wrap agreement may be an enforceable contract based on inquiry notice if (1) the website provides reasonably conspicuous notice of the terms to which the consumer will be bound; and (2) the consumer takes some action, such as clicking a button or checking a box, that unambiguously manifests his or her assent to those terms.” *Id.* at 1154–55 (citation omitted).

Here, the Cookie Banner comfortably satisfies the dual test for enforceability.

**1. The Terms are Conspicuous in the Cookie Banner.**

To analyze whether a website provides reasonably conspicuous notice of an agreement, courts “look[] to ‘the conspicuousness and placement of the Terms of Use hyperlink, other notices given to users of the terms of use, and the website’s general design’ in determining ‘whether a reasonably prudent user would have inquiry notice of a[n] [online] agreement.’” *Oberstein v. Live Nation Entertainment, Inc.*, 60 F.4th 505, 515 (9th Cir. 2023). “To be conspicuous, notice must be displayed in a font size and format such that the court can fairly assume that a reasonably prudent Internet user would have seen it.” *Keebaugh*, 100 F.4th at 1013–14 (internal quotations omitted). Courts find the notice is conspicuous where screens “interjected notice of the terms and conditions directly above or below the relevant action item.” *ClassPass*, 129 F.4th at 1157; *see also Peter v. DoorDash, Inc.*, 445 F. Supp. 3d 580, 586 (N.D. Cal. 2020) (compelling arbitration

where terms-of-use hyperlink appeared "directly below" the "sign-up button"); *Wilson v. Redbox Automated Retail, LLC*, 448 F. Supp. 3d 873, 885 (N.D. Ill. 2020) ("There must be some other distinguishing characteristic to inform consumers that there was in fact a hyperlink that should be clicked and that a contract should be reviewed, such as words to that effect, underlining, bolding, capitalization, italicization, or large font." (internal quotation marks omitted) (citation omitted)).

The Website's cookie banner incorporates elements of multiple categories. The banner appears prominently on the screen at the outset of a user's Website visit, and it persists in the left corner of the screen while the user remains on the Website's home page. *See* Wilder Decl., ¶ 6. It continues to appear until the user either selects one of the buttons, clicks the "x" in the banner's corner, or chooses to navigate further into the site by clicking on a link to another page. *See id.* Additionally, the banner states that "[b]y selecting any of the options below, by closing this window by clicking 'x', or by continuing to browse, you accept and agree to our **TERMS OF USE**." *See id.*, Ex. A, at 1; Compl. ¶¶ 2, 46, 51 (emphasis added). The banner's invitation of assent most closely resembles a clickwrap agreement because a user is given prominent notice of the terms and must signal their assent in some fashion in order to continue using the Website. However classified, the link to the Terms in the banner creates an enforceable agreement. *Cf. Lakes v. Ubisoft, Inc.*, 777 F. Supp. 3d 1047, 1054 (N.D. Cal. 2025) (finding "Plaintiffs were presented with a Cookie Banner when they first arrived at the Website" and thus "Plaintiffs had to consent to the use of cookies prior to use of the Website").

In *Morrison v. Yippee Entertainment, Inc.*, the Ninth Circuit found a similarly formatted terms link that was sufficiently conspicuous to put the plaintiff on notice that they were agreeing to the terms. *See* 2025 WL 2389424, at *1 (9th Cir. Aug. 18, 2025). The court emphasized the appearance of the terms link and noted that "the hyperlink appeared in bright blue font against a clean white background that stood out from the surrounding text to indicate it was clickable." *Id.* The same result should follow here. *See L.B. v. LinkedIn Corp.*, 2025 WL 2899514, at *10 (N.D. Cal. Oct. 10, 2025) (Davila, J.) (finding cookie banner displayed reasonably conspicuous notice of agreement when the cookie banner "clearly inform[ed] users in plain language that continued

use of the website constitutes acceptance, and though not required, users are notified that they can consent to the policy by clicking a large box with 'ACCEPT' written in all caps").

