**JANOVE PLLC**
Raphael Janove (SBN 361193)
raphael@janove.law
115 Broadway, 5th Floor
New York, NY 10006
(646) 347-3940

**LEVI & KORSINSKY, LLP**
Eduard Korsinsky (admitted *pro hac vice*)
ek@zlk.com
33 Whitehall Street, 27th Floor
New York, NY 10004
(212) 363-7500

***Attorneys for Plaintiffs and the Proposed Class***

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

SCOTT PFLAUMER, HANS CUMMINGS, and MARK ROSENTHAL, individually and on behalf of all others similarly situated,

Plaintiffs,

v.

ACE HARDWARE CORPORATION,

Defendant.

Case No. 5:26-CV-02151-EJD

**PLAINTIFFS' OPPOSITION TO DEFENDANT ACE HARDWARE CORPORATION'S MOTION TO COMPEL ARBITRATION AND STAY CASE PENDING ARBITRATION WITH MEMORANDUM OF POINTS AND AUTHORITIES**

Hearing Date: July 30, 2026
Time: 9:00 a.m.
Judge: Hon. Edward J. Davila
Courtroom: Courtroom 4
San Jose Courthouse
280 South First Street, 5th Fl.
San Jose, CA 95113

Complaint Filed: March 12, 2026

**TABLE OF CONTENTS**


INTRODUCTION ..... 1
FACTUAL BACKGROUND ..... 2
LEGAL STANDARD ..... 3
ISSUES TO BE DECIDED ..... 4
ARGUMENT ..... 4
I. Defendant Has Failed to Show that Plaintiffs Manifested Assent to the Website's Terms ..... 5
A. The Context of the Transactions at Issue Does not Indicate Plaintiffs' Intent to Enter into an Ongoing Contractual Relationship with Defendant ..... 9
B. The Cookie Banner Did Not Provide Sufficiently Conspicuous Notice of the Terms ..... 9
C. Defendant Cannot Establish Notice Via Website Purchases and/or Rewards Account Sign-Up ..... 14
D. Because Defendant's Cookie Banner Is Insufficient to Establish Constructive Notice of the Terms, Any Choice-of-Law Provision, Class Waiver, and/or Delegation Clause Contained Therein Are Also Unenforceable ..... 15
II. Even if Defendant Establishes Constructive Notice of the Terms, the Delegation Clause, the Arbitration Provision, and the Class Waiver are Unenforceable and/or Unconscionable ..... 16
A. The Terms Do Not Contain a Delegation Clause ..... 16
B. The Arbitration Provision in the Dispute Resolution Terms is Unconscionable and Unenforceable ..... 17
C. The Class Waiver in Defendant's Terms Improperly Prohibits Public Injunctive Relief ..... 22
CONCLUSION ..... 24

## TABLE OF AUTHORITIES

**Cases**


*A. Dhruva v. Curiositystream, Inc.*,
131 F.4th 146 (4th Cir. 2025) ........ 9

*Aral v. Earthlink, Inc.*,
36 Cal. Rptr. 3d 229 (Ct. App. 2005) ........ 18

*Armendariz v. Found. Health Psychcare Servs., Inc.*,
99 Cal. Rptr. 2d 745, 6 P.3d 669 (2000) ........ 18, 19

*AT&T Mobility LLC v. Concepcion*,
563 U.S. 333 (2011) ........ 4, 17, 19

*B.D. v. Blizzard Entm't, Inc.*,
292 Cal. Rptr. 3d 47 (Ct. App. 2022) ........ 7, 13

*Baltazar v. Forever 21, Inc.*,
200 Cal. Rptr. 3d 7, 367 P.3d 6 (2016) ........ 18, 19

*Berman v. Freedom Fin. Network, LLC*,
30 F.4th 849 (9th Cir. 2022) ........ 5, 6, 7, 9, 10, 12, 13, 14

*Brennan v. Opus Bank*,
796 F.3d 1125 (9th Cir. 2015) ........ 3

*Brown v. Madison Reed, Inc.*,
No. 21-cv-01233-WHO, 2021 U.S. Dist. LEXIS 164002 (N.D. Cal. Aug. 30, 2021) ........ 23

*Caremark, LLC v. Chickasaw Nation*,
43 F.4th 1021 (9th Cir. 2022) ........ 15, 16

*Cavanaugh v. Fanatics, LLC*,
738 F. Supp. 3d 1285 (E.D. Cal. 2024) ........ 14

*Chabolla v. Classpass Inc.*,
129 F.4th 1147 (9th Cir. 2025) ........ 6, 7, 8, 9, 10, 11, 12, 16

*Coinbase, Inc. v. Suski*,
602 U.S. 143 (2024) ........ 4

*Dahdah v. Rocket Mortg., LLC*,
166 F.4th 556 (6th Cir. 2026) ........ 7, 9, 10, 11, 12, 13

*DiCarlo v. MoneyLion, Inc.*,
988 F.3d 1148 (9th Cir. 2021) ........ 23

*Dohrmann v. Intuit, Inc.*,
823 F. App'x 482 (9th Cir. 2020) .......... 13

*Donovan v. Rrl Corp.*,
109 Cal. Rptr. 2d 807, 27 P.3d 702 (2001) .......... 7

*First Options of Chicago, Inc. v. Kaplan*,
514 U.S. 938 (1995) .......... 4

*Flores v. Transamerica HomeFirst, Inc.*,
113 Cal. Rptr. 2d 376 (Ct. App. 2001) .......... 18

*Frank v. Tesla, Inc.*,
No. 25-4168, 2026 U.S. App. LEXIS 12694 (9th Cir. May 1, 2026) .......... 18

*Fteja v. Facebook, Inc.*,
841 F. Supp. 2d 829 (S.D.N.Y. 2012) .......... 6

*Ghazizadeh v. Coursera, Inc.*,
737 F. Supp. 3d 911 (N.D. Cal. 2024) .......... 12, 13

*Godun v. JustAnswer LLC*,
135 F.4th 699 (9th Cir. 2025) .......... 15

*Harper v. Ultimo*,
7 Cal. Rptr. 3d 418 (Ct. App. 2003) .......... 19

*Heckman v. Live Nation Ent., Inc.*,
120 F.4th 670, 687 (9th Cir. 2024) .......... 4, 17, 18, 19

*Howsam v. Dean Witter Reynolds*,
537 U.S. 79 (2002) .......... 3

*In re BAM Trading Servs. Sec. Litig.*,
733 F. Supp. 3d 854 (N.D. Cal. 2024) .......... 19

*Keebaugh v. Warner Bros. Ent. Inc.*,
100 F.4th 1005 (9th Cir. 2024) .......... 5, 6, 7, 8, 9, 12, 13, 16, 23

*Kinkel v. Cingular Wireless, LLC*,
306 Ill. Dec. 157, 857 N.E.2d 250 (2006) .......... 19

*Kohler v. Whaleco, Inc.*,
757 F. Supp. 3d 1112 (S.D. Cal. 2024) .......... 16

*Kseniya Godun v. JustAnswer LLC*,
135 F.4th 699 (9th Cir. 2025) .......... 12

*L.B. v. LinkedIn Corp.*,
No. 5:24-cv-06832-EJD, 2025 U.S. Dist. LEXIS 193980 (N.D. Cal. Sep. 30, 2025) .......... 10, 11, 13

*Lakes v. Ubisoft, Inc.*,
777 F. Supp. 3d 1047 (N.D. Cal. 2025) .......... 7, 8

*McGill v. Citibank, N.A.*,
216 Cal. Rptr. 3d 627, 393 P.3d 85 (2017) .......... 23

*Meyer v. Uber Techs., Inc.*,
868 F.3d 66 (2d Cir. 2017) .......... 9, 10, 12, 13

*Morrison v. Yippee Ent., Inc.*,
756 F. Supp. 3d 842 (S.D. Cal. 2024) .......... 11

*Morrison v. Yippee Ent., Inc.*,
No. 24-7235, 2025 U.S. App. LEXIS 21024 (9th Cir. Aug. 18, 2025) .......... 10, 11, 13

*Nguyen v. Barnes & Noble Inc.*,
763 F.3d 1171 (9th Cir. 2014) .......... 4, 6

*Oberstein v. Live Nation Entm't, Inc.*,
60 F.4th 505 (9th Cir. 2023) .......... 5, 8, 9, 11, 12

*Ortiz v. Univ. Credit Union*,
No. 25-2207, 2025 U.S. App. LEXIS 33900 (9th Cir. Dec. 30, 2025) .......... 6

*OTO, L.L.C. v. Kho*,
251 Cal. Rptr. 3d 714, 447 P.3d 680 (2019) .......... 18, 19, 22

*Parker v. Verizon Commc'ns Inc.*,
No. 24-cv-08436, 2025 U.S. Dist. LEXIS 103017 (N.D. Ill. May 30, 2025) .......... 19

