DAVID HORNIAK (SBN 268441)
david.horniak@us.dlapiper.com
**DLA PIPER LLP (US)**
500 8th St NW
Washington, DC 20004-2131
Telephone: 202.799.4361
Facsimile: 202.799.5361

MATTHEW C. DANAHER (SBN 351055)
matt.danaher@us.dlapiper.com
**DLA PIPER LLP (US)**
4365 Executive Drive, Suite 1100
San Diego, CA 92121-2133
Telephone: 858.677.1400
Facsimile: 858.677.1401

Attorneys for Defendant
ACE HARDWARE CORPORATION

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

SCOTT PFLAUMER, HANS CUMMINGS, and MARK ROSENTHAL, individually and on behalf of all others similarly situated,

Plaintiffs,

v.

ACE HARDWARE CORPORATION,

Defendant.

Case No. 5:26-CV-02151-EJD

**DEFENDANT ACE HARDWARE CORPORATION'S REPLY IN SUPPORT OF MOTION TO COMPEL ARBITRATION AND STAY CASE PENDING ARBITRATION**

Date: September 10, 2026
Time: 9:00 a.m.
Judge: Hon. Edward J. Davila
Courtroom: Courtroom 4
San Jose Courthouse
280 South First Street, 5th Fl.
San Jose, CA 95113

Complaint Filed: March 12, 2026

# TABLE OF CONTENTS


Page

I. INTRODUCTION .....1

II. PLAINTIFFS MANIFESTED ASSENT TO A VALID AGREEMENT .....1

A. Plaintiffs Agreed to a Sign-In Wrap Agreement .....1

B. The Cookie Banner Provided Plaintiffs Reasonably Conspicuous Notice of the Terms. .....4

1. The Terms Appear Separate and Distinct from the Website's Content. .....4

2. The Terms Appear Directly Above the "Necessary Cookies Only" Button. .....6

3. The Terms Are Distinct from the Rest of the Cookie Banner's Text. .....7

C. The Context of Plaintiffs' Transactions Supports Notice. .....8

D. Plaintiffs Cummings and Rosenthal's Additional Interactions with Ace Provide Independent Bases for Assent. .....9

III. PLAINTIFFS FAIL TO IDENTIFY ANY UNENFORCEABLE OR UNCONSCIONABLE PROVISIONS. .....10

A. The Terms Delegate Arbitrability by Incorporating the AAA Consumer Rules. .....10

B. The Arbitration Provision Is Not Unconscionable .....10

C. The Class Action Waiver is Enforceable. .....14

IV. PLAINTIFFS DO NOT OPPOSE A STAY OF PROCEEDINGS. .....14

V. CONCLUSION .....14

## TABLE OF AUTHORITIES

Page(s)

**Cases**

*Armendariz v. Found. Health Psychcare Servs.*,
99 Cal. Rptr. 2d 745 (2000) ....................11

*Berman v. Freedom Fin. Network, LLC*,
30 F.4th 849 (9th Cir. 2022) ....................3, 5, 8

*Chabolla v. ClassPass Inc.*,
129 F.4th 1147 (9th Cir. 2025) ....................3, 5, 6

*Denson v. Keplr Vision, LLC*,
2021 WL 3419237 (S.D. Cal. Aug. 5, 2021) ....................11

*Diaz v. Intuit, Inc.*,
2017 WL 4355075 (N.D. Cal. Sept. 29, 2017) (Davila, J.) ....................10

*Flynn v. Nat'l R.R. Passenger Corp.*,
2026 WL 1252630 (E.D. Pa. May 7, 2026) ....................10

*Ghazizadeh v. Coursera, Inc.*,
737 F. Supp. 3d 911 (N.D. Cal. 2024) ....................7

*Gill v. Chipotle Mexican Grill, Inc.*,
2025 WL 287320 (C.D. Cal. Jan. 23, 2025) ....................7

*Hartranft v. Encore Capital Grp., Inc.*,
543 F. Supp. 3d 893 (S.D. Cal. 2021) ....................14

*Heckman v. Live Nation Ent., Inc.*,
120 F.4th 670 (9th Cir. 2024), *cert. denied*, 146 S. Ct. 96, 223 L. Ed. 2d 10 (2025) ....................12

*Kakalia v. BMO Bank N.A.*,
2026 WL 1004952 (C.D. Cal. Mar. 17, 2026) ....................9

*Keebaugh v. Warner Bros. Ent. Inc.*,
100 F.4th 1005 (9th Cir. 2024) ....................7, 8

*Kinkel v. Cingular Wireless LLC*,
857 N.E.2d 250 (Ill. App. 2006) ....................12, 13

*L.B. v. LinkedIn Corp.*,
2025 WL 2899514 (N.D. Cal. Oct. 10, 2025) (Davila, J.) ....................5, 6

*Lakes v. Ubisoft, Inc.*,
777 F. Supp. 3d 1047 (N.D. Cal. 2025) ....................4