Moreover, as part of determining whether a website provides reasonably conspicuous notice of its terms, courts can look to the "context of the transaction." *Keebaugh*, 100 F.4th at 1019. "The nature of an agreement may anticipate some sort of continuing relationship . . . that would require some terms and conditions[.]" *ClassPass Inc.*, 129 F.4th at 1155 (citation omitted). Here, Plaintiffs Cummings and Rosenthal each allege that they "maintain an account with [Ace]," evidencing their intent to continue their relationship with Ace as customers. Compl. ¶¶ 16, 17. And though Plaintiff Pflaumer "does not maintain an account," he made multiple website visits in 2025 and 2026 and alleges that but for the Cookie Banner's configuration, "he would have continued to use the Website." *Id.* ¶ 15.

**2. Plaintiffs Manifested Assent to the Terms by Interacting with the Cookie Banner.**

"The second step of the inquiry-notice internet contract formation test asks [courts] to consider whether any action taken by the internet user—such as clicking a button or checking a box—'unambiguously manifest[ed] his or her assent' to proposed contractual terms." *Godun v. JustAnswer LLC*, 135 F.4th 699, 710 (9th Cir. 2025) (quoting *Keebaugh*, 100 F.4th at 1018)). "[T]he notice must explicitly notify a user of the legal significance of the action she must take to enter into a contractual agreement." *Berman v. Freedom Fin. Network, LLC,* 30 F.4th 849, 858 (9th Cir. 2022).

Here, the Cookie Banner explains the user's options and the significance of interacting with the Cookie Banner. It states that "[b]y selecting any of the options below"—such as clicking "Necessary Cookies Only"—"by closing this window by clicking 'x', or by continuing to browse, you accept and agree to our **TERMS OF USE**." *See, e.g.*, Compl. ¶ 2. The Cookie Banner leaves no ambiguity that the specified actions, including Plaintiffs' selection of the "Necessary Cookies Only" button on the Cookie Banner, will result in agreement to the Terms. *See* Compl. ¶¶ 15–17. Unlike a "Reject All" button where a user could (unconvincingly) argue that they intended to reject both these cookies and the Terms, the "Necessary Cookies Only" button signals it applies

only to cookies. And the Cookie Banner expressly states that clicking this button is an acceptance of the Terms. Accordingly, by reviewing the Cookie Banner and selecting the "Necessary Cookies Only" button, Plaintiffs agreed to the Terms.

Even if Plaintiffs did not select the "Necessary Cookies Only" button (they admit they did), the Cookie Banner states that "by continuing to browse, you accept and agree to" the Terms. *See, e.g.*, Compl. ¶ 2. Because Plaintiffs plead that after interacting with the Cookie Banner, they continued to browse the Website for various browsing (and for Plaintiff Cummings, purchases), they manifested their assent to the Terms through this second action. *See id.* ¶¶ 15–17.

### B. Plaintiffs Cummings and Rosenthal Separately Manifested Assent to the Terms Through Additional Interactions with Ace.

Aside from their consent to the Cookie Banner, Plaintiffs Cummings and Rosenthal also manifested assent to the Terms by maintaining active Ace Rewards accounts and, for Plaintiff Cummings, by making Website purchases.

Plaintiffs Cummings and Rosenthal both admit that they "maintain an account with [Ace]" (Compl. ¶¶ 16-17), meaning that both plaintiffs are active Ace Rewards members. By maintaining their Ace Rewards accounts, Plaintiffs Cummings and Rosenthal have agreed to the Terms and the Privacy Policy. Wilder Decl., ¶ 23. Accordingly, Plaintiffs Cummings and Rosenthal each manifested consent ***yet again*** through their status as active Ace Rewards members. Further, Plaintiff Cummings admits that he "has made purchases through the Website." Compl. ¶ 16. Individuals that make purchases on the Website must agree to the Terms and the Privacy Policy every time they make a purchase. Wilder Decl., ¶ 23. Consequently, Plaintiff Cummings alleges yet another way in which he consented to the Terms. These additional bases confirm Plaintiff Cummings and Rosenthal's claims belong in arbitration.

### C. The Terms Mandate Arbitration of Plaintiffs' Claims

If there is agreement to arbitrate, the second inquiry is whether the Arbitration Agreement encompasses this dispute. The answer is yes, but the Court need not reach the question because the parties delegated arbitrability questions to the arbitrator. Accordingly, if there is a valid agreement to arbitrate, as there is here, the Court must compel arbitration and leave further

questions of arbitrability to the arbitrator.