*Patrick v. Running Warehouse, Ltd. Liab. Co.*,
93 F.4th 468 (9th Cir. 2024) .......... 7, 23

*Peter v. Doordash, Inc.*,
445 F. Supp. 3d 580 (N.D. Cal. 2020) .......... 13

*Pizarro v. QuinStreet, Inc.*,
No. 22-cv-02803-MMC, 2022 U.S. Dist. LEXIS 145556 (N.D. Cal. Aug. 15, 2022) .......... 13

*Ponkey v. LLR, Inc.*,
No. 22-55532, 2023 U.S. App. LEXIS 19621 (9th Cir. July 31, 2023) .......... 18

*Ramirez v. Charter Commc'ns, Inc.*,
322 Cal. Rptr. 3d 825, 551 P.3d 520 (2024) .......... 18

*Razor v. Hyundai Motor Am.*,
305 Ill. Dec. 15, 854 N.E.2d 607 (2006) .......... 19

*Rios v. HRB Digit. LLC*,
807 F. Supp. 3d 975 (N.D. Cal. 2025) .......... 19

*Selden v. Airbnb, Inc.*,
4 F.4th 148 (D.C. Cir. 2021) ........................................................ 9, 13

*Sellers v. JustAnswer LLC*,
289 Cal. Rptr. 3d 1 (Ct. App. 2021) ........................................................ 6, 7, 9, 10, 14

*Volt Info. Scis. v. Bd. of Trs.*,
489 U.S. 468 (1989) ........................................................ 4

*White v. PayPal Holdings Inc.*,
821 F. Supp. 3d 1058 (N.D. Cal. 2026) ........................................................ 14

*Windsor Mills, Inc. v. Collins & Aikman Corp.*,
25 Cal. App. 3d 987, 101 Cal. Rptr. 347 (1972) ........................................................ 7

**Statutes**

9 U.S.C. § 2 ........................................................ 4, 17

**Other Authorities**

*Restatement (Second) of Contracts* § 19(2) (1981) ........................................................ 5

Plaintiffs Scott Pflaumer, Hans Cummings, and Mark Rosenthal ("Plaintiffs") respectfully submit this Memorandum of Points and Authorities in opposition to Defendant Ace Hardware Corporation's Motion to Compel Arbitration and Stay Case Pending Arbitration (ECF No. 20).

## INTRODUCTION

This putative class action arises from Defendant Ace Hardware Corporation's unlawful invasions into its website users' privacy. Defendant operates a consumer-facing commercial website[1] (referred to herein as the "Website"), through which users can browse and/or purchase products, learn about promotional offers or sales, and/or create and manage user accounts. Like many websites, the Website utilizes proprietary tracking technologies to engage in, *inter alia*, targeted marketing and analytics in order to generate more revenue from users' data. The Website purports to give users control over what data it collects and shares with, and/or sells to, third parties; however, the consent mechanisms are as deceptive as they are illusory. The Website begins placing and transmitting third-party tracking technologies immediately upon a user's initial visit to the Website, before users receive any meaningful notice or opportunity to control the interception and/or dissemination of their personal data. Further, the Website continues its surreptitious tracking practices even after users affirmatively reject the sale and/or sharing of their personal data.

In sum, Defendant invaded Plaintiffs' fundamental right to privacy and fraudulently misrepresented the Website's data-collection practices by deceiving users and facilitating the unlawful interception of and intrusion into Plaintiffs' personal data. In doing so, Plaintiffs allege that Defendant violated the federal Wiretap Act, 18 U.S.C. § 2510, et seq.; California's Invasion of Privacy Act ("CIPA"), including Penal Code § 631 (illegal wiretapping) and § 638.51 (unlawful use of a pen register or trap and trace device); California's Consumer Legal Remedies Act ("CLRA"), Cal. Civ. Code § 1750, et seq.; the California Constitution at California Constitution, Article I, Section 1; California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200, et seq., and common law, including invasion of privacy, intrusion upon seclusion, fraud and deceit, and unjust enrichment. Plaintiffs bring

[1] https://www.acehardware.com/. *See* Compl. ¶ 2.

this action on behalf of themselves and a class of similarly situated users harmed by Defendant's deceptive and unlawful surveillance practices.

With the instant Motion, Defendant seeks to compel Plaintiffs to arbitrate their claims, arguing that Plaintiffs manifested assent to be bound by the Website's purported Terms of Use (referred to herein as the "Terms"). However, Defendant's arguments ignore their burden to show that Plaintiffs unequivocally manifested assent to be bound by the Website's Terms. Defendant cannot establish that Plaintiffs were on notice of the Terms and, therefore, cannot enforce any provisions of the same. Further, even if Plaintiffs were on notice of the Terms, the arbitration provision and class waiver Defendant seeks to enforce are unconscionable and/or unenforceable. Thus, for the reasons explained in detail herein, Defendant's Motion must be denied.

## FACTUAL BACKGROUND

Defendant operates a commercial website (the "Website") where consumers can browse and purchase hardware products, tools, home improvement supplies, and related merchandise; locate and interact with brick-and-mortar locations; engage with customer support services; and create and manage accounts. *See* Compl ¶¶ 2, 18 (ECF No. 1).

Upon navigating to the Website, the Website displays a cookie banner ("Cookie Banner")[2] informing users that they may control the sale and/or sharing of their personal data via the Website's cookie settings ("Cookie Settings"). *See* Compl ¶¶ 2, 18. Both the Cookie Banner and the Cookie Settings represent that users can reject the Website's use of advertising, marketing, and analytics cookies (referred to herein as the "Tracking Tools") by consenting only to cookies that are essential to the Website's functionality. *See* Compl. ¶¶ 2-9, 38-50. In reality, the Website deploys the Tracking Tools the moment a user navigates to the Website, before any opportunity to offer consent. *See* Compl. ¶¶ 2-9, 51-60. Moreover, after users affirmatively reject the Website's use of Tracking Tools, the Website continues to track users, nonetheless. *See* Compl. ¶¶ 7, 83-99. The Website continues to collect and transmit users' personal data (without their consent) to advertising, social media, and analytics companies that designed and operate the Tracking Tools (referred to herein as the "Tracking Entities").

[2] *See* Compl. ¶ 1, *Figure 1*, ¶ 51, *Figure 7*; *see also* Exhibit A annexed to the Declaration of Alice Wilder ("Wilder Decl.") (ECF No. 20-1).

*Id.* In sum, via the Website's Cookie Banner and Cookie Settings, Defendant deceives users and deprives them of control over their personal data to monetize that information and generate additional revenue. *See* Compl. ¶¶ 3-9, 38-99.

Plaintiffs each accessed the Website and affirmatively rejected the sale and/or sharing of their personal data via the Cookie Banner and Cookie Settings. *See* Compl. ¶¶ 15-17. Plaintiff Pflaumer is a resident of California who accessed the Website in May of 2025 to shop for screwdrivers, and again in February of 2026. *See* Compl. ¶ 15. Plaintiff Cummings is a resident of Indiana who most recently accessed the Website in February of 2026. *See* Compl. ¶ 16. Plaintiff Cummings maintains an account with Defendant and has made several purchases via the Website. *Id.* Plaintiff Rosenthal is a resident of Colorado who maintains an account with Defendants. Plaintiff Rosenthal most recently accessed the Website in January of 2026 to shop for barbecue supplies. *See* Compl. ¶ 17.

The Website deploys the Tracking Tools immediately upon a user's arrival to the Website, prior to affording the user any opportunity to consent to the collection, sale, and sharing of their data, and/or to assent to any terms of use. *See* Compl. ¶¶ 2-9, 45, 51-60. When the Cookie Banner is visible, it appears as a small, white box on the bottom left-hand side of the Website's homepage, which is full of colorful graphics and offers designed to draw attention away from the Cookie Banner. *See* Decl. of Mark Jensen in Support of Pls.' Opp. ("Jensen Decl.") ¶¶ 2-4; *see also* Exhibit A annexed to the Jensen Decl.; Declaration of Scott Pflaumer ("Pflaumer Decl.") ¶¶ 4-6; Declaration of Mark Rosenthal ("Rosenthal Decl.") ¶¶ 4-6; Declaration of Hans Cummings ("Cummings Decl.") ¶¶ 4-6; *compare* Exhibit A annexed to the Jensen Decl. (screenshot of the Website's homepage displaying the Cookie Banner) *with* Exhibit A annexed to the Wilder Decl. (picture of the Website's Cookie Banner, enlarged and depicted on a white backdrop).