*Loewen v. Lyft, Inc.*,
129 F. Supp. 3d 945 (N.D. Cal. 2015) ....................2

*Mcmillon v. Bridgecrest Acceptance Corp.*,
2025 WL 2631617 (C.D. Cal. Aug. 13, 2025) ....................10

*Morrison v. Yippee Ent., Inc.*,
2025 WL 2389424 (9th Cir. Aug. 18, 2025) ....................6

*Norcia v. Samsung Telecoms. Am., LLC*,
845 F.3d 1279 (9th Cir. 2017) ....................9

*Oberstein v. Live Nation Ent., Inc.*,
60 F.4th 505 (9th Cir. 2023) ....................4, 7

*OTO, L.L.C. v. Kho*,
447 P.3d 680 (Cal. 2019) ....................13

*Penning v. NVIDIA Corp.*,
2026 WL 1433313 (N.D. Cal. May 21, 2026) ....................2

*Porter v. McGrath*,
2006 WL 734944 (E.D. Cal. Mar. 23, 2006) ....................9

*Rios v. HRB Digital LLC*,
807 F. Supp. 3d 975 (N.D. Cal. 2025) ....................13

*Sellers v. JustAnswer LLC*,
73 Cal. App. 5th 444 (2021) ....................3, 4

*Tillman v. Tillman*,
825 F.3d 1069 (9th Cir. 2016) ....................14

**Statutes**

9 U.S.C. § 3 ....................14

**Other Authorities**

AAA Consumer Rule R-7(a) ....................10

AAA Consumer Rule R-7(b) ....................10

## I. INTRODUCTION.

Plaintiffs built their entire lawsuit on a single premise: that they saw Ace's Cookie Banner, read its language, clicked "Necessary Cookies Only," and continued to browse the Website in reliance on what the banner told them. Yet in their Opposition they ask the Court to pretend those same interactions never happened. Plaintiffs cannot have it both ways. By their own admissions, each Plaintiff engaged with a persistent, conspicuous Cookie Banner that informed them—through bolded, blue, capitalized, and underlined text positioned directly above the very button they clicked—that accepting or limiting their cookie preferences meant agreeing to Ace's Terms. That is a textbook manifestation of assent to a sign-in wrap agreement.

Having assented to the Terms, Plaintiffs cannot escape the consequences. Because Ace provided reasonably conspicuous notice, Plaintiffs' bootstrapped attacks on the Terms' delegation, arbitration, and class action waiver provisions all fail: the Terms incorporate the AAA Consumer Rules and thereby delegate questions of arbitrability to the arbitrator, the arbitration provision is neither procedurally nor substantively unconscionable, and the class action waiver is enforceable. And Plaintiffs do not oppose a stay, conceding that point. The Court should compel Plaintiffs' claims to individual arbitration and stay this action pending its outcome.

## II. PLAINTIFFS MANIFESTED ASSENT TO A VALID AGREEMENT.

Through their own admissions, Plaintiffs manifested assent to the Terms. Plaintiffs each admit in their complaint that they interacted with a persistent cookie banner that informed Plaintiffs—through its appearance and conspicuous hyperlinks—that accepting or limiting their cookie preferences required Plaintiffs to agree to the Terms. And mislabeling this consent vehicle as "browsewrap" and critiquing the Cookie Banner's appearance in an attempt to distract from Plaintiffs' own allegations does not alter this result. The Court should reject Plaintiffs' attempt to undercut their assent to the Terms.

### A. Plaintiffs Agreed to a Sign-In Wrap Agreement.

Plaintiffs each manifested their assent to the Cookie Banner that required Plaintiffs to agree to the Terms (and other agreements) before they could continue to navigate the Website without the deployment of non-necessary cookies. Indeed, Plaintiffs premise their entire lawsuit on their

interactions with the Cookie Banner. Instead of acknowledging this simple proposition, and their own allegations, Plaintiffs now attempt to backtrack and minimize those very same interactions. This attempt fails.

None of the Opposition's mischaracterizations of the Cookie Banner carry weight. First, according to the Opposition, "[t]he Cookie Banner articulated no means by which to affirmatively reject Defendant's Terms." Opp'n 6. This argument ignores the fact that Plaintiffs voluntarily visited the Website, where the Cookie Banner disclosed to Plaintiffs the use of cookies and the legal significance of interacting with the banner. *See* Mot. at 8. If Plaintiffs wished not to be bound by the Terms through the Cookie Banner, they could have closed the Website. They did not and instead did the opposite. *See Loewen v. Lyft, Inc.*, 129 F. Supp. 3d 945, 957 (N.D. Cal. 2015) (finding that plaintiff could not "claim surprise with respect to . . . the arbitration clause . . . where they . . . assented to the terms of the TOS by clicking 'I agree' on the Lyft App"). They clicked "Necessary Cookies Only" and continued to browse the Website after being informed that doing so constituted acceptance to the Terms. *See* Compl. ¶¶ 15–17. Second, the Opposition contends the Cookie Banner "more closely resembles browsewrap than sign-in wrap" because of the banner's "form and function." Opp'n 6. According to the Opposition, a browsewrap agreement "offers terms disclosed only through a hyperlink, with the user supposedly manifesting assent to those terms simply by continuing to use the website, as in Defendant's Cookie Banner" and requires "[n]o affirmative action . . . by the user other than the use of the website itself." *Id.*