"[I]f a valid [arbitration] agreement exists, and if the agreement delegates the arbitrability issue to an arbitrator, a court may not decide the arbitrability issue." *Henry Schein, Inc. v. Archer & White Sales, Inc.*, 586 U.S. 63, 69 (2019). The parties are free to delegate any "gateway issues" over the validity and enforceability of arbitration provisions. *Brennan*, 796 F.3d at 1130. "The Ninth Circuit has held that the 'incorporation of the AAA rules constitutes clear and unmistakable evidence that contracting parties agreed to arbitrate arbitrability.'" *Trimble Inc. v. Unity Software Inc.*, 2026 WL 42557, at *2 (N.D. Cal. Jan. 7, 2026). "Virtually every circuit to have considered the issue has determined that incorporation of [AAA's] arbitration rules constitutes clear and unmistakable evidence that the parties agreed to arbitrate arbitrability." *Oracle Am., Inc. v. Myriad Grp. A.G.*, 724 F.3d 1069, 1074 (9th Cir. 2013). Here, Ace's Dispute Resolution Terms calls for application of the AAA Consumer Rules. *See* Wilder Decl., Exs D, at 2; E, at 2. Moreover, the Terms' broad language requires Plaintiffs to arbitrate their disputes with Ace.

Regardless, the Terms' plain language requires Plaintiffs to arbitrate their claims. The Supreme Court has held that, "where [a] contract contains an arbitration clause, there is a presumption of arbitrability . . . [and d]oubts should be resolved in favor of coverage." *AT&T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 650 (1986) (citation omitted). Courts consistently hold that arbitration agreements like this one—which apply to all claims "that have arisen or may arise . . . in connection with" the contract—are "broad and far reaching." *Chiron Corp. v. Ortho Diagnostic Sys., Inc.,* 207 F.3d 1126, 1131 (9th Cir. 2000). There's simply no debate that the arbitration agreement in the Terms covers this dispute.

Plaintiffs agreed to arbitrate "all claims arising out of or relating to any agreement with Ace and any Ace site, product, service, application, or tool, including these Terms of Use," otherwise known as the "Ace Offerings." Wilder Decl., Exs. B, at 11; C, at 12. Plaintiffs' claims arise from Ace's alleged conduct during Plaintiffs' visit(s) to the Website. *See, e.g.*, Compl. ¶ 10 (alleging "Plaintiffs . . . visited [the] Website in or around 2025 and 2026 for ordinary consumer purposes, including browsing and comparing products, ordering products, and otherwise navigating the Website's content" and that "[Ace] deployed Tracking Tools that automatically intercepted,

recorded, and transmitted Plaintiffs' Sensitive Information to the Tracking Entities."). Accordingly, Plaintiffs' allegations place their dispute with Ace squarely within the arbitration clause's scope.

### D. The Action Should Be Stayed Pending Arbitration.

Ace seeks a stay of this action pending arbitration of Plaintiffs' claims. "When a district court finds that a lawsuit involves an arbitrable dispute, and a party requests a stay pending arbitration, § 3 of the FAA compels the court to stay the proceeding." *Smith v. Spizzirri*, 601 U.S. 472, 478 (2024). Section 3 provides that a court "*shall* on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement, providing the applicant for the stay is not in default in proceeding with such arbitration," so long as the court is "satisfied that the issue involved in such suit or proceeding is referable to arbitration under such an agreement." 9 U.S.C. § 3 (emphasis added); *see also Tillman v. Tillman*, 825 F.3d 1069, 1075 (9th Cir. 2016) (holding Section 3 of the FAA mandates "that district courts must stay pending proceedings on issues subject to arbitration until such arbitration has been had").

Accordingly, the Court should stay the entirety of this lawsuit pending the completion of Plaintiffs' arbitrations.

## VI. CONCLUSION

For the foregoing reasons, Ace respectfully requests that the Court compel Plaintiffs' claims to individual binding arbitration and stay this action pending the outcome of the arbitration.

Dated: May 18, 2026

DLA PIPER LLP (US)

By: <u>/s/ *David Horniak*</u>
David Horniak

*Attorneys for Defendant*
Ace Hardware Corporation