**LEGAL STANDARD**

In a motion to compel arbitration, the moving party bears the burden of showing that a valid arbitration agreement exists and that the dispute at issue falls within the scope of the purported agreement. *See Brennan v. Opus Bank*, 796 F.3d 1125, 1130 (9th Cir. 2015) (citing *Howsam v. Dean Witter Reynolds*, 537 U.S. 79, 84 (2002)). Though the Federal Arbitration Act ("FAA"), which controls here, articulates a general policy favoring alternative dispute resolution, it does not mandate arbitration

of a dispute each and every time an arbitration provision may be part of a consumer contract, nor does the FAA "reflect a congressional intent to occupy the entire field of arbitration." *Heckman v. Live Nation Ent., Inc.*, 120 F.4th 670, 687 (9th Cir. 2024) (quoting *Volt Info. Scis. v. Bd. of Trs.*, 489 U.S. 468, 477 (1989)). 9 U.S.C. § 2 specifically provides that an arbitration agreement may be found invalid on "grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2; *see also Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171, 1175 (9th Cir. 2014) (quoting *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995)). Indeed, "[u]nder the FAA, a court . . . may invalidate an arbitration agreement by 'generally applicable contract defenses, such as fraud, duress, or unconscionability.'" *Heckman*, 120 F.4th at 680 (quoting *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2011)). Even in instances, such as here, where a movant contends that the threshold question of arbitrability has been delegated to an arbitrator, the court must still determine that a valid agreement exists between the parties. *See Coinbase, Inc. v. Suski*, 602 U.S. 143, 149-51 (2024).

**ISSUES TO BE DECIDED**

- Did Plaintiffs manifest assent to be bound by Defendant's Terms of Use?
- Do Defendant's Terms of Use contain a valid and enforceable delegation clause?
- Is the arbitration provision included in Defendant's Terms of Use unconscionable and/or unenforceable?
- Is the class action waiver included in Defendant's Terms of Use unenforceable due to its prohibition against seeking public injunctive relief?

**ARGUMENT**

Defendant cannot meet its burden to show that Plaintiffs manifested assent to arbitrate their claims. The record before the Court does not reflect that Plaintiffs had actual or constructive notice of the Website's Terms of Use ("Terms")[3] Defendant seeks to enforce. Further, even if Defendant were able to show that Plaintiffs were on notice of the Terms (which they were not) and manifested assent to

[3] Annexed to the Wilder Decl. as Exhibits B and C.

be bound by the same (which they did not), the arbitration provisions and class action waiver contained in Defendant's Terms and Dispute Resolution Terms[4] are unconscionable and/or unenforceable.

## I. Defendant Has Failed to Show that Plaintiffs Manifested Assent to the Website's Terms

Defendant has failed to show that Plaintiffs manifested an intent to be bound by any provisions in its Terms. Defendant has not argued that Plaintiffs had actual notice of the Website's Terms and, with respect to constructive notice, Defendant has not shown that the Website's Terms were reasonably conspicuous on the Cookie Banner. Therefore, Defendant cannot meet its burden to show that Plaintiffs or any reasonable user manifested assent to the purported waiver of their ability to seek relief from the courts.

"To form a contract under California law, there must be actual or constructive notice of the agreement and the parties must manifest mutual assent." *Keebaugh v. Warner Bros. Ent. Inc.*, 100 F.4th 1005, 1013-14 (9th Cir. 2024) (quoting *Oberstein v. Live Nation Entm't, Inc.*, 60 F.4th 505, 512 (9th Cir. 2023)); *see also Berman v. Freedom Fin. Network, LLC*, 30 F.4th 849, 855 (9th Cir. 2022). Parties may manifest assent through conduct, "[h]owever, '[t]he conduct of a party is not effective as a manifestation of his assent unless he intends to engage in the conduct and knows or has reason to know that the other party may infer from his conduct that he assents.'" *Berman*, 30 F.4th at 855 (quoting *Restatement (Second) of Contracts* § 19(2) (1981)). When evaluating the manifestation of assent to internet contracts such as Defendant's Terms, courts must first classify the contract based on the mechanism by which a user purportedly gives their assent. *See Keebaugh*, 100 F.4th at 1014.

Internet contracts generally fall into one of four categories: browsewrap, clickwrap, scrollwrap, and sign-in wrap. *See Berman*, 30 F.4th at 864-66; *Keebaugh*, 100 F.4th at 1014. Scrollwrap and clickwrap are not at issue here; Defendant contends that the Website's "Cookie Banner is a 'sign-in wrap' agreement." *See* Def.'s Mem. at 12. However, in the context of constantly evolving jurisprudence related to internet contracts, Defendant's argument undermines key aspects of the Cookie Banner at issue. Traditionally, the term "sign-in wrap" has been self-explanatory, i.e., "'*Sign-in wrap*' agreements are those in which a user **signs up to use an internet product or service**, and the sign-up screen states

[4] Annexed to the Wilder Decl. as Exhibits D and E.

that acceptance of a separate agreement is required before the user can access the service." *Chabolla v. Classpass Inc.*, 129 F.4th 1147, 1161 (9th Cir. 2025) (quoting *Sellers v. JustAnswer LLC*, 289 Cal. Rptr. 3d 1, 15 (Ct. App. 2021)) (emboldened emphasis added) (italicized emphasis in original). Here, Defendant's Cookie Banner states that "[b]y selecting any options below, by closing this [Cookie Banner], or by continuing to browse [the Website]," users agree to, *inter alia*, Defendant's Terms.[5] Thus, rather than being directed to "take some action, such as clicking a button or checking a box,"[6] Plaintiffs (and all Website users) were ostensibly informed that if they took *any* action, they would purportedly be bound by Defendant's Terms. The Cookie Banner articulated no means by which to affirmatively reject Defendant's Terms. Given the necessary "context and fact-specific inquiry" that must be undertaken,[7] the fact that Defendant's Cookie Banner, in practical form and function, more closely resembles browsewrap than sign-in wrap should inform the Court's analysis.

A browsewrap agreement offers terms disclosed only through a hyperlink, with the user supposedly manifesting assent to those terms simply by continuing to use the website, as in Defendant's Cookie Banner. *See Nguyen*, 763 F.3d 1175-76 ("Indeed, in a pure-form browsewrap agreement, the website will contain a notice that—by merely using the services of, obtaining information from, or initiating applications within the website—the user is agreeing to and is bound by the site's terms of service.") (quoting *Fteja v. Facebook, Inc.*, 841 F. Supp. 2d 829, 837 (S.D.N.Y. 2012) (internal quotation marks omitted)); *see also Berman*, 30 F.4th 865. No affirmative action is required by the user other than the use of the website itself. *Id.* Courts in the Ninth Circuit have thusly reasoned that the determination of the validity of a browsewrap contract turns on whether the user has actual or constructive knowledge of the website's terms and conditions,[8] as opposed to a sign-in wrap where the determination of validity examines *both* whether "the website provides reasonably conspicuous notice," and whether "the consumer takes some action, such as clicking a button or checking a box, that unambiguously manifests his or her assent to those terms." *Chabolla*, 129 F.4th at 1154-55 (citing *Keebaugh*, 100 F.4th at 1014).

---

[5] *See* Exhibit A annexed to Wilder Decl.

[6] *Ortiz v. Univ. Credit Union*, No. 25-2207, 2025 U.S. App. LEXIS 33900, at *2 (9th Cir. Dec. 30, 2025) (quoting *Berman*, 30 F.4th at 856).

[7] *See Chabolla*, 129 F.4th at 1155.

[8] *See*, *e.g.*, *Nguyen*, 763 F.3d at 1175-76.

Thus, because the Website's presentation of the Cookie Banner is, in essence, browsewrap in sign-in wrap's clothing, the Terms should be given no heightened deference as a sign-in wrap.

"[T]he onus must be on website owners to put users on notice of the terms to which they wish to bind consumers,'" therefore, mechanisms that only suggest the "vague nature of business" have generally been found deficient in similar contexts. *See Chabolla*, 129 F.4th at 1156 (quoting *Sellers*, 289 Cal. Rptr. 3d at 20). With respect to the mechanism by which a user manifests assent to an internet contract, the closer the mechanism gets to traditional principles of 'offer' and 'acceptance,' the more likely it is that that mechanism can be found to put reasonably prudent users on notice of the formation of a contractual relationship. *See Dahdah v. Rocket Mortg., LLC*, 166 F.4th 556, 567-68 (6th Cir. 2026) (citing *Sellers*, 289 Cal. Rptr. 3d 1, 12; *Donovan v. Rrl Corp.*, 109 Cal. Rptr. 2d 807, 815, 27 P.3d 702, 709 (2001); *Windsor Mills, Inc. v. Collins & Aikman Corp.*, 25 Cal. App. 3d 987, 991, 101 Cal. Rptr. 347, 350 (1972); *B.D. v. Blizzard Entm't, Inc.*, 292 Cal. Rptr. 3d 47, 58 (Ct. App. 2022); *Berman*, 30 F.4th at 855-56). In *Berman*, the court found that a button confirming the plaintiff's zip code (stating "This is correct, Continue!") was insufficient to establish constructive notice. *See Berman*, 30 F.4th at 853. In *Sellers*, the court reasoned that a user clicking a "'Start my trial'" button to "get the answer to a single question for a one-time fee of $5" was insufficient to establish constructive notice. *See Sellers*, 289 Cal. Rptr. 3d at 5. *Berman* and *Sellers* contrast with assent mechanisms in cases like *Keebaugh*, where the court found that a button labeled, "By tapping 'Play' I agree to the Terms of Service," was sufficient to establish users' constructive notice of the terms. *See Keebaugh*, 100 F.4th at 1009, 1020; *see also Patrick v. Running Warehouse, Ltd. Liab. Co.*, 93 F.4th 468, 474 (9th Cir. 2024) (where a purchase completed by a "Submit Order" button immediately adjacent to the statement, "[b]y submitting your order you . . . agree to our privacy policy and terms of use," was found sufficient to establish constructive notice).