Though "there is no bright-line rule that browsewrap agreements are not enforceable," *Penning v. NVIDIA Corp.*, 2026 WL 1433313, at *8 (N.D. Cal. May 21, 2026), Plaintiffs' argument overlooks both critical features of the banner and Plaintiffs' allegations. Unlike traditional browsewrap agreements where a website simply links a hyperlink to the Terms and "the user supposedly manifests assent to those terms simply by continuing to use the website" (*id.*), the Cookie Banner specifically informs Website visitors (like Plaintiffs) that by clicking the "Necessary Cookies Only" button (or other buttons) they "accepted and agree" to the Terms. *See* Compl. ¶¶ 2, 46, 51. Plaintiffs did not merely open the Website and browse it while a hyperlink to the Terms was buried in the Website's footer or provided in the Cookie Banner with no

language explaining how visitors can agree to and accept the Terms. Instead, Plaintiffs each allege that they "engaged with the cookie consent mechanism and declined all non-essential cookies" on multiple occasions. *Id.* ¶¶ 15–17. This allegation is fatal to their browsewrap argument.

Indeed, Plaintiffs' allegations spell out the exact "traditional principles of 'offer' and 'acceptance'" their Opposition discusses. Opp'n 7. The Cookie Banner's language offered Plaintiffs the ability to use the Website with "Necessary Cookies Only" and invited Plaintiffs to use the Website as such so long as they agreed to the Terms. Then, each Plaintiff took a quintessential affirmative act of acceptance: clicking a labeled button on a persistent banner that expressly informed them that their click constituted acceptance. Put simply, Plaintiffs "sign[ed] up to use an internet . . . service" (using the Website without non-necessary cookies by clicking the "Necessary Cookies Only" button). *Berman v. Freedom Fin. Network, LLC*, 30 F.4th 849, 865 (9th Cir. 2022). "[T]he sign-up screen state[d] that acceptance of a separate agreement is required before the user can access the service" because in order to use the Website as Plaintiffs desired, they needed to agree to, *inter alia*, the Terms. *Id.* at 865–66, 869. Therefore, Plaintiffs agreed to, at minimum, a sign-in wrap agreement. *Chabolla v. ClassPass Inc.*, 129 F.4th 1147, 1154 (9th Cir. 2025) ("[A] sign-in wrap lives somewhere in the middle: the website provides a link to terms of use and indicates that some action may bind the user but does not require that the user actually review those terms."); *Berman*, 30 F.4th at 868.

Plaintiffs' authorities do not compel a different result. The Opposition attempts to analogize the Cookie Banner to the notices in *Berman* and *Sellers v. JustAnswer LLC*, because those notices did not put reasonably prudent users on constructive notice of the websites' terms. But *Berman* and *Sellers* only help Ace here. Neither *Berman* nor *Sellers* found the website notices at issue constituted browsewrap agreements. First, *Sellers* noted that "[w]e agree this case involves a sign-in wrap agreement" when the notices at issue disclosed that taking a further action manifested assent to the defendant's terms and privacy policy. *See Sellers v. JustAnswer LLC*, 73 Cal. App. 5th 444, 465 (2021). Meanwhile, the *Berman* court noted that, like Ace, "Defendants also do not argue that merely *accessing* the websites constitutes agreement to the terms of use,

so their sites do not use browsewrap." 30 F.4th at 868. "Instead, defendants argue that their sites' terms and conditions, including mandatory arbitration, are enforceable because of the sites' notices that consumers agree to those provisions." *Id.* These sites therefore employ sign-in wrap under *Sellers.* These cases confirm the Cookie Banner is not a browsewrap agreement.

Plaintiffs' attempt to distinguish *Lakes* is also unavailing. First, after describing the *Lakes* cookie banner as "materially distinguishable" (*see* Opp'n 7), the Opposition immediately concedes that "the express mechanism by which a user affirmatively rejected tracking and assented to be bound in *Lakes* is ***virtually identical*** to the mechanism Defendant argues binds Plaintiffs to the Terms here: a button to manage cookie consent preferences and reject the sale and/or sharing of personal data." Opp'n 8 (emphasis added). Further, as the Opposition concedes, the Cookie Banner, like in *Lakes*, informed users about the legal significance of clicking a button in the cookie banner then subsequently using a website. *See Lakes v. Ubisoft, Inc.*, 777 F. Supp. 3d 1047, 1052 (N.D. Cal. 2025). Because the Cookie Banner appears persistently, a user can manifest assent to the Terms when they click "Necessary Cookies Only" and then continue to browse the Website, which is exactly what Plaintiffs allege here.