As to the arguable classification of Defendant's Cookie Banner, Defendant argues that "[h]owever classified, the link to the Terms in the banner creates an enforceable agreement." Def.'s Mem. at 8 (citing *Lakes v. Ubisoft, Inc.*, 777 F. Supp. 3d 1047, 1054 (N.D. Cal. 2025)). However, the cookie banner in *Lakes* was materially distinguishable from Defendant's Cookie Banner such that the reasoning in *Lakes* supports Plaintiffs' position here. Like the case at bar, *Lakes* examined user assent

in the context of a cookie banner that deployed immediately upon arrival to the subject webpage; *Lakes* described the cookie banner as follows:

> The first time a user arrives at the Website, the user is presented with a Cookies Banner notifying him or her that by clicking "OK" and "continuing to navigate on the site" that "you accept the use of cookies by Ubisoft and its partners to offer advertising adapted to your interests." If a user clicks on the "set your cookies" hyperlink, in the above banner, a pop-up appears with more detailed options to change cookies consent preferences, as shown in the following image. If the user does not want to share his or her information with Ubisoft and third parties, the user can click the "set your cookies" hyperlink to adjust the cookies he or she permits on the browser or click "OK" to accept the default settings.

*Lakes*, 777 F. Supp. 3d at 1051-52 (internal citations to the record omitted). In other words, the cookie banner in *Lakes* required a combination of affirmative actions (clicking 'OK' *and* continuing to use the site afterward) for a user to manifest assert. And, unlike here, *the website did not track users until they affirmatively consented*. Moreover, the express mechanism by which a user affirmatively rejected tracking and assented to be bound in *Lakes* is virtually identical to the mechanism Defendant argues binds Plaintiffs to the Terms here: a button to manage cookie consent preferences and reject the sale and/or sharing of personal data. That discrepancy emphasizes the fact-sensitive nature of the totality-of-circumstance analysis.

When analyzing the existence *vel non* of Plaintiffs' manifestation of assent and the conspicuousness (or lack thereof) of the Terms in Defendant's Cookie Banner, the Court must look to "[t]he 'context of the transaction,' as well as the 'traditional inquiry related to the visuals involved with the notice, such as font size, text placement, and overall screen design.'" *See Chabolla*, 129 F.4th. at 1155-56 (quoting *Keebaugh*, 100 F.4th at 1019). Indeed, "[t]he nature of the service or goods offered and the visual aspects of every page of a multi-page transaction should be considered together." *Id.* (quoting *Oberstein*, 60 F.4th at 515-16). Here, the nature of Plaintiffs' transactions with the Website, as well as 'visuals involved with notice' dictate that Plaintiffs did not manifest assent to be bound by Defendant's Terms. Thus, Defendant's Motion must be denied.

### A. The Context of the Transactions at Issue Does not Indicate Plaintiffs' Intent to Enter into an Ongoing Contractual Relationship with Defendant

With respect to the context-of-the-transaction analysis, "[t]he nature of an agreement may anticipate 'some sort of continuing relationship . . . that would require some terms and conditions[.]'" *Chabolla*, 129 F.4th at 1155 (quoting *Sellers*, 289 Cal. Rptr. 3d at 26). The formation of certain relationships, characterized primarily by expected, repeated, and/or habitual transactions, can be bound by terms even if not explicitly told. *Id.* (citing *Keebaugh*, 100 F.4th at 1020 (finding that users who download and play a mobile game that includes in-app purchases should expect a continuing relationship with the developer governed by terms of use). "Conversely, when a user simply purchases goods or avails herself of a one-time discount offer, there is less reason for her to expect a continued relationship beyond the purchase." *Id.* (citing *Sellers*, 289 Cal. Rptr. 3d at 25; *Berman*, 30 F.4th at 869).

When examining the Website's Cookie Banner, it provides no indication of an ongoing relationship based on interaction with the cookie banner. There is no invitation to join a "plan," "membership," or "trial." *See Id.* (citing *Oberstein*, 60 F.4th at 516; *Sellers*, 289 Cal. Rptr. at 26). Though the Cookie Banner mentions "participat[ion] in Ace Rewards," there is no indication that taking any action described by the Cookie Banner would create an 'Ace Rewards' account or an otherwise ongoing relationship. The Cookie Banner did not invite or evidence ongoing dealings. This analysis is true of all three Plaintiffs because it is objectively based on the appearance of the Cookie Banner itself; however, the principle rings especially true in the context of Plaintiff Pflaumer, who has never maintained any account with Defendant or made any purchases on the Website. *See* Compl. ¶ 15. Thus, the 'context of the transactions' at issue weighs against a finding that Defendant's Cookie Banner sufficiently meets the notice requirement.

### B. The Cookie Banner Did Not Provide Sufficiently Conspicuous Notice of the Terms

Courts from around the country have analyzed hybrid sign-in wrap agreements under California law. *See Dahdah*, 166 F.4th at 569 (citing *Chabolla*, 129 F.4th at 1155-58; *A. Dhruva v. Curiositystream, Inc.*, 131 F.4th 146, 151-55 & n.1 (4th Cir. 2025); *Meyer v. Uber Techs., Inc.*, 868 F.3d 66, 74-80 (2d Cir. 2017); *Selden v. Airbnb, Inc.*, 4 F.4th 148, 155-58 (D.C. Cir. 2021)). Generally, "courts have resolved th[e] conspicuousness question using a 'fact-intensive' approach that turns on all the circumstances of each website." *Dahdah*, 166 F.4th at 569 (quoting *Oberstein*, 60 F.4th at 515; citing

*Sellers*, 289 Cal. Rptr. 3d at 23). With that approach, courts "largely ask the same general questions when deciding whether a 'reasonably prudent Internet user' would have found a website's proposed terms 'conspicuous.'" *Id.* (quoting *Berman*, 30 F.4th at 856).

"*Question One*: Did the website display the offer on an uncluttered page or on a page filled with items that will draw the user's attention away from the proposal?" *Dahdah*, 166 F.4th at 569 (quoting *Berman*, 30 F.4th at 857; *Meyer*, 868 F.3d at 78) (internal quotation marks omitted). Courts are less likely to find terms to be conspicuous if a page surrounds the terms with distractions, rather than a streamlined design to emphasize the nature of the purported agreement and/or offer. *See Berman*, 30 F.4th at 857. Notably, Defendant's Motion is silent on this point. Indeed, Defendant's Exhibit A is a cropped, enlarged depiction of the Cookie Banner on a white backdrop that omits the surrounding webpage, which is filled with colorful graphics, offers, deals, etc. *See* Jensen Decl. ¶¶ 2-4; *see also* Exhibit A annexed to the Jensen Decl.; Pflaumer Decl. ¶¶ 4-6; Rosenthal Decl. ¶¶ 4-6; Cummings Decl. ¶¶ 4-6; Exhibit A annexed to the Wilder Decl. Plaintiffs' Exhibit A displays a screenshot of the Website's home page and Cookie Banner as of June 8, 2026. Even a cursory review of the aforementioned screenshot shows that the Cookie Banner occupies a fraction of the page on the lower left-hand corner and is surrounded by larger and similarly sized colorful graphics, advertisements, and purported deals, designed to draw the user's attention away from the comparatively small Cookie Banner. *See* Exhibit A annexed to the Jensen Decl. This rings especially true when compared to similar depictions in *Berman* (30 F.4th at 860), where the *Berman* court found the notice to be deficient, and *Chabolla* (129 F.4th at 1166), where the *Chabolla* court found notice to be deficient and remarked that the relevant webpage figure "is less cluttered than the one we found deficient in *Berman*." Thus, the answer to 'question one' weighs against a finding of constructive notice here.