### B. The Cookie Banner Provided Plaintiffs Reasonably Conspicuous Notice of the Terms.

Ace has satisfied its burden of showing that the Cookie Banner provided "reasonably conspicuous notice" of the Terms and clearly instructed users like Plaintiffs about how to "unambiguous[ly] manifest[] . . . assent." *Oberstein v. Live Nation Ent., Inc.*, 60 F.4th 505, 514 (9th Cir. 2023). Ace has satisfied that burden, and the Cookie Banner easily satisfies the inquiries Plaintiffs' Opposition describes.

#### 1. The Terms Appear Separate and Distinct from the Website's Content.

The Cookie Banner conspicuously displayed the Terms and did so persistently in the bottom left quadrant of the Website. *See* Mot. 8–9; Wilder Decl. ¶¶ 6–7. The Opposition critiques the Cookie Banner and contends that it is "surrounded" by Website contents that clutters the banner's appearance in an attempt "to draw the user's attention away from the comparatively small Cookie Banner." Opp'n 10. But Plaintiffs' own evidence suggests otherwise. For one thing,

all Plaintiffs allege they saw and interacted with the banner. And as Exhibit A to the Jensen Declaration depicts, the banner does not appear as a narrow footer or header on the page, nor do Plaintiffs suggest that the banner vanishes at any point when a user refreshes the page. Plaintiffs also note that the ***white*** cookie banner appears against "***colorful*** graphics, advertisements, and purported deals." *Id.* (emphasis added). Plaintiffs cite no authority that requires a cookie banner to be a particular size or have certain dimensions. Indeed, no such authority exists. In any event, Plaintiffs' contentions in their declarations about the Cookie Banner being "smaller in size" than Exhibit A in Ace's Motion (*see* Decl. of Scott Pflaumer ¶ 5; Decl. of Hans Cummings ¶ 5; Decl. of Mark Rosenthal ¶ 5) offer no rebutting evidence about how the Cookie Banner ***they*** encountered (and still read) on the Website was "smaller in size."

Moreover, the notices in *Berman* and *Chabolla*, Plaintiffs' primary authorities, lack probative value. Unlike Ace's authorities discussed below, neither *Berman* nor *Chabolla* involved a pop-up cookie banner, let alone a cookie banner at all. In *Berman*, the defendant's notices of its Terms were "deemphasized by the overall design of the webpage, in which other visual elements draw the user's attention away from the barely readable critical text." *Berman*, 30 F.4th at 857. There, however, the Terms appeared in a significantly smaller font while couched between unrelated textual disclosures. *Id.* at 860. Meanwhile, in *Chabolla*, the three screens providing notice of the defendant's terms similarly appeared couched and surrounded by unrelated language. *See Chabolla v. ClassPass Inc.*, 129 F.4th 1147, 1165–69 (9th Cir. 2025). The Cookie Banner is not buried on the Website, and as Plaintiffs themselves note, the surrounding materials are "similarly sized," not larger in size. Opp'n 10.

Additionally, Plaintiffs' critiques of this Court's decision in *LinkedIn* fall flat. First, the Cookie Banner is even more conspicuous than the banner in *LinkedIn*: it is larger in size, uses bolded, blue, capitalized text to display the Terms link, requires an affirmative button click, "continues to appear on a user's screen as they scroll down the Website page," and persists on a user's screen until the user acts. *See* Wilder Decl. ¶ 6. None of these factors appeared in *LinkedIn*, and they only strengthen the Cookie Banner's visual aspects here. Regardless, as the Opposition notes, this Court found there was "no surrounding clutter" (Opp'n 11) when the pop-up notice

appeared in front of various images containing marketing-related language. *L.B. v. LinkedIn Corp.*, 2025 WL 2899514, at *8 (N.D. Cal. Oct. 10, 2025) (Davila, J.). Therefore, the placement of the Cookie Banner weighs in Ace's favor.

**2. The Terms Appear Directly Above the "Necessary Cookies Only" Button.**

The Cookie Banner also satisfies the proximity inquiry. This inquiry asks whether the website operator placed the notice sufficiently close to the button the user must click to signal acceptance. Here, the Cookie Banner's text and link to Terms appear ***directly above*** the "Necessary Cookies Only" button. *See*, e.g., Compl. ¶ 2. It does not appear after the buttons, nor does it appear distanced from the "Necessary Cookies Only" button through any other means. This is the same type of positioning that the Ninth Circuit has found weighs in favor of reasonably conspicuous notice. *See Morrison v. Yippee Ent., Inc.*, 2025 WL 2389424, at *1 (9th Cir. Aug. 18, 2025) ("The hyperlink was also located directly above the "Start subscription" button—precisely where a user would expect it within the natural visual path of completing the subscription process.").

Plaintiffs' Opposition essentially concedes this point, noting "the proximity of the Terms to the action buttons may appear to favor notice." Opp'n 11. Unable to rebut this appearance, the Opposition resorts to the critique "[t]he Terms [Ace] seeks to enforce were located immediately above the 'Accept All Cookies' button, but insulated away from the 'Necessary Cookies Only' and 'Manage Choices' buttons." *Id.* But this argument conveniently omits the "Necessary Cookies Only" button appearing directly below the "Accept All Cookies" button in the same exact size and formatting. *See, e.g.*, Compl. ¶ 2.