In arguing that "similarly formatted" terms in cookie banners have been enforced, Defendant relies primarily on two cases: *L.B. v. LinkedIn Corp.*, No. 5:24-cv-06832-EJD, 2025 U.S. Dist. LEXIS 193980 (N.D. Cal. Sep. 30, 2025); and *Morrison v. Yippee Ent., Inc.*, No. 24-7235, 2025 U.S. App. LEXIS 21024 (9th Cir. Aug. 18, 2025). *See* Def.'s Mem. at 8-9. Defendant asserts that in *Morrison*, "[t]he court emphasized the appearance of the terms link and noted that 'the hyperlink appeared in bright blue font against a clean white background that stood out from the surrounding text to indicate it was

clickable.'" Def.'s Mem. at 8 (quoting *Morrison*, No. 24-7235, 2025 U.S. App. LEXIS 21024, at *2). However, in *Morrison*, the terms at issue were part of a single figure on a plain, contrasting webpage; i.e., a user selected either an annual or a monthly paid subscription and entered payment information in a large white box against a dark blue background. *See Morrison v. Yippee Ent., Inc.*, 756 F. Supp. 3d 842, 848 (S.D. Cal. 2024), *overruled by Morrison*, No. 24-7235, 2025 U.S. App. LEXIS 21024. At the bottom of the payment information fields, black text indicated that by clicking "Start Subscription," the user accepted the terms of service. *Id. Morrison* is readily distinguishable from the case at bar with respect to the size and scale of the banner, the surrounding webpage, and the mechanism to purportedly manifest assent. Here, Defendant's Cookie Banner is a fraction of the size of the banner in *Morrison,* and Defendant's Cookie Banner is not a lone figure that occupies nearly the entire webpage. Rather, Defendant's Cookie Banner is more analogous to a tree in a forest. Similarly distinguishable from the case at bar is *L.B. v. LinkedIn Corp.* There, the court reasoned that "[t]he visual placement of the Cookie Banner could…provide sufficient notice of the Cookies Policy and Privacy Notice," because "the notice is written in clear font in the middle of the page with a contrasting blue box as a background and no surrounding clutter" and "users [were] notified that they can consent to the policy by clicking a large box with 'ACCEPT' written in all caps." *LinkedIn Corp.*, No. 5:24-cv-06832-EJD, 2025 U.S. Dist. LEXIS 193980, at *28. Notwithstanding the fact that the photo depicted in Defendant's Exhibit A precludes the Court from even engaging in the necessary fact-intensive visual analysis of the placement, scale, and context of the Cookie Banner, the screenshot depicted in Plaintiff's Exhibit A demonstrates that Defendant's Cookie Banner was not in the middle of the page, but on the bottom left; nor was it in a contrasting box or free from clutter. Thus, Defendant's arguments fail, and the Motion must be denied.

Turning to "*[q]uestion [t]wo*: Did the website operator place the proposed offer close to—or away from—the button that a user must click to signal the user's acceptance of the proposal? The closer that the operator places the offer to the critical action button, the more conspicuous courts will find it." *Dahdah*, 166 F.4th at 569 (citing *Oberstein*, 60 F.4th at 515-16). "[T]he farther away that the operator places the offer from this button, the less conspicuous courts will find it." *Id. (citing Chabolla*, 129 F.4th at 1157). Here, the proximity of the Terms to the action buttons may appear to favor notice when analyzed in a vacuum; however, the form of the Cookie Banner, when analyzed in light of the 'totality

of circumstance' and the related holding in *Chabolla*, weighs against sufficiently conspicuous notice. In *Chabolla*, the court was presented with a hybrid sign-in wrap with two distinct action buttons in proximity to the website's terms of use: a 'continue' button and a 'sign-up button.' *See Chabolla*, 129 F.4th at 1152, 1174. The sign-up page at issue in *Chabolla* allowed users to sign up either by using an email address and clicking "Continue" or by clicking on a link to Facebook. *Id.* at 1152. Underneath the Facebook button, the screen told users: "By clicking 'Sign up with Facebook' or 'Continue,' I agree to the Terms of Use and Privacy Policy." *Id.* at 1174. The *Chabolla* court reasoned that a user who signed up via email (rather than Facebook) would immediately click "Continue" and "read no further if she had no intention of using Facebook." *Id.* at 1157. So that user might miss the proposal because it fell below the Facebook button. *Id*. The same is true here. The Terms Defendant seeks to enforce were located immediately above the "Accept All Cookies" button, but insulated away from the "Necessary Cookies Only" and "Manage Choices" buttons. Like *Chabolla*, a reasonable user who clicked either "Necessary Cookies Only" or "Manage Choices," rather than "Accept All Cookies," would select "Necessary Cookies Only" or "Manage Choices" with the reasonable belief that the Terms adjacent to "Accept All Cookies" did not apply because the user had no intention of "Accept[ing] All Cookies" and/or the adjacent Terms. An objectively reasonable user of the Website would not suspect that choosing to affirmatively reject the sale and/or sharing of their personal data by "Necessary Cookies Only" or "Manage Choices" would constitute an offer/acceptance binding them to a contractual relationship any more than a user who clicked a button confirming their zip code. *See Berman*, 30 F.4th at 853. Indeed, the "legal significance of an action must truly be unambiguous." *Kseniya Godun v. JustAnswer LLC*, 135 F.4th 699, 711 (9th Cir. 2025). And "[c]ourts have found no assent where, considering the overall design of the page, there was a discrepancy between the action button and the text of the notice." *Ghazizadeh v. Coursera, Inc.*, 737 F. Supp. 3d 911, 929 (N.D. Cal. 2024). Thus, in light of *Berman*, *Chabolla*, *Ghazizadeh*, and *Dahdah*, 'question two' weighs against sufficient notice here.

"Question [t]hree" asks "[d]id the website operator use a font size or color that would draw attention to the proposal? Courts are more likely to find a proposal conspicuous if the operator uses a larger font or at least colored hyperlinks that draw attention to the proposal despite a 'small font' for its terms." *Dahdah*, 166 F.4th at 573 (citing *Meyer*, 868 F.3d at 78; *Keebaugh*, 100 F.4th at 1020; *Oberstein*,

60 F.4th at 515-16; *Selden*, 4 F.4th at 156). Conversely, [courts] are more likely to find the proposal inconspicuous if operators use a small font with normal colors for the terms." *Id.* (citing *Berman*, 30 F.4th at 856). Additionally, the 'relative clutter' of the surrounding webpage (discussed above in the "Question One" analysis) also plays a role an answering "Question Three." *See Ghazizadeh*, 737 F. Supp. 3d at 927 (citing *Pizarro v. QuinStreet, Inc.*, No. 22-cv-02803-MMC, 2022 U.S. Dist. LEXIS 145556, at *3 (N.D. Cal. Aug. 15, 2022); *Dohrmann v. Intuit, Inc.*, 823 F. App'x 482, 484 (9th Cir. 2020); *Peter v. Doordash, Inc.*, 445 F. Supp. 3d 580, 586 (N.D. Cal. 2020)). Here, the blue lettering "TERMS OF USE" is buried at the bottom of a paragraph of text in the same size and style font on a small Cookie Banner on a cluttered webpage meant to draw users' attention *away* from the Terms. *See* Exhibit A annexed to the Jensen Decl. *Berman* dictates that mere underlining of a hyperlink in the face of a cluttered webpage is insufficient to beget constructive notice. *See Berman*, 30 F.4th at 856-57; *see also Dahdah*, 166 F.4th at 574. As mentioned above, the cases Defendant relies on, *Morrison* and *LinkedIn*, are in line with the holding in *Berman* in that they also underscore the importance of a contrasting figure on an uncluttered webpage, as well as the placement, scale, and size of the banner. *See Morrison*, No. 24-7235, 2025 U.S. App. LEXIS 21024, at *2; *LinkedIn Corp.*, No. 5:24-cv-06832-EJD, 2025 U.S. Dist. LEXIS 193980, at *28. Given the totality of circumstances, blue lettering is insufficient to distinguish the case at bar from *Berman* and/or establish notice. Thus, the answer to 'question three' weighs against a finding of constructive notice.

"*Question Four*: Did the website operator and users engage in the kind of interaction that one would expect to include contractual terms?" *Dahdah*, 166 F.4th at 574 (citing *Keebaugh*, 100 F.4th at 1020; *Blizzard Entm't, Inc.*, 292 Cal. Rptr. 3d at 61-62). Though 'question four' was substantially addressed in Section I(A) above, the *Dahdah* court further explained that the standard for users' reasonable expectation of a continuing relationship is an objective one, i.e., 'question four' asks whether "**users would reasonably anticipate** 'some sort of continuing relationship' with an operator (such as when they sign up for an account)" by engaging with the Cookie Banner. *See Dahdah*, 166 F.4th at 574 (emphasis added) (citing *Meyer*, 868 F.3d at 80; *Blizzard Entm't, Inc.*, 292 Cal. Rptr. 3d at 61). "[I]f users would not anticipate any relationship with the operator once they leave the site, courts are less likely to find the terms conspicuous because users would not expect contracts to govern that one-off

visit." 574-75 (citing *Sellers*, 289 Cal. Rptr. 3d at 26). As discussed above, there are no indications in the Website's Cookie Banner that would apprise a reasonable user of a potential ongoing relationship, especially considering that the Cookie Banner purports to bind users who have not engaged with it in any way. As a result of the above analysis, the Court should find that Defendant's Cookie Banner fails to establish constructive notice of the Terms, and Defendant's Motion should therefore be denied.