Plaintiffs' reliance on *Chabolla* is of no moment. Plaintiffs cite *Chabolla* for the proposition that a "user might miss the proposal [i.e., the Terms link] because it fell below the Facebook button," which, purportedly, "is true here." Opp'n 12 (citing *Chabolla*, 12 F.4th at 1157). This misleading statement fails to take into account that the link to the Terms on the web page the court was discussing linked to the defendant's terms ***below*** the "Continue" and "Sign up with Facebook" buttons. *See Chabolla*, 12 F.4th at 1157, 1166. Here, to the contrary, the Cookie

Banner displays the Terms ***above*** both the "Accept All Cookies" and "Necessary Cookies Only" buttons. *See, e.g.*, Compl. ¶ 2. In other words, the user encounters the text disclosing the Terms ***before*** reaching and interacting with the buttons.

Lastly, Plaintiffs argue that "[a]n objectively reasonable user of the Website would not suspect that choosing to affirmatively reject the sale and/or sharing of their personal data by 'Necessary Cookies Only' or 'Manage Choices' would constitute an offer/acceptance binding them to a contractual relationship." Opp'n at 12. The banner's plain text directly refutes this assertion and renders inapposite Plaintiffs' authorities. *See discussion infra* Section III.B.ii.

**3. The Terms Are Distinct from the Rest of the Cookie Banner's Text.**

As Ace established in its Motion, the Terms are distinct from the rest of the Cookie Banner's text in multiple regards. In particular, the Terms: (1) are bolded; (2) appear in blue text; (3) appear in capitalized letters; and (4) appear in underlined text. *See, e.g.*, Compl. ¶ 2. The Opposition does not acknowledge any of these features. Critically, it is these very features that courts have found sufficient to put users on reasonable notice of an agreement. *See Gill v. Chipotle Mexican Grill, Inc.*, 2025 WL 287320, at *4 (C.D. Cal. Jan. 23, 2025) (collecting cases and noting that "when courts conclude hyperlinks are reasonably conspicuous, courts regularly highlight the fact that hyperlinks were in a different color than surrounding text, or in all capital letters"). Indeed, the Ninth Circuit found reasonably conspicuous notice in *Oberstein* and *Keebaugh*, and Ace's notice is even more prominent than in those cases. *See Oberstein*, 60 F.4th 505, 516–17 (9th Cir. 2023) (hyperlink was conspicuous where it was only "marked in bright blue font" without underlining or bolding); *Keebaugh v. Warner Bros. Ent. Inc.,* 100 F.4th 1005, 1021 (9th Cir. 2024) (hyperlink in "a contrasting" font color without blue font, bolding, or underlining); *see also Ghazizadeh v. Coursera, Inc.*, 737 F. Supp. 3d 911, 928 (N.D. Cal. 2024) (finding sign-up screen reasonably conspicuous when terms were bolded even though "Coursera could have used underlining, blue coloring, all capital letters, or a larger font").

The Opposition does not controvert Ace's evidence and simply deflects. Plaintiffs argue "the blue lettering '<u>TERMS OF USE</u>' is buried at the bottom of a paragraph of text in the same size and style font on a small Cookie Banner on a cluttered webpage meant to draw users'

attention *away* from the Terms." Opp'n 13. But the Terms' bold, underlined, capitalized appearance directly refutes this assertion, erasing any notion that they are "buried" in the Cookie Banner and only serves to distinguish the Terms from the rest of the Cookie Banner's language. For these same reasons, *Berman* purportedly "dictat[ing] that mere underlining of a hyperlink in the face of a cluttered webpage is insufficient to beget constructive notice" is of no moment. *Id.*

Accordingly, Plaintiffs' arguments are not persuasive.[1]

**C. The Context of Plaintiffs' Transactions Supports Notice.**

Further, the context of Plaintiffs' repeated visits to the Website and Plaintiffs' allegation evince the context of Plaintiffs' transactions would put a reasonable consumer on notice.[2] "[T]he context of the transaction is a non-dispositive factor under California law, used to evaluate whether a website's notice is sufficiently conspicuous." *Keebaugh*, 100 F.4th at 1019. Nevertheless this factor weighs in favor of reasonably conspicuous notice.

Each Plaintiff alleges that when they visited the Website, they "engaged with the cookie consent mechanism and declined all non-essential cookies, ***relying on [Ace's] representations*** that such selection would disable marketing and tracking technologies" and then browsed the Website. Compl. ¶¶ 15–17 (emphasis added). In other words, Plaintiffs allege that: (1) they visited the Website; (2) reviewed the Cookie Banner's language; (3) selected "Necessary Cookies Only" in the Cookie Banner; and (4) browsed the Website. Plaintiffs Pflaumer and Cummings allege they engaged in this conduct during multiple Website visits. *See id.* ¶¶ 15–16. Overall, Plaintiffs premise the entirety of their Complaint on their purported interactions with, and review of, the Cookie Banner and its statements. *See id.*

In light of these claims, when analyzing the context of Plaintiffs' transactions, "the Court

---

[1] Because Plaintiffs were on reasonably conspicuous notice of the Terms, they were similarly on notice of the Terms' provisions, including the choice of law, class action waiver, and delegation clause provision.