### C. Defendant Cannot Establish Notice Via Website Purchases and/or Rewards Account Sign-Up

In California and the Ninth Circuit, a motion to compel arbitration based on an internet contract requires more than bare declaratory statements to establish the contract's conspicuousness. This is because the test for conspicuousness is an inherently visual inquiry, assessing (1) the size of the text; (2) the color of the text compared to the background; (3) the location of the text and its proximity to any button the user must click; (4) the obviousness of any associated hyperlink; and (5) whether other elements on the screen clutter or obscure the textual notice. *See Berman*, 30 F.4th at 853; *Cavanaugh v. Fanatics, LLC*, 738 F. Supp. 3d 1285, 1295 (E.D. Cal. 2024) (quoting *Sellers*, 289 Cal. Rptr. 3d at 22). Without visual evidence as to what Plaintiffs allegedly signed up for, **and how they allegedly signed up**, Defendant cannot meet its burden to show that Plaintiffs manifested assent to be bound by the Terms. *See White v. PayPal Holdings Inc.*, 821 F. Supp. 3d 1058, 1066 (N.D. Cal. 2026) ("Defendants fail to meet their evidentiary burden to establish that certain plaintiffs entered into a contract that compels arbitration," because "[d]efendants' declaration does not provide any affirmative attestation or screenshot as to what the Honey sign-up page said or looked like in 2015, or the methods through which users could sign up at that time.").

Applying the above-described principle to the case at bar, Defendant contends that "Plaintiffs Cummings and Rosenthal admit that they maintain active Ace Rewards accounts, and Plaintiff Cummings has also used the Website to make purchases. These actions constitute separate bases for assent to Ace's Terms and, accordingly, arbitration." Def.'s Mem. at 1; *see also* Def.'s Mem. at 4 (citing the Wilder Decl. ¶ 23) ("Any individual that makes a purchase on the Website agrees to Ace's Terms and Privacy Policy as part of the checkout process. Further, individuals (like Plaintiffs Cummings and Rosenthal) must agree to the Terms to maintain an active Ace Rewards Account.") (internal citations to

the record omitted). At ¶ 23, the Wilder Decl. states without supporting evidence that "[t]hrough maintaining an Ace Rewards account, and by making purchases on the Website, individuals agree to the Terms and the Privacy Policy." However, Defendant cannot rely upon a bare declarant's statement to establish the visual elements of the purchase and/or account sign-up flow. The Motion record is devoid of evidence on this issue. Therefore, Defendant has failed to meet its burden to show that any individual, including Plaintiffs Rosenthal and Cummings, would be bound to Defendant's Terms via completing a purchase and/or registering for an account. Thus, Defendant's arguments necessarily fail.

### D. Because Defendant's Cookie Banner Is Insufficient to Establish Constructive Notice of the Terms, Any Choice-of-Law Provision, Class Waiver, and/or Delegation Clause Contained Therein Are Also Unenforceable

Defendant has argued that Plaintiffs' claims are subject to a choice-of-law provision that selects the laws of the State of Illinois; however, Defendant has also conceded that, under applicable precedent, "no differences exist in the law of the different states as to internet contract formation." Def.'s Mem. at 6 (quoting *Godun v. JustAnswer LLC*, 135 F.4th 699, 708 (9th Cir. 2025)). Thus, Defendant's failure to establish constructive notice remains the same under either analysis. However, even if the contract-formation analysis differed under Illinois law (which it does not), the choice-of-law provision remains just as unenforceable as the arbitration provision included in the Terms. In other words, because Defendant cannot establish Plaintiffs' notice or assent to the Terms, no agreement was formed between the parties, and none of the provisions in the Terms are binding on Plaintiffs.

The reasonable conspicuousness test operates at the level of contract formation and determines whether the user assented to the agreement as a whole, not whether the user was specifically aware of any particular provision within it. The analysis in *Berman* expressly made this very point, i.e., "[t]he question . . . is not whether [the plaintiffs] may have been aware of the mandatory arbitration provision in particular, but rather **whether they can be deemed to have manifested assent to any of the terms and conditions in the first place**." *Berman*, 30 F.4th at 858 (emphasis added). Under similar principles, the Court must determine whether a delegation clause, "essentially a mini-arbitration agreement, nested within a larger one," was ever validly formed and/or consented to. *See Caremark, LLC v. Chickasaw Nation*, 43 F.4th 1021, 1029 (9th Cir. 2022). Indeed, "[t]he Court has treat[s] delegation clauses within

arbitration provisions the same way it treats arbitration provisions within broader contracts." *Id.* That is to say, failing to establish notice of the Terms also dooms any attempted enforcement of a purported delegation clause. *See Kohler v. Whaleco, Inc.*, 757 F. Supp. 3d 1112, 1123–25 (S.D. Cal. 2024); *see also Caremark*, 43 F.4th at 1029 ("The Court has treated delegation clauses within arbitration provisions the same way it treats arbitration provisions within broader contracts.").

In the same vein, Defendant cannot enforce any class waiver included in the Terms. *See In re Juul Labs, Inc.*, 555 F. Supp. 3d 932, 949 n.6 (N.D. Cal. 2021) ("[T]he class action waiver provision rises and falls with the enforceability of the arbitration provision."); *see also Chabolla*, 129 F.4th at 1153; *Keebaugh*, 100 F.4th 1005, *generally*. Thus, because Defendant cannot establish Plaintiffs' notice and/or assent to the Terms, Defendant cannot enforce any of the Terms, including the purported delegation clause, class waiver, or choice-of-law provision.

## II. Even if Defendant Establishes Constructive Notice of the Terms, the Delegation Clause, the Arbitration Provision, and the Class Waiver are Unenforceable and/or Unconscionable

Even if Defendant were able to establish Plaintiffs' notice of the Terms, the arbitration provision, delegation clause, and class waiver all fail for independent reasons. As explained below, the Terms do not contain any delegation clause *at all*, the arbitration provision is unconscionable and unenforceable, and the class waiver impermissibly disallows public injunctive relief.

### A. The Terms Do Not Contain a Delegation Clause

Defendant tacitly argues two separate times in its Memorandum that the Terms contain an enforceable delegation clause and, therefore, that the threshold question of arbitrability must be decided by an arbitrator, not the Court. *See* Def.'s Mem. at 6 ("where, as here, the parties have delegated threshold arbitrability questions to the arbitrator . . ."), 10-11 ("[T]he Court need not reach the question because the parties delegated arbitrability questions to the arbitrator."). However, Defendant's argument is not supported by the Motion record; there are no provisions in the Terms which could be construed as delegating the issue of arbitrability to an arbitrator or defining a dispute to include the scope and/or enforceability of the arbitration provision, which may explain why Defendant's Memorandum does not cite any. On review, the citation to the record closest in proximity to Defendant's argument that there is an enforceable delegation clause is at the bottom of page eleven of Defendant's Memorandum:

"Plaintiffs agreed to arbitrate 'all claims arising out of or relating to any agreement with Ace and any Ace site, product, service, application, or tool, including these Terms of Use,' otherwise known as the 'Ace Offerings.' Wilder Decl., Exs. B, at 11; C, at 12." Def.'s Mem. at 11. Examining Exhibits B and C to the Wilder Decl. provides no clarity or support for Defendant's argument. In pertinent part, Section 20 of Defendant's Terms (Exhibit B at 12; Exhibit C at 12) reads: "[A]ll claims arising out of or relating to any agreement with Ace and any Ace site, product, service, application, or tool, including these Terms of Use (collectively, "Ace Offerings"), will be resolved exclusively through binding arbitration according to the Dispute Resolution Terms . . . ." Examining Defendant's Dispute Resolution Terms yields no support for Defendant's argument. In pertinent part, the Dispute Resolution Terms (Exhibit D at 1; Exhibit E at 1) read as follows:

> **YOU AND ACE AGREE THAT, TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, ANY CLAIM OR DISPUTE AT LAW OR EQUITY THAT HAS ARISEN OR MAY ARISE BETWEEN US IN CONNECTION WITH THE ACE OFFERINGS WILL BE RESOLVED IN ACCORDANCE WITH THE PROVISIONS SET FORTH IN THIS SECTION. You and Ace agree that such claims or disputes shall be resolved exclusively through confidential, final, and binding arbitration; provided that either party may file suit in court seeking to enjoin infringement, misappropriation, or misuse of its intellectual property rights. YOU ARE GIVING UP THE RIGHT TO LITIGATE A DISPUTE IN COURT BEFORE A JUDGE OR JURY.**

Def.'s Exhibit D at 1; Exhibit E at 1 (emphasis in original). Based on the foregoing, it is clear that no provisions in the Terms or Dispute Resolution Terms delegate the threshold question of arbitrability to an arbitrator. Thus, the Court must decide the issue of arbitrability.