[2] The context of Plaintiffs' site visits weighs in favor of this inquiry whether conveyed as a standalone inquiry or as the "fourth question" posed in Plaintiffs' Opposition. *See* Opp'n 13–14.

must also take into account [p]laintiff[s'] admissions that [they] made repeat visits to the Website and that [they] "viewed [d]efendant's representation on the popup cookie banner." *NVIDIA*, 2026 WL 1433313, at *11. Analyzing identical allegations, the court in *NVIDIA* reasoned that the plaintiff "admit[ted] he actually saw not only the cookie banner but the cookie advisal within the banner," and "[t]here is no reason why a reasonable consumer like [p]laintiff should have noticed one advisal but not the other." *Id.* at *10. So too here. Plaintiffs visited the Website and do not allege that they ignored or overlooked the Cookie Banner. They allege the exact opposite and attempt to assign liability for purportedly not honoring the same Cookie Banner's language that contains the Terms. Plaintiffs cannot have it both ways. A reasonable consumer like Plaintiffs cannot selectively be on notice of some—but not all—of the Cookie Banner's advisal. That is particularly true for Plaintiffs Cummings and Rosenthal, who each maintain active Ace Rewards accounts (despite their allegations against Ace). Compl. ¶¶ 16–17. Therefore, the context of this transaction similarly demonstrates that a reasonable user would expect to consent to the Terms.

### D. Plaintiffs Cummings and Rosenthal's Additional Interactions with Ace Provide Independent Bases for Assent.

The Wilder Declaration establishes that Cummings and Rosenthal also accepted the Terms through account creation and maintenance and Cummings' purchases. (Wilder Decl. ¶ 23.) Plaintiffs protest that the Wilder Declaration lacks sufficient evidence of the sign-up flow but fails to offer any evidence from Plaintiffs—including in their declarations—that Plaintiffs did not encounter and agree to the Terms during these processes. As "[t]he party seeking to compel arbitration," Ace "bears 'the burden of proving the existence of an agreement to arbitrate by a preponderance of the evidence.'" *Kakalia v. BMO Bank N.A.*, 2026 WL 1004952, at *1 (C.D. Cal. Mar. 17, 2026) (quoting *Norcia v. Samsung Telecoms. Am., LLC*, 845 F.3d 1279, 1283 (9th Cir. 2017)). To assess whether Ace satisfied this burden, the Court need only compare Ace's evidence to Plaintiffs'. *See Porter v. McGrath*, 2006 WL 734944, at *20 (E.D. Cal. Mar. 23, 2006) ("Preponderance of the evidence means evidence that has more convincing force than that opposed to it."). Ace has provided the necessary evidence, and Plaintiffs have not rebutted it with any evidence whatsoever.

## III. PLAINTIFFS FAIL TO IDENTIFY ANY UNENFORCEABLE OR UNCONSCIONABLE PROVISIONS.

Unable to rebut Ace's evidence of Plaintiffs' notice to the Terms, the Opposition resorts to challenging the Terms' delegation clause, arbitration provision, and class action waiver. *See* Opp'n 16–23. For the following reasons, these attempted attacks all fail.

### A. The Terms Delegate Arbitrability by Incorporating the AAA Consumer Rules.

Plaintiffs' attacks on the Terms' delegation language—and their contention that there is no delegation clause—fall flat. Ace's Dispute Resolution Terms have at all relevant times called for the application of the AAA Consumer Rules. It is well-settled "that incorporation of the AAA arbitration rules 'constitutes clear and unmistakable evidence that the parties agreed to arbitrate arbitrability.'" *Diaz v. Intuit, Inc.*, 2017 WL 4355075, at *3 (N.D. Cal. Sept. 29, 2017) (Davila, J.) (citation omitted). The Dispute Resolution Terms expressly provide that arbitration is commenced by filing a demand with the AAA and that the "AAA Consumer Rules" govern. Wilder Decl. ¶¶ 21–22, Exs. D & E. In turn, Rule R-7(a) of the AAA Consumer Rules provides that "[t]he arbitrator shall have the power to rule on their own jurisdiction, including any objections with respect to the existence, scope, or validity of the arbitration agreement or the arbitrability of any claim or counterclaim." *Mcmillon v. Bridgecrest Acceptance Corp.*, 2025 WL 2631617, at *5 (C.D. Cal. Aug. 13, 2025); *Flynn v. Nat'l R.R. Passenger Corp.*, 2026 WL 1252630, at *6 (E.D. Pa. May 7, 2026) (same). And Rule R-7(b) provides "[t]he arbitrator shall have the power to determine the existence or validity of a contract of which an arbitration clause forms a part. Such an arbitration clause shall be treated as an agreement independent of the other terms of the contract. A decision by the arbitrator that the contract is null and void shall not, for that reason alone, render invalid the arbitration clause." *Id.*

Accordingly, the Opposition fails to override Plaintiffs' and Ace's agreement to resolve disputes in arbitration in accordance with the AAA Consumer Rules and delegate questions of arbitrability to an arbitrator.