**B. The Arbitration Provision in the Dispute Resolution Terms is Unconscionable and Unenforceable**

"Under the FAA, a court may declare an arbitration agreement unenforceable 'upon such grounds as exist at law or in equity for the revocation of any contract,' and may invalidate an arbitration agreement by 'generally applicable contract defenses, such as fraud, duress, or unconscionability.'" *Heckman*, 120 F.4th at 680 (quoting 9 U.S.C. § 2; *Concepcion*, 563 U.S. at 339) (internal citations omitted).

To demonstrate the unconscionability of Defendant's arbitration provision, Plaintiffs must show that the provision is both procedurally and substantively unconscionable. *See Heckman*, 120 F.4th at

681 (citing *Armendariz v. Found. Health Psychcare Servs., Inc.*, 99 Cal. Rptr. 2d 745, 767, 6 P.3d 669, 690 (2000)). Indeed, "the more substantively oppressive the contract term, the less evidence of procedural unconscionability is required to come to the conclusion that the term is unenforceable, and vice versa." *Id.* Thus, "[i]f there is 'substantial procedural unconscionability . . . even a relatively low degree of substantive unconscionability may suffice to render the agreement unenforceable." *Heckman*, 120 F.4th at 681 (quoting *OTO, L.L.C. v. Kho*, 251 Cal. Rptr. 3d 714, 729, 447 P.3d 680, 693 (2019)).

The "[u]nconscionability analysis begins with an inquiry into whether the contract is one of adhesion, defined as a standardized contract, imposed upon the subscribing party without an opportunity to negotiate the terms." *Heckman*, 120 F.4th at 681 (quoting *Armendariz*, 99 Cal. Rptr. 2d at 766, 6 P.3d at 689; *Flores v. Transamerica HomeFirst, Inc.*, 113 Cal. Rptr. 2d 376, 381-82 (Ct. App. 2001)). In evaluating unconscionability, "[s]ome California courts have held that in itself '[a] finding of a contract of adhesion is essentially a finding of procedural unconscionability.'" *Heckman*, 120 F.4th at 681 (citing *Flores*, 113 Cal. Rptr. 2d at 382; *Aral v. Earthlink, Inc.*, 36 Cal. Rptr. 3d 229, 238 (Ct. App. 2005); *Baltazar v. Forever 21, Inc.*, 200 Cal. Rptr. 3d 7, 12, 367 P.3d 6, 11 (2016); *Ramirez v. Charter Commc'ns, Inc.*, 322 Cal. Rptr. 3d 825, 837, 551 P.3d 520, 530 (2024). Here, there is no dispute that Defendant's Terms are a contract of adhesion, offered to consumers on a take-it-or-leave-it basis. Thus, the threshold for procedural unconscionability has been met. Further, procedural and substantive unconscionability are assessed on a "sliding scale," meaning that "where a contract is more substantively oppressive, less evidence of procedural unconscionability is necessary, and vice versa." *Ponkey v. LLR, Inc.*, No. 22-55532, 2023 U.S. App. LEXIS 19621, at *2 (9th Cir. July 31, 2023) (citing *Armendariz*, 99 Cal. Rptr. 2d at 767, 6 P.3d at 689); *see also Frank v. Tesla, Inc.*, No. 25-4168, 2026 U.S. App. LEXIS 12694, at *3 (9th Cir. May 1, 2026). Thus, because a high degree of procedural unconscionability is present here, Plaintiffs need only show a comparatively small degree of substantive unconscionability to demonstrate that the arbitration provision in the Terms is unconscionable and unenforceable.

The analysis of unconscionability in a consumer adhesion contract is similar under Illinois law, except that under Illinois law, (1) the adhesive nature of a contract is a relevant factor in determining procedural unconscionability but not wholly dispositive; (2) the procedural unconscionability analysis examines the lack of meaningful choice in the matter of contracting; and (3) Illinois law does not require

a showing of both procedural and substantive unconscionability, i.e., a finding of unconscionability may be based on either procedural or substantive unconscionability, or a combination of both. *See Kinkel v. Cingular Wireless, LLC*, 306 Ill. Dec. 157, 171-75, 857 N.E.2d 250, 264-68 (2006), *rev'd in part on other grounds*, *Concepcion*, 563 U.S. 333; *Razor v. Hyundai Motor Am.*, 305 Ill. Dec. 15, 30, 854 N.E.2d 607, 622 (2006). Importantly, under Illinois law, procedural unconscionability is established where terms are so difficult to find, read, or understand that the plaintiff cannot fairly be said to have been aware of agreeing to them, particularly where, as here, key provisions were layered through documents incorporated by reference and where there is a vast discrepancy in bargaining power. *See Razor*, 305 Ill. Dec. at 40-41, 854 N.E.2d at 632-33; *see also Parker v. Verizon Commc'ns Inc.*, No. 24-cv-08436, 2025 U.S. Dist. LEXIS 103017, at *8 (N.D. Ill. May 30, 2025).

With respect to substantive unconscionability, "[s]ubstantive unconscionability pertains to the fairness of an agreement's actual terms and to assessments of whether they are overly harsh or one-sided." *Heckman*, 120 F.4th at 683 (quoting *OTO, LLC*, 447 P.3d at 690). Substantive unconscionability may be found where there is a practice of manufacturing delays to obstruct arbitration and/or claimants' vindication of rights. *See Rios v. HRB Digit. LLC*, 807 F. Supp. 3d 975, 983 (N.D. Cal. 2025). Additionally, where, as here, relevant terms are "artfully hidden" via incorporation by reference,[9] Courts will more closely scrutinize the substantive unconscionability of the terms that were "artfully hidden," rather than included in or attached to the arbitration agreement. *See Baltazar v. Forever 21, Inc.*, 200 Cal. Rptr. 3d 7, 14-15, 367 P.3d 6, 12-13 (2016) (citing *Harper v. Ultimo*, 7 Cal. Rptr. 3d 418, 422 (Ct. App. 2003)); *see also In re BAM Trading Servs. Sec. Litig.*, 733 F. Supp. 3d 854, 868 (N.D. Cal. 2024). Here, the framework of the "Mass Arbitration" provision[10] In the Defendant's Dispute Resolution Terms, it obstructs Plaintiffs' vindication of rights and provides for "harsh" and "one-sided" engagement with arbitration. *See Armendariz*, 99 Cal. Rptr. 2d at 750, 6 P.3d at 674.

Defendant's Mass Arbitration provision ostensibly triggers "any time 25 or more claimants (including you) submit Demands or seek to file demands for arbitration raising similar claims against

[9] Section 20 of the Terms states that claims "will be resolved exclusively through binding arbitration according to the Dispute Resolution Terms . . . ." *See* Wilder Decl., Exhibits B and C at 12.
[10] *See* Wilder Decl., Exhibits D and E at 3.

Ace or related parties . . . . ." *See* Wilder Decl., Exhibits D and E at 3. Notably, Defendant's Dispute Resolution Terms do not define the term "claim," but impose temporal requirements and admit the possibility of delayed adjudication based on Defendant's unilateral determination as to what "claims" are "similar." The structure of Defendant's bellwether mass arbitration is such that, during stage one, "[c]ounsel for the claimants and counsel for Ace shall each select 15 claims per side (30 claims total) to be filed and to proceed in individual arbitrations as part of a staged process." *Id.* Further, "[e]ach of these individual arbitrations shall be assigned to a different, single arbitrator unless the parties agree otherwise in writing. Any remaining claims shall not be filed or be deemed filed in arbitration, nor shall any arbitration fees be assessed in connection with those claims unless and until they are selected to be filed in individual arbitration proceedings as part of a staged process." *Id.* "After this initial set of staged proceedings is completed, the parties shall promptly engage in a global mediation session of all remaining claims. . . ." *Id.* However, if the remining claims are not resolved during the global mediation, then the bellwether mass arbitration proceeds to stage two. Notably, the provision related to global resolution of all claims requires Defendant's agreement, i.e., Defendant maintains control over whether the claims have been resolved through global mediation. Therefore, the procession and timing of the bellwether mass arbitration is almost unilaterally controlled by Defendant. In other words, Defendant has sole discretion with respect to the triggering of mass arbitration procedures *and* the staging process.