### B. The Arbitration Provision Is Not Unconscionable.

Even assuming the Court reaches the unconscionability analysis, Plaintiffs cannot meet

their burden. Under California law, both procedural *and* substantive unconscionability must be present, evaluated on a sliding scale. *Armendariz v. Found. Health Psychcare Servs.*, 99 Cal. Rptr. 2d 745, 767 (2000). Plaintiffs cannot establish either.

First, Plaintiffs rest their procedural unconscionability argument on the assertion that the Terms are a contract of adhesion under California and Illinois law. *See* Opp'n 17–19. As a threshold matter, "without more, an adhesion contract 'gives rise to a low degree of procedural unconscionability at most.'" *Denson v. Keplr Vision, LLC*, 2021 WL 3419237, at *3 (S.D. Cal. Aug. 5, 2021) (citation omitted). Regardless of the application of Illinois or California law, the result is the same. Plaintiffs do not allege or argue that they were unaware of the Terms or their arbitration clause. In fact, they aver the opposite by including multiple images of the Cookie Banner in their Complaint that conspicuously linked to Ace's Terms. *See, e.g.*, Compl. ¶ 2. What's more, the second paragraph of Ace's Terms explicitly informs users, in all capitalized, bold letters, that agreeing to the Terms means agreeing to, *inter alia*, an arbitration clause. *See* Wilder Decl. Exs. B, at 1, C, at 2. The arbitration clause is far from "artfully hidden." Opp'n 19. In any event, nowhere do Plaintiffs contend that they experienced "difficulty to find, read, or understand" the Terms. Opp'n 19. As such, Plaintiffs' procedural unconscionability argument falls flat.

Second, Plaintiffs' substantive unconscionability argument fares no better. The Opposition appears to focus its substantive unconscionability argument exclusively on the Dispute Resolution Terms' Mass Arbitration provision. *See* Wilder Decl., Exs. D, at 3, E, at 3. In a clear effort to tee up a future mass arbitration should the Court grant Ace's Motion, Plaintiffs challenge a provision that they have not triggered and simply cannot trigger as three named plaintiffs (rather than 25 or more). Plaintiffs' arbitrations will not be arbitrated according to those terms unless and until Plaintiffs attempt to join a mass arbitration, and there is no basis in the record currently before the Court to support that conclusion.

Moreover, Plaintiffs' critiques of the mass arbitration clause are unavailing. Plaintiffs take issue with the structure of the mass arbitration and state that the Dispute Resolution Terms "do not define the term 'claim,' but impose temporal requirements and admit the possibility of delayed adjudication based on Defendant's unilateral determination as to what 'claims' are

'similar.'" Opp'n 20. But this critique ignores the Mass Arbitration provision's bilateral structure (which Plaintiffs cite in their Opposition) through which claimants and Ace would each select certain numbers of claims ***per side*** and proceed with individual arbitrations as to those claims. *See* Wilder Decl., Exs. D, at 3, E, at 3. Nothing about this process assigns Ace exclusive control—or even a majority of the control—over the claims selection process.

Plaintiffs also speculate Ace "has sole discretion with respect to the triggering of mass arbitration procedures and the staging process." Opp'n 20. Plaintiffs' main support for this assertion is that "[Ace] maintains control over whether the claims have been resolved through global mediation." *Id.* But this overlooks the plain text of the provision the Opposition quotes elsewhere, that "the parties ***shall*** promptly engage in a global mediation session of all remaining claims." Wilder Decl., Exs. D, at 3, E, at 3 (emphasis added). This language is not permissive, and the global mediation requires Ace's participation.

Temporally, the Opposition engages in similarly misleading remarks. It contends that the claims of the "Nationwide Class" "would yield a total of 45,000 claims" (Opp'n 20), ignoring the fact that non-California residents would be foreclosed from even asserting the Complaint's five causes of action (i.e., the majority of the claims), which sound in California law. The Opposition's claim that resolving each individual's claim "would require approximately 228 stages of arbitration" is also misleading. Opp'n 21. This claim overlooks Section 4 of the Mass Arbitration provision, which provides clear instructions about how individuals may opt out of the Mass Arbitration and adjudicate their claims in court following the first three stages. *See* Wilder Decl. Exs. D, at 4, E, at 4. This inherently forecloses the possibility that anyone must subject their claims to an indefinitely long resolution period of time, such as the "114 years" about which the Opposition cries wolf. Opp'n 21.