During stage two, "counsel for the claimants and counsel for Ace shall each select 20 claims per side (40 claims total) to be filed and to proceed in individual arbitrations as part of a second staged process . . . ." *Id.* Stage three increases to "25 claims per side (50 claims total)," and if a claimant's claims are not resolved after completion of stage three, Defendant reserves the right to opt certain claimants out of the staging process or "resolve" the claim "as part of continuing, staged individual arbitration proceedings in batches of 200 claims until all claimants' claims have been adjudicated. *Id.* In other words, at this stage, Defendant can unilaterally opt claimants out of the staging process, seemingly without cause or explanation.

Applying Defendant's bellwether mass arbitration procedures to the case at bar yields one result; as structured, Defendant's bellwether mass arbitration procedures function to delay adjudication of claimants' claims to a point that undermines their vindication of rights within a time frame that comports

with notions of due process. The Complaint in this action asserts nine separate claims. Conservatively estimating the putative Nationwide Class[11] size as 5,000 individuals would yield a total of 45,000 claims. As per Defendant's bellwether mass arbitration procedures, adjudication of those claims would require approximately 228 stages of arbitration proceedings. If each stage were to take six months, the putative class members would have to wait approximately 114 years before all of their claims against Defendant were heard and their rights vindicated. Moreover, though not expressly precedential, Defendant would be the lone party with knowledge of the outcome(s) of prior batched proceedings (to then utilize that information in future arbitration proceedings if Defendant determines the claims are "similar"). This is the exact "harsh" and "one-sided" lack of substantive fairness that *Heckman*, *Rios*, and *Kinkel* cautioned against. *See, e.g., Heckman*, 120 F.4th at 683.

The framework of Defendant's Dispute Resolution Terms also presents further asymmetric procedures that unilaterally favor Defendant. Defendant's Dispute Resolution Terms begin by stating that the "arbitration procedure" requires individual arbitration to be conducted in accordance with the "rules and procedures" of the "American Arbitration Association ("AAA")." *See* Wilder Decl., Exhibits D and E at 2. Once claims are ostensibly deemed "similar" by Defendant, Defendant's Dispute Resolution Terms substitute a different dispute resolution system:

> If, at any time, 25 or more claimants (including you) submit Demands or seek to file demands for arbitration raising similar claims against Ace or related parties, and such circumstances meet the definition and criteria of Mass Arbitration ("Mass Arbitration") set forth in JAMS's Mass Arbitration Procedures and Guidelines ("JAMS's Mass Arbitration Rules," available at https://www.jamsadr.com/mass-arbitration-procedures), you and Ace agree that the AAA shall not serve as arbitrator and that instead JAMS shall administer any Mass Arbitration claims and the JAMS Comprehensive Arbitration Rules and Procedures (available at https://www.jamsadr.com/rules-comprehensive-arbitration/) and the JAMS Mass Arbitration Rules in effect at the time such claim is filed shall apply as modified below. You agree that throughout this process, the parties' counsel shall meet and confer to discuss modifications to these procedures based on the particular needs of the Mass Arbitration. You acknowledge and agree that your election to participate in a Mass Arbitration may result in a delay in the adjudication of your dispute with Ace.

[11] *See* Compl. ¶ 137.

Wilder Decl., Exhibits D and E at 3. However, Defendant's Dispute Resolution Terms do not define how claims are determined to be "similar" or how parties are determined to be "related." Which means the determination to apply AAA's rules and procedures versus JAMS's rules and procedures is both unilaterally within the control of Defendant and unknown to the claimant at the time a claim is submitted. Courts evaluating unconscionability consider whether arbitration provisions impose procedures that differ materially from the dispute-resolution process the weaker party reasonably understood when accepting the agreement. *See OTO, L.L.C.*, 251 Cal. Rptr. 3d at 725-26, 447 P.3d at 690 (finding arbitration procedures substantively unconscionable where the structure of the process imposed significant procedural disadvantages). Here, Defendant's Dispute Resolution Terms prime consumers to expect individual arbitration, but then funnel any "similar claims," without defining the term, into a dispute resolution framework that substantially deviates from the characteristics of individual arbitration. At the least, an individual consumer could reasonably be confused about where their individual claim should be filed and whether their claim was determined to be an individual claims by Defendant or related to other "similar claims" in a mass arbitration. This consumer confusion is exacerbated by the fact that an individual consumer claimant will be entirely unaware of any existing mass arbitration before Defendant (and/or JAMS or AAA) put them on notice that the purported mass arbitration threshold has been met, and, therefore, that they are no longer permitted to file their individual arbitration demand with AAA as the Defendant's Dispute Resolution Terms instruct them to do.

When scrutinizing the structure and practical application of Defendant's Dispute Resolution Terms as they relate to individual and mass arbitration, it is clear that a consumer-claimant is put at an extremely disadvantageous position when compared to Defendant, both procedurally and substantively. Thus, the arbitration provision included in Defendant's Dispute Resolution terms, incorporated by reference into Defendant's Terms, is unconscionable and unenforceable. Thus, Defendant's Motion must be denied.

### C. The Class Waiver in Defendant's Terms Improperly Prohibits Public Injunctive Relief

"[A]ny contract that bars public injunctive relief in both court and arbitration is invalid." *DiCarlo v. MoneyLion, Inc.*, 988 F.3d 1148, 1153 (9th Cir. 2021) (citing *McGill v. Citibank, N.A.*, 216 Cal. Rptr.

3d 627, 638, 393 P.3d 85, 94 (2017)); *see also Brown v. Madison Reed, Inc.*, No. 21-cv-01233-WHO, 2021 U.S. Dist. LEXIS 164002, at *24 (N.D. Cal. Aug. 30, 2021) ("[T]he arbitration agreement's preclusion of claims seeking public injunctions is unenforceable.").

In *Keebaugh*, *supra*, the Ninth Circuit Court of Appeals reasoned that "[t]o implicate *McGill*, the arbitration provision must also prohibit the arbitrator from awarding relief that would affect those other than plaintiff." *Keebaugh*, 100 F.4th at 1022 (quoting *Patrick v. Running Warehouse, Ltd. Liab. Co.*, 93 F.4th 468, 478 (9th Cir. 2024)). *Keebaugh* explained that a ban on seeking injunctive relief rises to the level of implicating *McGill* where "[t]he Terms of Service restrict the available remedies an arbitrator may award to the scope 'necessary to provide relief warranted by that party's individual claim.'" *Keebaugh*, 100 F.4th at 1021-22. There, the terms of service at issue "provide[d] that the parties may bring claims against the other only in your . . . individual capacity, and not as a plaintiff or class member in any purported class, representative, or private attorney general proceeding.' Put succinctly, the Terms require disputes to go to arbitration, barring consideration of a public injunctive claim in court, while also limiting the arbitrator's ability to award remedies to only 'that party's individual claim.'" *Id.* The terms examined in *Keebaugh* mirror Defendant's Dispute Resolution Terms here, specifically the class action waiver Defendant seeks to enforce.

The class action waiver included in Defendant's Dispute Resolution Terms (Wilder Decl. Exhibits D and E at 2) reads, in pertinent part, that "**the arbitrator may award relief (including monetary, injunctive, and declaratory relief) only in favor of the individual party seeking relief and only to the extent necessary to provide relief necessitated by that party's individual claim(s). Any relief awarded cannot affect any other person or party.**" (emphasis in original). Thus, Defendant's class waiver is on all fours with the invalid individualized relief provision in *Keebaugh*. Defendant's class waiver improperly prohibits Plaintiffs from seeking relief to benefit the public at large in the form of, *inter alia*, "requiring Defendant to immediately (i) remove the Tracking Tools from the Website or (ii) add, and obtain, the appropriate consent from Website users." *See* Compl., Prayer for Relief. Thus, it is indisputable that Defendant's class waiver seeks to improperly bar public injunctive relief and should be found unenforceable.

## CONCLUSION

For the foregoing reasons, including, *inter alia*, Defendant's failure to meet its burden to show Plaintiffs' manifestation of assent and the unconscionability of Defendant's arbitration provision, Defendant's Motion must be denied.

DATED: June 12, 2026

Respectfully submitted,

By: */s/ Edward Korsinsky*
Edward Korsinsky (admitted *pro hac vice*)
ek@zlk.com
**LEVI & KORSINSKY, LLP**
33 Whitehall Street, 27th Floor
New York, NY 10004
Telephone: (212) 363-7500
Facsimile: (212) 363-7171

Raphael Janove (SBN 361193)
raphael@janove.law
**JANOVE PLLC**
115 Broadway, 5th Floor
New York, NY 10006
Telephone: (646) 347-3940

***Attorneys for Plaintiffs and the Proposed Class***

**CERTIFICATE OF SERVICE**

I hereby certify that on this day, June 12, 2026, I filed the foregoing Plaintiffs' Opposition to Defendant's Motion to Compel Arbitration and Stay Case Pending Arbitration using the CM/ECF system. Notice of this filing will be sent automatically by the CM/ECF system to all counsel of record.

*/s/ Edward Korsinsky*
Edward Korsinsky