Plaintiffs' reliance on *Heckman*, *Rios*, and *Kinkel* does not change this result. *Heckman* involved a batch arbitration procedure that structured the arbitration as a representative class action and did not include an opt-out provision like the one here. *Cf. Heckman v. Live Nation Ent., Inc.,* 120 F.4th 670, 677–80 (9th Cir. 2024), *cert. denied*, 146 S. Ct. 96, 223 L. Ed. 2d 10 (2025) ("It is not until after the settlement conference ***that plaintiffs can finally argue for***

***removal*** from the mass arbitration." (emphasis added)). In *Rios v. HRB Digital LLC*, though the mass arbitration provision contained an opt out clause, "[u]sers who opt out, however, [were] still subject to any prior arbitration agreements entered into with HRB." 807 F. Supp. 3d 975, 981 (N.D. Cal. 2025). And *Kinkel v. Cingular Wireless LLC* did not even address these temporal unconscionability concerns. *See generally* 857 N.E.2d 250, 267 (Ill. App. 2006). Accordingly, Plaintiffs' temporal critiques of the Mass Arbitration provision are incorrect and not premised on the actual terms of that provision.

Further, the Opposition claims that the Mass Arbitration provision confuses consumers about where to file their individual claims. Plaintiffs claim that "[Ace's] Dispute Resolution Terms prime consumers to expect individual arbitration, but then funnel any 'similar claims,' without defining the term, into a dispute resolution framework that substantially deviates from the characteristics of individual arbitration." Opp'n 22. This argument ignores that the Dispute Resolution Terms also inform individuals about the possibility of mass arbitration through the Mass Arbitration provision. *See* Wilder Decl. Exs. D, at 3–4, E, at 3–4. It also overlooks that the Mass Arbitration Terms do not batch claims on a representative class basis and instead specify that disputes shall proceed "in individual arbitrations." *See* Wilder Decl. Exs. D, at 3, E, at 3. The Opposition cites no authority finding a mass arbitration clause substantively unconscionable when the provision provided a different arbitration provider to administer mass arbitration proceedings. Plaintiffs' sole authority for this argument, *OTO, L.L.C. v. Kho*, did not even address this issue. *See generally OTO, L.L.C. v. Kho*, 447 P.3d 680, 694 (Cal. 2019).

Finally, even if this Court found any portion of the Mass Arbitration provision unconscionable or unenforceable, the Mass Arbitration provision's severability clause upholds the balance of the provision. It provides:

> If any part of this Mass Arbitration provision is deemed to be invalid, unenforceable or illegal, or otherwise conflicts with JAMS's rules, then the balance of this Mass Arbitration provision shall remain in effect and shall be construed in accordance with its terms as if the invalid, unenforceable, illegal or conflicting provision were not contained herein unless the lack of such provision would lead this Mass Arbitration provision to fail of its essential purpose.

*See* Wilder Decl. Exs. D, at 4, E, at 4.

Accordingly, Plaintiffs' attacks on the Mass Arbitration provision fail.

**C. The Class Action Waiver is Enforceable.**

Lastly, Plaintiffs attempt to invalidate the Dispute Resolution Terms' class action waiver because the waiver allegedly bars public injunctive relief. This argument should be made to the arbitrator, not to this Court, for the reasons stated above. But even if the Court reaches this issue and finds this language unenforceable, the Dispute Resolution Terms specify that "in the event this arbitration agreement is held to be unenforceable for any reason, the prohibitions on class and representative actions and non-individualized relief set forth in this paragraph are severable and shall apply to any claim between you and Ace in any forum." Wilder Decl., Ex. D, at 2, E, at 2. Thus, if the Court found the public injunctive relief language unenforceable for any reason, the Dispute Resolution Terms confirm that the prohibition on class and representative actions would remain.

## IV. PLAINTIFFS DO NOT OPPOSE A STAY OF PROCEEDINGS.

As Ace's Motion explained (Mot. at 12), Section 3 of the Federal Arbitration Act requires that a court "shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement, providing the applicant for the stay is not in default in proceeding with such arbitration," so long as the court is "satisfied that the issue involved in such suit or proceeding is referable to arbitration under such an agreement." 9 U.S.C. § 3 (emphasis added); *Tillman v. Tillman*, 825 F.3d 1069, 1075 (9th Cir. 2016).

The Opposition does not oppose Ace's arguments about staying this lawsuit and has therefore waived its ability to do so. *See Hartranft v. Encore Capital Grp., Inc.*, 543 F. Supp. 3d 893, 913 (S.D. Cal. 2021) ("[W]here a non-moving party fails to address an argument raised by the moving party in the opposition brief, the Court may consider any arguments unaddressed by the non-moving party as waived.").

## V. CONCLUSION.

For the foregoing reasons, Ace respectfully requests that the Court compel Plaintiffs'

claims to arbitration and stay this action pending the outcome of the arbitration.

Dated: June 30, 2026

DLA PIPER LLP (US)

By: /s/ *David Horniak*
David Horniak

*Attorneys for Defendant*
Ace Hardware Corporation